IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE No.

CARLOS EDUARDO MARRÓN; JANE DOE;　　　　　**COMPLAINT**
C.R., A MINOR; and S.A., A MINOR,

      Plaintiffs,　　　　　　　　　　　　　　　**JURY TRIAL**
　　　　　　　　　　　　　　　　　　　　　　**DEMANDED**
vs.

NICOLAS MADURO MOROS;
FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA ("FARC");  THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; TAREK WILLIAM
SAAB; and TARECK EL AISSAMI,

      Defendants.
_____/

1

## TABLE OF CONTENTS

Page

INTRODUCTION ................................................................................................ 4

PARTIES ............................................................................................................. 9

JURISDICTION AND VENUE ........................................................................ 14

FACTUAL ALLEGATIONS ............................................................................ 22

    I.       BACKGROUND ..................................................................... 22

         A.     The Marrón Family ................................................... 22

         B.     The Maduro Regime .................................................. 23

             1.     Maduro's Illegitimate Authoritarian Control over
Venezuela. .............................................................. 23

             2.     The Maduro Regime's Anti-Americanism ................. 25

         C.     The Cartel of the Suns ............................................... 26

         D.     The FARC .................................................................. 27

         E.     The Maduro Criminal Enterprise and the Maduro Criminal
Conspiracy ............................................................... 28

             1.     The Maduro Criminal Enterprise's Narcotics Trafficking
and Narco-Terrorism ............................................... 30

             2.     The Maduro Criminal Enterprise's Material Support for
FARC Terrorism, Including Against the United States and
Its Citizens. ............................................................. 36

             3.     The Maduro Regime's Terrorism Against the Civilian
Population of Venezuela. .......................................... 38

                 i.     Overview ...................................................... 38

                ii.     The DGCIM .................................................. 40

                iii.     The "Playbook" for Oppressing Political Prisoners ......... 41

             4.     Kleptocracy and Corruption ...................................... 43

                 i.     Currency Control Scams ................................. 43

                ii.     Bribery to Obtain Payments from PDVSA. ...................... 45

             5.     Money Laundering ................................................... 46

                 i.     Proceeds of Currency Control Scams Received by
Members of the Maduro Criminal Enterprise. ................. 46

                ii.     Proceeds of Bribery Received by Members of the
Maduro Criminal Enterprise. ........................................ 47

        iii.     Proceeds of Narcotics Trafficking Received by Members of the Maduro Criminal Enterprise. ................ 48

II.    THE MADURO CRIMINAL ENTERPRISE'S CRIMES AGAINST MR. MARRÓN AND HIS FAMILY ................................................................ 51

    A.    The DGCIM Kidnapping and Torture of Mr. Marrón's Father. ............... 51

    B.    The DGCIM Kidnapping of Mr. Marrón. .................................................. 52

    C.    The Maduro Regime Brings Bogus Charges Against Mr. Marrón and Defames Him. ............................................................................... 52

    D.    The Maduro Regime's Detention and Horrific Torture of Mr. Marrón. .................................................................................................. 57

    E.    The Maduro Criminal Enterprise Tortures and Abuses Mr. Marrón's Father and Stepmother. ............................................................. 61

    F.    The Maduro Criminal Enterprise's Acts of Robbery, Bank Fraud, Money Laundering, Extortion and Kidnapping in Miami. ..................... 62

    G.    Escape and Rescue ..................................................................................... 65

    H.    Additional Injuries to Mr. Marrón. ........................................................... 66

    I.    Additional Injuries to Jane Doe, S.A. and C.R. ....................................... 67

    J.    Injuries to Business and/or Property. ........................................................ 68

COUNT I VIOLATION OF THE FEDERAL ANTI-TERRORISM ACT, 18 U.S.C. § 2333 (BY JANE DOE, C.R., AND S.A.) ........................................................... 69

COUNT II VIOLATION OF THE FLORIDA ANTI-TERRORISM ACT, FLA. STAT. § 772.13 (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS) ............................. 75

COUNT III FEDERAL CIVIL RICO, 18 U.S.C. § 1964(C) (BY PLAINTIFFS JANE DOE AND MR. MARRÓN AGAINST MADURO AND THE INDIVIDUAL DEFENDANTS) .................................................................................................... 83

COUNT IV CONSPIRACY TO VIOLATE FEDERAL CIVIL RICO, 18 U.S.C. § 1962(D) (BY JANE DOE AND MR. MARRÓN AGAINST MADURO AND THE INDIVIDUAL DEFENDANTS) ................................................................ 89

COUNT V DEFAMATION *PER SE* (BY MR. MARRÓN AGAINST ALL DEFENDANTS) .................................................................................................... 91

COUNT VI CONSPIRACY  (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS) ....... 92

COUNT VII FALSE IMPRISONMENT  (BY MR. MARRÓN AGAINST ALL DEFENDANTS) .................................................................................................... 93

COUNT VIII INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS  (BY ALL PLAINTIFFS AGAINST ALL DEFENDANTS) .......................................... 93

PRAYER FOR RELIEF ................................................................................................. 94

## COMPLAINT

Plaintiffs, by and through counsel, bring this action seeking damages for the kidnapping, over two years of arbitrary detention, and repeated torture of Carlos Eduardo Marrón ("Mr. Marrón"), as well as the theft of Mr. Marrón's life savings from his U.S. bank accounts, the destruction of Mr. Marrón's Miami businesses, and the untold hardship to Mr. Marrón's family, by Nicolás Maduro Moros ("Maduro"), the unlawful apparatus through which Maduro and his deputies control Venezuela (the "Maduro Regime"), and their narco-terrorist co-conspirators.

## INTRODUCTION

1.    Over the last decade, Maduro and his criminal collaborators have looted Venezuela's treasury, partnered with Colombian narco-terrorists Fuerzas Armadas Revolucionarias de Colombia ("FARC") to traffic in cocaine into the United States by the ton, and laundered the ill-gotten gains through the United States and elsewhere, all while simultaneously plunging Venezuela into a humanitarian crisis of epic proportions, marked by starvation, malnutrition, hyperinflation, and the mass exodus of Venezuelan citizens.

2.    The lynchpin of this sprawling criminal enterprise and its rich bounty is Maduro's grip on authoritarian control over Venezuela.  As the United Nations explains, "[a]s the opposition has been debilitated, the executive [branch with Maduro at the helm] has taken on increasingly expansive powers."[1]  But for Maduro's dictatorial power, he and his co-conspirators would have no platform from which to raid Venezuela's coffers with impunity and no mantel of

---

[1] *See* U.N. Human Rights Council [UNHRC], Detailed Findings of the Independent International Factfinding Mission on the Bolivarian Republic of Venezuela, ¶ 133, U.N. Doc. A/HRC/45/CRP.11 (Sept. 15, 2020) ("UNHRC Detailed Findings"), available at https://www.ohchr.org/Documents/HRBodies/HRCouncil/FFMV/A_HRC_45_CRP.11.pdf.

"governmental" protection to shield them from prosecution in the United States, where Maduro and many of his comrades are wanted for flooding the United States with illegal narcotics.

3.      The Maduro Regime maintains its unlawful control over the Venezuelan state through its terrorist suppression of Venezuela's civilian population, including through the routine kidnapping, torture, and murder of those who express criticisms that the Maduro Regime wishes to silence or who share information the Maduro Regime wishes to conceal.

4.      The Maduro Regime, FARC, and Cartel of the Suns are engaged in a mutually-reinforcing cycle of criminal conduct.  The FARC and Cartel of the Suns perform important services for the Maduro Regime.  During a time when Venezuela's access to the international banking system is severely limited by U.S. sanctions and the Venezuelan Bolivar is essentially worthless, they bring foreign hard currency into Venezuela from their narcotics smuggling and distribution efforts in Florida and other states.  They also act as a paramilitary force that can do the Maduro Regime's "dirty work" while maintaining some plausible deniability for the regime.

5.      In turn, the Maduro regime provides important service for the FARC and Cartel of the Suns.  In exchange for a cut of the hard currency flowing into Venezuela from those narco-terrorist groups, the Maduro Regime gives them material support in the form of safe haven and access to state-controlled corporations and banks through which the FARC and Cartel of the Suns can launder the ill-gotten proceeds of their narco-terrorism.

6.      To keep the Venezuelan people from knowing the truth—that their supposed leader is illegitimate, in bed with narco-terrorists, and stealing billions of dollars from the country—the Maduro Regime promotes a counterfactual alternative narrative.  In that narrative, Venezuela's economic woes are not caused by Maduro's avarice and corruption, but rather the Venezuelan economic tragedy is due to the  "United States of America [taking actions] . . . aimed to destroy

the country's economy and to set back all the great advances obtained regarding rights in the last two decades in favor of our people."[2]

7.     The members of this criminal syndicate do not tolerate prominent Venezuelans telling the truth about what is going on in their country.  Such whistleblowers are marked for retribution, kidnapping, torture, and murder.

8.     Much of the free speech that the Maduro Regime finds objectionable originates from the United States.  In 2018, for example, a website owned by Mr. Marrón—a lawful permanent resident of the United States, residing in Miami, Florida—began to publish information that illuminated cracks in the Maduro Regime's "utopian" communist economy.

9.     Among other things, Mr. Marrón's website published the true, free market exchange rate between Venezuela's currency and U.S. dollars—a rate far different from Venezuela's official exchange rate that artificially inflated the value of the Venezuelan currency (the bolívar[3]).  Mr. Marrón's website was, therefore, an embarrassment to the Maduro Regime. And, because Maduro and his colleagues were engaged in a variety of phenomenally profitable scams based on Venezuela's bogus official exchange rate, the Maduro Regime was hyper-sensitive about the true exchange rate.

10.     Although  Mr.  Marrón  was  physically  in  Miami  (1,367  miles  from  Caracas, Venezuela)  and  his  website  was  protected  by  the  right  to  free  speech  enshrined  in  the  U.S. Constitution,  Mr.  Marrón's  elderly  parents  still  lived  in  Venezuela.   On  April  10,  2018,

---

[2] *See* UNHRC, Report of the Independent Expert on the promotion of a democratic and equitable international order on his country visit to the Bolivarian Republic of Venezuela: Comments by the State, ¶ 42(i), U.N. Doc. A/HRC/39/47/Add.2 (Sept. 7, 2018) ("UNHRC Venezuelan Response to Expert Report"), available at A_HRC_39_47_Add.2 (1) (unwatch.org).

[3] Prior to August 20, 2018, the official currency was the bolívar fuerte ("strong bolívar," or VEF) and after August 20, 2018, the official currency was the bolívar soberano ("sovereign bolívar" or VES).

Venezuela's General Directorate of Military Counterintelligence ("DGCIM")—a unit of the Venezuela security apparatus loyal to Maduro and notorious for arresting and torturing Maduro's political opponents—kidnapped Mr. Marrón's father.[4]

11.     When Mr. Marrón learned that his father had been kidnaped, Mr. Marrón immediately purchased a ticket and flew from Miami to Caracas to help negotiate for his father's release, just as the DGCIM had hoped he would.  When Mr. Marrón reached immigration at Simón Bolivar International Airport on April 11, 2018, armed DGCIM agents, who had been lying in wait until immigration reported Mr. Marrón's arrival to them, kidnapped Mr. Marrón and took him to their headquarters in Caracas.

12.     The DGCIM released Mr. Marrón's father a few days after they kidnapped Mr. Marrón, but the DCGIM did not tell Mr. Marrón that they had done so.  Instead, the DGCIM taunted Mr. Marrón, saying that they were "concerned" that his father would die in captivity without his medicine.  In fact, during the time the DGCIM held Mr. Marrón's father, the DGCIM tortured Mr. Marrón's father by forcing him into a wooden box for four days without light or food.

13.     The DCGIM held Mr. Marrón at its facilities for 21 months.  At the beginning, Mr. Marrón's family had no idea whether he even was alive.  Senator Marco Rubio tweeted:  "The families of . . . Carlos Marrón [and others], who are arbitrarily arrested by the #DGCIM, have the right to demand proof of life from their relatives."[5]

---

[4] A video of the kidnapping taken by a witness who, for safety reasons, has not self-identified, is available online at  https://www.infobae.com/america/venezuela/2019/09/29/la-estrategia-de-la-inteligencia-chavista-para-doblegar-y-chantajear-a-sus-adversarios-politicos/  as well as on YouTube, https://www.youtube.com/watch?v=hPMpJv7BzqQ.

[5] *See* Marco Rubio (@SenRubioPress), Senator Rubio Press on Twitter: "Las familias del Coronel Luis De La Sotta, de Carlos Marrón, y de los Tenientes Coroneles Ruperto Molina y Marín Chaparro, que están arbitrariamente arrestados por la #DGCIM, tienen el derecho de exigir fe de vida de sus familiares." / Twitter (unofficial translation).

14.     During the 21 months that Mr. Marrón was in DGCIM custody, DCGIM agents subjected Mr. Marrón to a wide variety of torture.  Among other things, they beat Mr. Marrón with metal rebar, placed him in a hood filled with tear gas, and repeatedly subjected him to waterboarding.  And they crammed him into a tiny, unsanitary punishment cell, with other political prisoners, where there was no running water or toilet.  They served him rotted food infested with live insects.  Mr. Marrón  and the other prisoners were forced to defecate in plastic bags.  Mr. Marrón lost 66 pounds while in DGCIM custody.

15.     The DCGIM also forced Mr. Marrón to reveal the passwords for his U.S. financial accounts, including accounts at Bank of America, Wells Fargo, Citibank that Mr. Marrón had opened in Miami, Florida.  Then the DCGIM, using the passwords they had tortured from Mr. Marrón, electronically accessed his accounts and stole his life's savings, transferring Mr. Marrón's money first to Mr. Marrón's account at Coinbase, and then transferring cryptocurrency (e.g., Bitcoin) to their own wallets to cover their tracks.

16.     Not content with what they could steal from Mr. Marrón, DGCIM agents also began to contact Mr. Marrón's wife to extort money from her.  In a seemingly endless series of calls to Jane Doe's cell phone in Miami, DGCIM agents spoke directly to Jane Doe, threating to break Mr. Marrón's arms, poison him, or transfer him to a prison where he would be ill-treated and possibly killed, unless Jane Doe sent them money (or, at times, items from their "wish list").  Desperate, distraught, helpless, and increasingly dreading the ring of her own phone, Jane Doe repeatedly sent money to the DGCIM, frequently sending $5,000 to $20,000 at time.  It was money she and her children could ill-afford.

17.     The ordeal took a tremendous toll on Jane Doe's physical and emotional health. She began to suffer from severe insomnia and developed stress-induced carbuncles covering her

body.  She was diagnosed Raynaud's syndrome (which causes severe pain in her extremities, and has no known cure) and Post Traumatic Stress Disorder ("PTSD").  These maladies continue to plague her to this day.

18.     On January 6, 2020, the DGCIM (after having subject Mr. Marrón to 635 days of captivity and torture) released Mr. Marrón from its dungeons, but Mr. Marrón remained captive within Venezuela.  The Maduro Regime continued to hold Mr. Marrón's passport and told him he could not leave Venezuela or use any of his assets to survive in Venezuela.

19.     Penniless, paperless, and fearing for his life, Mr. Marrón chose to make a daring escape.  He traveled by car to the Colombian border, and from there he hiked over hundreds of miles through Colombian jungle to Bogota.  He forded rivers, avoided local bandits, and hid from the FARC and various militias along the way.  His journey began on August 21, 2020, and took 15 days to complete.

20.     On September 5, 2020, the U.S. State Department Official in Bogota personally arranged for Mr. Marrón's visa and re-entry into the United States.  Mr. Marrón flew home and was reunited with his wife and children.

21.     Although Mr. Marrón and his family were, and remain, overjoyed at his return, they continue to suffer from the ordeal, including grappling with ongoing mental and emotional issues. As is all too common with victims of terrorism and kidnapping, Mr. Marrón's marriage has suffered as well.  In addition, while Mr. Marrón remained a political prisoner in Venezuela, his U.S. businesses collapsed.

## **PARTIES**

22.     Plaintiff Carlos Marrón is a lawful permanent resident of the United States, a status he has held since November 5, 2015.  He resides in Miami, Florida, with his wife and two minor

children, who are U.S. citizens.  He has lived lawfully in Miami continuously from May 11, 2011 through today, with the exception of the time when he was arbitrarily detained in Venezuela.

23.     Plaintiff Jane Doe is the spouse of Mr. Marrón.  She is a citizen of the United States who resides with Mr. Marrón in Miami, Florida, where she has resided continuously since 2011, including during the time when Mr. Marrón was kidnapped, tortured, and arbitrarily detained.

24.     Plaintiff C.R. is the minor son of Mr. Marrón and Jane Doe.  He is 13 years old and is a citizen of the United States who resides with Mr. Marrón  and Jane Doe in Miami, Florida.

25.     Plaintiff  S.A. is the minor daughter of Mr. Marrón  and Jane Doe.  She is 7 years old and is a citizen of the United States who resides with Mr. Marrón and Jane Doe in Miami, Florida.

26.     Defendant Maduro is the former President of Venezuela.  On July 31, 2017, the U.S. Department of Treasury, Office of Foreign Assets Control ("OFAC") sanctioned Maduro for "undermining democracy in Venezuela."[6]  On March 26, 2020, the Department of Justice unsealed a criminal indictment against Maduro, pending in the United States District Court for the Southern District of New York, for orchestrating a "corrupt and violent narco-terrorism conspiracy between the  Venezuelan  Cartel  de  Los  Soles  ('Cartel  of  the  Suns')  and  the  Fuerzas  Armadas Revolucionarias de Colombia ('FARC')."[7]  Maduro is a citizen and resident of Venezuela, where (although he has no recognized or lawful government position) he openly and notoriously controls the country, flouts U.S. authority, and remains a fugitive from justice.  The U.S. Department of

---

[6] *See* Press Release, U.S. Dep't of the Treasury, Treasury Sanctions the President of Venezuela, ¶ 1  (July  31,  2017),  available  at  https://www.treasury.gov/press-center/press-releases/pages/sm0137.aspx.

[7] *See* Superseding Indictment, ¶ 1 *United States v. Maduro*, 11-cr-205 (S.D.N.Y. 2011) ("Maduro Indictment"), available at https://www.justice.gov/opa/page/file/1261806/download.

State, through its Narcotics Rewards Program, is offering rewards of up to $15 million for information leading to the arrest and/or conviction of Maduro.[8]

27.     Defendant Cartel of the Suns (or Cartel de los Soles) is a Venezuelan drug-trafficking cartel.  Maduro—along with several others—controls the Cartel of the Suns.  The DOJ has explained that "Maduro," including through his leadership of the Cartel, "expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation."[9]  The Cartel of the Suns is an unincorporated association based in Venezuela.  Several senior members of the Cartel of the Suns are incarcerated in prison in the United States, including (Former) Major General Cliver Alcala Cordones, a Cartel de los Soles leader (charged with conspiracy to commit narco-terrorism, conspiracy to import cocaine and associated firearms charges); and Efraín Antonio Campo Flores and Francisco Flores de Freitas, both nephews of Maduro's wife (charged with conspiracy to import 770 kilos of cocaine to the United States).

28.     Defendant FARC is a terrorist organization that between 1999 and 2021 became one of the largest producers of cocaine in the world and perpetrated acts of violence against U.S. nationals and property.  The United States designated FARC as a Foreign Terrorist Organization ("FTO") on October 8, 1997.[10]  FARC is an unincorporated association based in Colombia with operations throughout South and Latin America.  Certain senior FARC leaders, such as Juvenal Ovidio Ricardo Palmera Pineda, are imprisoned in the United States.

---

[8] *See* DEA Reward Poster, available at https://www.justice.gov/opa/page/file/1262286/download.

[9] *See* Press Release, U.S. Dep't of Justice ("DOJ"), Nicolás Maduro Moros and 14 Current and Former Venezuelan Officials Charged with Narco-Terrorism, Corruption, Drug Trafficking and Other Criminal Charges, ¶ 3 (March 26, 2020) ("DOJ Press Release"), available at https://www.justice.gov/opa/pr/nicol-s-maduro-moros-and-14-current-and-former-venezuelan-officials-charged-narco-terrorism.

[10] *See* U.S. Dep't of State, Terrorist Designations and State Sponsors of Terrorism: Foreign Terrorist Organizations, available at https://www.state.gov/foreign-terrorist-organizations/.

29.     Defendant Vladimir Padrino Lopez is the *de facto* Minister of Defense of Venezuela. On September 25, 2018, OFAC imposed US sanctions on Padrino Lopez, explaining that Padrino Lopez is "a member of [Maduro's] inner circle and lifelong member of the Venezuelan military," who Maduro installed "to help ensure the military's loyalty to the Maduro regime."[11] Padrino Lopez was indicted in the United States District Court for the District of Colombia.[12] The indictment alleges that from March 2014 until May 2019, Padrino Lopez conspired with others to distribute cocaine on board an aircraft registered in the United States. Padrino Lopez is a senior member of the Cartel of the Suns. Padrino Lopez is a citizen and resident of Venezuela, where he remains a fugitive from justice.

30.     Maikel Jose Moreno Perez is the current Chief Justice of the Venezuelan Supreme Court, a position he has held since February 2017. In May 2017, OFAC sanctioned him for "judicial rulings . . . that have usurped the authority of Venezuela's democratically-elected legislature."[13] He has been criminally charged in the United States District Court for the Southern District of Miami.[14] He is charged with conspiracy to commit money laundering and money laundering in connection with the corrupt receipt of millions of dollars and bribes—largely originating from accounts in South Florida—to illegally alter the outcome of dozens of civil and criminal cases in Venezuela. The U.S. State Department has offered a reward of $5 million for

---

[11] *See* Press Release, U.S. Dep't of the Treasury, Treasury Targets Venezuela President Maduro's Inner Circle and Proceeds of Corruption in the United States (Sept. 25, 2018), ¶ 5, available at https://home.treasury.gov/news/press-releases/sm495.

[12] *See* Indictment, *United States v. Vladimir Padrino Lopez,* 1:19-cr-176 (D.D.C. 2019), available online at https://www.justice.gov/opa/page/file/1261721/download.

[13] *See* Press Release, U.S. Dep't of the Treasury, Treasury Sanctions Eight Members of Venezuela's Supreme Court of Justice (May 18, 2017), ¶ 1, available at https://www.treasury.gov/press-center/press-releases/Pages/sm0090.aspx.

[14] *See* Criminal Complaint, *United States v. Moreno Perez,* 20-cr-2407 (S.D. Fla. March 2, 2020), available at https://www.justice.gov/opa/page/file/1261816/download.

information leading to his arrest and/or conviction.[15] He is a citizen and resident of Venezuela, and a fugitive from justice.

31. Defendant Nestor Luis Reverol Torres has held many government positions in Venezuela. He is currently the Minister of People's Power for Electric Power. He is the former general director of Venezuela's La Oficina Nacional Antidrogas ("ONA"), which is the Venezuela government agency charged with fighting narcotics production and trafficking (its mission is similar to that of the Drug Enforcement Agency in the United States). On July 26, 2017, OFAC imposed sanctions on Torres for "undermining democracy" in Venezuela.[16] In 2016, the DOJ unsealed an indictment against Torres for offenses including trafficking and distributing cocaine.[17] Defendant Reverol Torres is a senior member of the Cartel of the Sun. He is a citizen and resident of Venezuela and a fugitive from justice.

32. Defendant Tarek William Saab is the *de facto* Attorney General (sometimes called the Prosecutor General) of Venezuela. On July 26, 2017, OFAC sanctioned him for undermining democracy in Venezuela.[18] He has been sanctioned by other countries, such as Switzerland, for human rights violations. Tarek William Saab is a citizen and resident of Venezuela.

33. Defendant Tareck El Aissami was the *de facto* Vice President of Venezuela from 2017 to 2018. He is currently the Maduro Regime's Minister of Industries and National Production

---

[15] *See* Press Release, U.S. Dep't of State, Transnational Organized Crime Rewards Program: Maikel Jose Moreno Perez (July 21, 2020) available at https://www.state.gov/inl-rewards-program/transnational-organized-crime-rewards-program/maikel-jose-moreno-perez/.

[16] *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions 13 Current and Former Senior Officials of the Government of Venezuela, ¶ 1 (July 26, 2017) ("July 26, 2017 OFAC Press Release") available at https://www.treasury.gov/press-center/press-releases/Pages/sm0132.aspx.

[17] *See* Indictment, *United States v. Torres*, 15-cr-20 (E.D.N.Y. Jan. 21, 2015), available at https://www.justice.gov/doj/page/file/1261891/download.

[18] *See* July 26, 2017 OFAC Press Release, *supra* n. 13.

and Minister of Petroleum.  El Aissami is a senior leader of the Cartel of the Suns.  On February

13, 2017, OFAC sanctioned El Aissami under the Foreign Narcotics Kingpin Designation Act for

facilitating drug shipments from Venezuela to the United States.[19]  He is also the key facilitator of

the Maduro Regime's support for Hezbollah.[20]  In 2014 Robert Morgenthau, then the Manhattan

District Attorney, indicated that El Aissami had provided Venezuelan passports to terror

organizations including Hamas and Hezbollah.[21]  He is on the U.S. Customs and Immigration

Enforcement's 10 most wanted list.[22]  Tareck El Aissami is a citizen and resident of Venezuela

and a senior member of Cartel of the Suns.

34.    Defendants Vladimir Padrino Lopez, Maikel Jose Moreno Perez, Nestor Reverol

Torres, Tarek William Saab, and Tareck El Aissami are collectively the "Individual Defendants."

## JURISDICTION AND VENUE

35.    This Court has subject matter jurisdiction under 28 U.S.C. § 1331 because

Plaintiffs' RICO and federal Anti-Terrorism Act ("ATA") claims arise under the law of the United

States.  This court has supplemental jurisdiction over Plaintiffs' state-law claims because those

---

[19] *See* Press Release, U.S. Dep't of Treasury, Treasury Sanctions Sanctions Prominent Venezuelan Drug Trafficker Tareck El Aissami and His Primary Frontman Samark Lopez Bello, ¶ 1 (Feb. 13, 2017), available at https://www.treasury.gov/press-center/press-releases/pages/as0005.aspx

[20] *See* Florencia Montaruli, *Tareck El Aissami: Hezbollah's Biggest Benefactor in Venezuela*, Iran Wire (May 4, 2021), available at https://iranwire.com/en/features/9471.

[21] *Id.;* Scott Zamost, Drew Griffin, Kay Guerrero and Rafael Romo, *Venezuela may have given passports to people with ties to terrorism*, CNN (Feb. 14, 2017), available at https://www.cnn.com/2017/02/08/world/venezuela-passports-investigation/index.html.

[22] *See* ICE: Former Venezuelan VP Among 10 Most Wanted Fugitives, NBC Miami (July 31, 2019), available at https://www.nbcmiami.com/news/local/former-venezuelan-vice-president-tareck-el-aissami-most-wanted-ice/125106/.

claims arise from the same nucleus of operative facts, and are part of the same case or controversy under Article III of the United States Constitution, as Plaintiffs' RICO and ATA claims.

36.     Venue properly lies in this forum because 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this judicial district, including (a) unauthorized electronic access to Mr. Marrón's Miami, Florida bank accounts, (b) the robbery of the assets from those Miami bank accounts that occurred when Defendants tortured Mr. Marrón to obtain the passcodes for the bank accounts, (c) the laundering through Miami of the stolen money, which converted from U.S. dollars to cryptocurrency to obscure its origins, (d) the repeated communication of myriad extortion/ransom demands to Jane Doe in Miami, (e) Jane Doe's payment of ransom/extortion from Miami to Defendants, and (f) the distribution of narcotics in Florida for the purpose of unlawfully providing material support to the terrorists who kidnapped and tortured Mr. Marrón.

37.     Venue properly lies in this forum pursuant to 18 U.S.C. § 1965(a), which provides that "[a]ny civil action or proceeding under this chapter against any person may be instituted in the district court of the United States for any district in which such person resides, is found, has an agents, or transacts his affairs," because each of the defendants "transacts his affairs" in this jurisdiction, including but not limited to (a) flooding this jurisdiction with cocaine, (b) laundering ill-gotten proceeds of narcotics trafficking and Venezuela government corruption through this jurisdiction, (c) accepting bribes from accounts maintained in this judicial district and/or (d) communicating random/extortion demands to this district.

38.     The Court has personal jurisdiction, under the Florida long-arm statute, Florida Stat. § 48.193, and the Due Process Clause of the Constitution, over the Defendants because they

personally and/or through agents committed a tortious act within the State of Florida, giving rise to Plaintiffs' claims, including that Defendants themselves and/or through agents:

      a.        committing the crime of robbery in Florida, in violation of Fla. Stat. § 812.13 (also a crime of violence under 18 U.S.C. § 16), by taking Mr. Marrón's money from his Miami bank accounts, with the intent to permanently deprive Mr. Marrón of such money, and during the course of such taking, using force, violence, assault and putting in fear, specifically, torturing Mr. Marrón until he revealed his pin numbers and other bank access information for his Miami bank accounts;

      b.        committing the crime of bank fraud in Florida, in violation of 18 U.S.C. § 1344, by obtaining money under the custody of a financial institution by falsely representing their identities (pretending to be Mr. Marrón) and their rights (pretending to have authority to access Mr. Marrón's accounts) to financial institutions in Miami, Florida;

      c.        committing the crime of money laundering in Florida, in violation of 18 U.S.C. § 1956, by conducting a financial transaction with property that was the proceeds of specified unlawful activity (i.e., robbery, as set forth above), knowing the property was the proceeds of specified unlawful activity, and knowing that the transaction was designed to conceal or disguise the ownership of the proceeds of specified unlawful activity; specifically, transferring proceeds of robbery from Mr. Marrón's Miami bank accounts to Coinbase so that the money could be converted to cryptocurrency and further concealed;

      d.        committing the crime of extortion in Florida, in violation of Fla. Stat. § 836.05, by repeatedly communicating extortionate demands to Jane Doe in Miami, stating that Mr. Marrón would be injured or poisoned if Jane Doe did not make payments to the Defendants, which payments Jane Doe made to Defendants from Miami, Florida on many separate occasions over 635 days that Mr. Marrón was in captivity;

e.       defaming Mr. Marrón in Florida by publishing defamatory statements about Mr. Marrón on YouTube and globally accessible other media, causing those defamatory statements being read, heard and reviewed by numerous third parties in Florida, including members of the large population of Venezuelan ex-patriots residing in South Florida, with the specific intention of affecting Mr. Marrón's reputation in Florida;

f.       laundering millions of dollars of ill-gotten proceeds of public corruption offenses through South Florida, causing the kidnapping, torture and arbitrary detention of Mr. Marrón in retribution for, and to silence his exposure of, information related to such public corruption offenses;

g.       criminally trafficking millions of dollars of illicit drugs into Florida for distribution in Florida, with the support of the Maduro Regime that retains power in Venezuela through the suppression of dissent, including the kidnapping, torture and arbitrary detention of Mr. Marrón as retribution for his exercise of free speech that the Maduro Regime deemed harmful to its interests;

h.       providing material support to terrorists in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2339C, in that defendants trafficked cocaine in Florida intending that those monetary proceeds be used for acts of terror that included the kidnapping and torture of Mr. Marrón, and in that defendants laundered money in Florida, intending that the proceeds be used for acts of terror that;  and

i.       causing various injuries to the plaintiffs in Miami, Florida, including destroying Mr. Marrón's Florida businesses, and causing plaintiffs pain, suffering and loss of consortium in Miami, Florida.

39.       Defendants' torts against Mr. Marrón were inextricably intertwined with, and a necessary and foreseeable component of, Defendants' trafficking of illegal drugs into and

throughout South Florida, and their laundering money throughout South Florida, for their profit and gain.

40.     This court has personal jurisdiction over defendants served pursuant to the nationwide service provision of RICO, 18 U.S.C. § 1965(d), because, in light of defendants' contacts with the United States as a whole, exercising jurisdiction over the defendants in the United States (including in this district) is consistent with the United States Constitution.  Defendants themselves and/or through agents committed the following conduct in the United States, giving rise to Plaintiffs' claims:

a.     committing the crime of robbery in Florida, in violation of Fla. Stat. § 812.13 (also a crime of violence under 18 U.S.C. § 16), by taking Mr. Marrón's money from his Miami bank accounts, with the intent to permanently deprive Mr. Marrón of such money, and during the course of such taking, using force, violence, assault and putting in fear, specifically, torturing Mr. Marrón until he revealed his pin numbers and other bank access information for his Miami bank accounts;

b.     committing the crime of bank fraud in Florida, in violation of 18 U.S.C. § 1344, by obtaining money under the custody of a financial institution by falsely representing their identities (pretending to be Mr. Marrón) and their rights (pretending to have authority to access Mr. Marrón's accounts) to financial institutions in Miami, Florida;

c.     committing the crime of money laundering in Florida, in violation of 18 U.S.C. § 1956, by conducting a financial transaction with property that was the proceeds of specified unlawful activity (i.e., robbery, as set forth above), knowing the property was the proceeds of specified unlawful activity, and knowing that the transaction was designed to conceal or disguise the ownership of the proceeds of specified unlawful activity; specifically, transferring proceeds of

robbery from Mr. Marrón's Miami bank accounts to Coinbase so that the money could be converted to cryptocurrency and further concealed;

d.       committing the crime of extortion in Florida, in violation of Fla. Stat. § 836.05, by repeatedly communicating extortionate demands to Jane Doe in Miami, stating that Mr. Marrón would be injured or poisoned if Jane Doe did not make payments to the Defendants, which payments Jane Doe made to Defendants from Miami, Florida on many separate occasions over 635 days that Mr. Marrón was in captivity;

e.       defaming Mr. Marrón in Florida by publishing defamatory statements about Mr. Marrón on YouTube and globally accessible other media, causing those defamatory statements being read, heard and reviewed by numerous third parties in Florida, including members of the large population of Venezuelan ex-patriots residing in South Florida, with the specific intention of affecting Mr. Marrón's reputation in Florida;

f.       laundering millions of dollars of ill-gotten proceeds of public corruption offenses through South Florida, causing the kidnapping, torture and arbitrary detention of Mr. Marrón  in retribution for, and to silence his exposure of, information related to such public corruption offenses;

g.       criminally trafficking millions of dollars of illicit drugs into Florida for distribution in Florida, with the support of the Maduro Regime that retains in power in Venezuela through the suppression of dissent, including the kidnapping, torture and arbitrary detention of Mr. Marrón as retribution for his exercise of free speech that the Maduro Regime deemed harmful to its interests;

h.       providing material support to terrorists in violation of 18 U.S.C. § 2339B and 18 U.S.C. § 2339C, in that defendants trafficked cocaine in Florida intending that those monetary proceeds be used for acts of terror that included the kidnapping and torture of Mr. Marrón, and in

that defendants laundered money in Florida, intending that the proceeds be used for acts of terror that;  and

    i.    causing various injuries to the plaintiffs in Miami, Florida, including destroying Mr. Marrón's Florida businesses, and causing plaintiffs pain, suffering and loss of consortium in Miami, Florida.

    41.    In the alternative, this court has personal jurisdiction over the defendants under Fed. R. Civ. P. 4(k)(2) because the defendants (a) are not subject to jurisdiction in any state's courts of general jurisdiction and (b) exercising jurisdiction over the defendants in the United States, including in this district, is consistent with the United States Constitution.  Defendants themselves and/or through agents committed the following conduct in the United States, giving rise to Plaintiffs' claims:

    a.    committing the crime in of robbery in Florida, in violation of Fla. Stat. § 812.13 (also a crime of violence under 18 U.S.C. § 16), by taking Mr. Marrón's money from his Miami bank accounts, with the intent to permanently deprive Mr. Marrón  of such money, and during the course of such taking, using force, violence, assault and putting in fear, specifically, torturing Mr. Marrón  until he revealed his pin numbers and other bank access information for his Miami bank accounts;

    b.    committing the crime of bank fraud in Florida, in violation of 18 U.S.C. § 1344, by obtaining money under the custody of a financial institution by falsely representing their identities (pretending to be Mr. Marrón) and their rights (pretending to have authority to access Mr. Marrón's accounts) to financial institutions in Miami, Florida;

    c.    committing the crime of money laundering in Florida, in violation of 18 U.S.C. § 1956, by conducting a financial transaction with property that was the proceeds of specified

unlawful activity (i.e., robbery, as set forth above), knowing the property was the proceeds of specified unlawful activity, and knowing that the transaction was designed to conceal or disguise the ownership of the proceeds of specified unlawful activity; specifically, transferring proceeds of robbery from Mr. Marrón's Miami bank accounts to Coinbase so that the money could be converted to cryptocurrency and further concealed;

d.     committing the crime of extortion in Florida, in violation of Fla. Stat. § 836.05, by repeatedly communicating extortionate demands to Jane Doe in Miami, stating that Mr. Marrón would be injured or poisoned if Jane Doe did not make payments to the Defendants, which payments Jane Doe made to Defendants from Miami, Florida on many separate occasions over 635 days that Mr. Marrón was in captivity;

e.     defaming Mr. Marrón in Florida by publishing defamatory statements about Mr. Marrón on YouTube and globally accessible other media, causing those defamatory statements being read, heard and reviewed by numerous third parties in Florida, including members of the large population of Venezuelan ex-patriots residing in South Florida, with the specific intention of affecting Mr. Marrón's reputation in Florida;

f.     laundering millions of dollars of ill-gotten proceeds of public corruption offenses through South Florida, causing the kidnapping, torture and arbitrary detention of Mr. Marrón  in retribution for, and to silence his exposure of, information related to such public corruption offenses;

g.     criminally trafficking millions of dollars of illicit drugs into Florida for distribution in Florida, with the support of the Maduro Regime that retains in power in Venezuela through the suppression of dissent, including the kidnapping, torture and arbitrary detention of Mr. Marrón as retribution for his exercise of free speech that the Maduro Regime deemed harmful to its interests;

h.      providing material support to terrorists in violation of 18 U.S.C. § 2339B, and 18 U.S.C. § 2339C, in that defendants trafficked cocaine in Florida intending that those monetary proceeds be used for acts of terror that included the kidnapping and torture of Mr. Marrón, and in that defendants laundered money in Florida, intending that the proceeds be used for acts of terror that;  and

i.      causing various injuries to the plaintiffs in Miami, Florida, including destroying Mr. Marrón's Florida businesses, and causing plaintiffs pain, suffering and loss of consortium in Miami, Florida.

42.     To the extent that this Court requires an additional basis to exercise jurisdiction over any of Plaintiffs' claims against any particular Defendant, this court may exercise pendant personal jurisdiction to the maximum extent permitted by the Constitution over such claims because Plaintiffs' claims all arise from the same common nucleus of operative fact.

## FACTUAL ALLEGATIONS

### I.   BACKGROUND

#### A.  The Marrón Family

43.     Mr. Marrón was born in Venezuela.  He relocated to the United States in 2011 on an L1 investor visa, and became a lawful permanent resident in 2015.  He has resided in Miami, Florida without interruption since 2011, with the exception of the time when he was in DGCIM custody.

44.     Jane Doe is Mr. Marrón's spouse.  She is a U.S. citizen.  At all relevant times, she resided with Mr. Marrón in Miami Florida.  Mr. Marrón and his wife were married in 2005.

45.     They have two children:  S.A., a seven year old daughter, and C.R., a thirteen year old son.

46.     Until Mr. Marrón's kidnapping, they were a strong, close, loving and deeply committed family.   Although the psychological and emotional damage of Mr. Marrón's kidnapping have taken a terrible toll on his marriage to Jane Doe, at bottom, they still love and respect one another.

**B.     The Maduro Regime**

**1.     Maduro's Illegitimate Authoritarian Control over Venezuela.**

47.     Maduro assumed the Presidency of Venezuela on March 5, 2013, upon the death of then Venezuelan President Hugo Chavez.

48.     On May 20, 2018, Venezuela held a presidential election.   Although Maduro nominally "won" the presidential election, the election was neither free nor fair.   As then-U.S. Secretary of State Michael Pompeo explained, "[s]ham elections change nothing.   We need Venezuelan people running this country."[23]

49.     Accordingly, on June 27, 2018, the Organization of American States ("OAS") recognized the presidency of the Venezuela opposition leader, Juan Guaidó ("Guaidó").

50.     Notwithstanding the fact that the May 20, 2018 election was illegitimate, on January 10, 2019, Maduro was inaugurated as Venezuela's president—a result Maduro achieved by the forceful and unlawful suppression of the legitimate government led by Guaidó.

51.     On January 15, 2019, Venezuela's freely elected National Assembly declared Maduro a "usurper."  On January 23, 2019, Guaidó declared himself President.

52.     Also on January 23, 2019, the United States recognized Mr. Guaidó as Venezuela's legitimate President.  The U.S. State Department implored "Maduro to step aside in favor of

---

[23]     Michael     Pompeo     (@SecPompeo)     (May     20,     2018), https://twitter.com/SecPompeo/status/998254964408545283.

a legitimate leader reflecting the will of the Venezuelan people."[24]  The White House stated that the United States will "continue to hold the illegitimate Maduro regime directly responsible for any threats it may pose to the safety of the Venezuelan people."[25]  The current administration continues to recognize Guaidó as the legitimate President of Venezuela.[26]

53.     Subsequently, over 50 other recognized and respected countries—including leading western democracies, and excluding pariahs such as North Korea, Iran, Syria and Cuba—recognized Guaidó as the legitimate President of Venezuela.

54.     In 2020, Maduro used the pandemic to increase repression.  Ahead of elections for Venezuela's National Assembly that were schedule for December 2020, the Supreme Court, under the leadership of Defendant Moreno Perez, disbanded the leadership of three major opposition parties and named new leaders for each.  As a result, opposition parties largely boycotted the elections, and with low voter turnout, Maduro's party captured the national assembly.  However, the United States and the other countries that recognized Guaidó's government in 2019 also do not recognize the legitimacy of the legislature seated in January 2021.

55.     The State Department's 2020 Country Reports on Human Rights Practices: Venezuela, sums up the political situation, explaining that "While Venezuela is legally a multiparty, constitutional republic, the illegitimate authoritarian regime led by Nicolas Maduro usurped control

---

[24] *See* Reuters, *Pompeo Calls on Venezuela's Maduro to Step Down, Urges Support from Military* (Jan. 23, 2020), available at https://www.reuters.com/article/us-venezuela-politics-pompeo/pompeo-calls-on-venezuelas-maduro-to-step-down-urges-support-from-military-idUSKCN1PH2HI.

[25] *See* Jeremy Diamond and Boris Sanchez, Trump recognizes Venezuelan opposition leader as nation's president, CNN, Jan. 24, 2019, available online at https://www.cnn.com/2019/01/23/politics/trump-juan-guaido-venezuela/index.html.

[26] *See* Press Release, U.S. Dep't of State, Secretary Blinken's Call with Venezuela Interim President Guaidó (March 2, 2021), available at https://www.state.gov/secretary-blinkens-call-with-venezuelan-interim-president-guaido/.

over the executive, judicial, citizens' power (which includes the prosecutor general and ombudsman), and electoral branches of government, and stood up a parallel, illegitimate legislative body [the Constituent Assembly] alongside the existing elected one [the National Assembly]."[27]

56.     In short, although Maduro continues to exert authoritarian control over Venezuela, he is no longer the head of state, and he has not been the head of state, or a member of the recognized government of Venezuela, since May 20, 2018.

57.     The Maduro Regime includes myriad individuals, including many in governmental positions, who are beholden to Maduro and who execute unlawful instructions from Maduro and his deputies.

58.     A Washington Post article captures the essence of the Maduro Regime: "the reality is that the [Venezuelan] regime is less a government — much less a socialist one — than a criminal gang," in which "the money it is reaping from criminal activity is serving as a prop that allows it to survive U.S. sanctions."[28]

### 2.     The Maduro Regime's Anti-Americanism

59.     The Maduro Regime is virulently anti-American.

60.     Among other things, the Maduro Regime blames the United States for a variety of economic failings and social deprivations of its own making.  The Maduro Regime accuses the United States of "making threats" "with the sole aim of smothering the Venezuelan economy causing pain, unrest, and suffering to the Venezuelan people all to promote political instability in

---

[27] *See* U.S. Dep't of State, Venezuela, 2020 Country Reports on Human Rights Practices, at 1 ("Venezuela Country Report"), available at https://www.state.gov/reports/2020-country-reports-on-human-rights-practices/venezuela/.

[28] *See* Jackson Diehl, *The Real Reason Venezuela's Maduro Survives: Dirty Money*, Washington Post (May 12, 2019, 7:15 PM) available at https://www.washingtonpost.com/opinions/global-opinions/the-real-reason-venezuelas-maduro-survives-dirty-money/2019/05/12/ba96413e-7263-11e9-8be0-ca575670e91c_story.html.

order to overthrow the legitimate government of President Nicolás Maduro Moros," and of enforcing a "financial blockade," which the Maduro Regime describes as "illegal unilateral coercive measures imposed by the United States government."[29]

61.     The Maduro Regime further blames non-Venezuelan actors, particularly the United States, for Venezuela's hyperinflation.  And the regime falsely accuses websites ("with servers in Miami, United States") of "fraudulent and criminal manipulation of the exchange rate."[30]

### C.  The Cartel of the Suns

62.     Member of the Venezuelan military became involved in the drug trade in 1990s, largely in the form of accepting bribes to ignore drug traffickers.  Around 1992, Hugo Chavez formed a Venezuela drug cartel, which at the time was known as the "Cartel Bolivariano" or "Bolivarian Cartel."  In 1993, the name changed to the "Cartel of the Suns," a reference to the sun insignia on the Venezuelan military uniforms of many of the cartel's leaders.

63.     The Venezuelan government under Hugo Chavez grew the cartel, affording Venezuelan officials engaged in drug trafficking immunity in exchange for their loyalty to Chavez. In 2005, the Chavez government expelled the U.S. Drug Enforcement Agency ("DEA") from Venezuela, making Venezuela a more attractive route for drug trafficking.  As discussed further below, the Cartel of the Suns began coordinating with FARC to traffic cocaine.  Venezuelan air force bases began to shelter planes loaded with cocaine that arrived from Colombia.

64.     When Hugo Chavez died in 2013, Maduro stepped up to become one of the leaders of the Cartel.  Defendants Nestor Reverol Torres and Padrino Lopez are senior figures within the Cartel.

---

[29] *See* UNHRC Venezuela Response to Independent Expert Report, ¶ 42(ii), (iv).

[30] *See Id.* ¶ 42(x).

### D.  The FARC

65.     The FARC is an armed and violent organization based primarily in the Republic of Colombia.   Since its inception in 1964, FARC has engaged in armed conflict against the government of Colombia, which is a constitutional, multi-party democracy. Although many FARC rebels laid down arms as part of a 2016 peace agreement, a significant number—notably, those that are in league with Maduro and the Maduro Regime—continue to  fight to derail the peace process and to destabilize all levels of the Colombian government through violence, including murders and hostage takings, threats of violence, and other terrorism-related activities. The FARC's activities throughout Colombia have caused hundreds of civilian deaths and injuries.

66.     The FARC has been, and remains, strongly anti-American.   It characterizes American citizens as "military targets," and it has engaged in violent acts against U.S. nationals in Colombia, including murders and hostage takings.

67.     FARC supports itself largely through the trafficking of cocaine.  FARC rebels on Colombia's borders, particularly the Venezuelan border, are responsible for transporting cocaine outside of Colombia, and facilitating the exchange of cocaine and cocaine paste for weapons and supplies that are used by the FARC to support their international terrorism activities.

68.     FARC leadership frequently noted during meetings that the FARC could not survive without the proceeds generated from cocaine and cocaine paste manufacturing and distribution.   Recognizing that the United States has contributed significantly to Colombian fumigation efforts, the FARC leadership ordered FARC members to kidnap and murder U.S. nationals to intimidate the United States and coerce it from efforts to fumigate and disrupt the FARC's cocaine and cocaine paste manufacturing and distribution activities.

69.     On October 8, 1997, the Secretary of State of the United States designated the FARC designated foreign terrorist organization ("FTO"), pursuant to Title 8, United States Code, Section 1189. The FARC was re-designated on September 5, 2001. At all times material to this action, the FARC is a designated FTO.  Specifically, 8 U.S.C. § 1189(a)(1) authorizes the Secretary of State to designate an organization as a foreign terrorist organization . . . if the Secretary finds that (A) the organization is a foreign organization; (B) the organization engages in terrorist activity . . . ; and (C) the terrorist activity or terrorism of the organization threatens the security of United States nationals or the national security of the United States. 8 U.S.C. § 1189(a)(1).

### E.  The Maduro Criminal Enterprise and the Maduro Criminal Conspiracy

70.     The Maduro Criminal Enterprise is an association that includes, among others, Maduro, the Maduro Regime, the Cartel of the Suns, the FARC, and the Individual Defendants.

71.     Members of the Maduro Criminal Enterprise have conspired and agreed to commit a wide variety of interrelated crimes (the "Maduro Criminal Conspiracy"), including (a) narcotics trafficking; (b) narco-terrorism and other terrorism against the United States and its citizens; (c) acts of terrorism designed to intimidate Venezuela civilian population, including kidnapping, torture, arbitrary detention, "disappearances," and murder; (d) public corruption offenses including foreign exchange scams that rely on the artificially inflated value of the bolívar on Venezuela's official currency exchanges; and (e) money laundering.

72.     Each of Maduro Criminal Enterprise's criminal endeavors is intrinsic to, and necessary to the functionality of, the overall criminal enterprise.  Put differently, each line of criminal wrongdoing supports and reinforces the ability of the Maduro Criminal Enterprise to commit each of the other criminal wrongdoing in which the Maduro Criminal Enterprise engages.

a.      For example, a central objective of the Maduro Criminal Enterprise and the Maduro Criminal Conspiracy is to assist Maduro to retain authoritarian control over Venezuela. By ensuring that Maduro unlawfully controls the Venezuelan state, the Maduro Criminal Enterprise ensures that it can continue to commit profitable crimes—such as narcotics trafficking and looting the Venezuela treasury—with impunity and without interference from legitimate law enforcement.

b.      Conversely, the Maduro Criminal Enterprise, through its earnings from profitable crimes such as narcotics trafficking and public corruption, obtains wealth through which Maduro purchases the loyalty of Maduro Criminal Enterprise's leaders and loyalists, thereby cementing Maduro's authoritarian control over Venezuela.  "A key to Maduro's resilience has been the loyalty he has retained among most Venezuelan security forces. For years, military leaders and other officials have enriched themselves through corruption, drug trafficking, and other illicit industries."[31]  In other words, dirty money is the lifeblood of the Maduro Criminal Enterprise and the Maduro Criminal Conspiracy.  As the Washington Post explains, "each year [the Cartel of the Suns, the drug cartel that lies at the heart of the Maduro Criminal Enterprise] flies hundreds of tons of Colombian cocaine from Venezuelan airfields to Central America and the Caribbean for eventual distribution in the United States and Europe — and that [cartel] includes some of the most senior officials in the Maduro regime. These men are not clinging to power because they are true believers in socialism . . . .  They hang on because, in spite of Venezuela's economic implosion, they are still reaping millions."[32]

---

[31] *See* Congressional Research Service, *Venezuela, Background and U.S. Relations* (April 28, 2021), at 5, available online at https://fas.org/sgp/crs/row/R44841.pdf.

[32] *Id*.

c.     And, through acts of terrorism and human rights abuses, the Maduro Criminal Enterprise suppresses opposition to its narcotics trafficking, public corruption, and Maduro's authoritarian control of Venezuela.

73.     Because the foregoing crimes are interrelated, because each type of criminality furthers the other types of criminality, and because the Maduro Criminal Enterprise conspicuously engages in each type of criminality, each and every co-conspirator in the Maduro Criminal Conspiracy has knowingly and intentionally agreed to all types of criminality in which the Maduro Criminal Enterprise engages.

74.     The key lines of criminal conduct in which the Maduro Criminal Enterprise engages are discussed in more detail below.

### 1. The Maduro Criminal Enterprise's Narcotics Trafficking and Narco-Terrorism

75.     For at least 20 years, and continuing through today, Maduro, along with a cadre of his Venezuelan loyalists and the FARC, has run a vast narco-terrorism conspiracy, and through it, has intentionally inundated the United States with cocaine, not only to enrich Maduro himself along with the other members of the Maduro Criminal Enterprise, but also to harm the United States and its citizens.

76.     On March 26, 2020, the DOJ unsealed indictments charging myriad crimes against Maduro, other Venezuelan leaders, and their FARC co-conspirators, for narcotics trafficking and narcoterrorism.  Summing up the charges, U.S. Attorney General William P. Barr explained that "[t]he Venezuelan regime, once led by Nicolás Maduro Moros, remains plagued by criminality and corruption. . . .  For more than 20 years, Maduro and a number of high-ranking colleagues . . .

conspired with the FARC, causing tons of cocaine to enter and devastate American communities."[33]

77.     The United States Attorney for the Southern District of New York, Geoffrey S. Berman, further explained how Maduro and his cronies leveraged their authoritarian power in Venezuela to support their narcoterrorism and narcotics trafficking conspiracy:

> Today we announce criminal charges against Nicolás Maduro Moros for running, together with his top lieutenants, a narco-terrorism partnership with the FARC for the past 20 years. . .  ***The scope and magnitude of the drug trafficking alleged was made possible only because Maduro and others corrupted the institutions of Venezuela and provided political and military protection for the rampant narco-terrorism crimes described in our charges***.  As alleged, Maduro and the other defendants expressly intended to flood the United States with cocaine in order to undermine the health and wellbeing of our nation.  Maduro very deliberately deployed cocaine as a weapon.  While Maduro and other cartel members held lofty titles in Venezuela's political and military leadership, the conduct described in the Indictment wasn't statecraft or service to the Venezuelan people.  As alleged, the defendants betrayed the Venezuelan people and corrupted Venezuelan institutions to line their pockets with drug money. [34]

78.     Attorney General Barr further explained the role of FARC in the conspiracy: "there is a dissident group of about 2,500 FARC members, and they have taken up on the border between Venezuela and Colombia.  These FARC dissidents continue to be involved in drug trafficking and armed insurgency.  They have obtained the support of the Maduro regime, which is allowing them to use Venezuela as a safe haven from which they can continue to conduct their cocaine trafficking and their armed insurgency."[35]

---

[33] *See* DOJ Press Release, *supra* n. 6, ¶ 1.

[34] *Id.* ¶ 3 (emphasis added).

[35] *See* Press Release, Dep't of Justice, Attorney General William P. Barr Delivers Remarks at Press Conference Announcing Criminal Charges against Venezuelan Officials (March 26, 2020) ("AG Barr Remarks") available at https://www.justice.gov/opa/speech/attorney-general-william-p-barr-delivers-remarks-press-conference-announcing-criminal; *see also*  Douglas Farah and Caitlyn Yates, *MADURO'S LAST STAND Venezuela's Survival Through the Bolivarian Joint Criminal Enterprise with the FARC*, IBI Consultants LLC ((May 2019) ("The alliance of the [Maduro Regime] together w/ the FARC have coalesced into . . . a consortium of criminalized states and

79.     Attorney General Barr further explained:  "There is an area right on the border in Colombia, Norte de Santander, which is one of the primary cocaine producing areas remaining in Colombia.  FARC gets this cocaine over into Venezuela and then is given safe haven by the regime to fly this cocaine from an area called Zulia, near Lake Maracaibo, up into Central America.  Since 2016, this air bridge has been established and has grown fivefold in just those four years.  In addition, the regime is allowing these drug traffickers to take drugs by a maritime route into the Caribbean.  We estimate that somewhere between 200 and 250 metric tons of cocaine are shipped out of Venezuela by these routes per year."[36]

80.     In a background call on February 5, 2020, a senior White House official told journalists that Maduro "has turned Venezuela into a narco state, which has become a primary point of narcotics trafficking to Central America, Mexico, therefore the United States."[37]   The Cartel of the Suns and FARC traffic a significant portion of this cocaine in Florida.[38]

81.     As set forth in the Maduro indictment, a member of the FARC high command "agreed to provide a multi-ton quantity of cocaine to DEA confidential sources so that the drugs could be imported into the United States. The sources purported to work for Rafael Caro Quintero, a Mexican drug trafficker who participated in the 1985 torture and murder of DEA Agent Enrique 'Kiki' Camarena.  During a recorded meeting, [the FARC leader] referred to the murder of

---

non-state    actors    working    in    concert    with    shared    objectives"),    available    at https://www.ibiconsultants.net/_pdf/maduros-last-stand-final-publication-version.pdf.

[36] *See* AG Barr Remarks, *supra* n. 29.

[37] White House Office of the Press Secretary, Public Pool, Subject: Background Press Call on Venezuelan Interim President Guaidó's Head of State Visit, (2020).

[38] *See* Nat'l Drug Intelligence Center, Fla. Drug Threat Assessment, July 2003, available at https://www.justice.gov/archive/ndic/pubs5/5169/overview.htm.

Camerana by characterizing Caro Quintero as the person who had killed the 'son of the bitch of the DEA.'"[39]

82.     U.S. Attorney Berman explained the role of the Cartel of the Suns in the conspiracy. He stated that Maduro and the Individual Defendants "called their cartel the 'Cartel of the Suns.' The name they chose reflects the Cartel's identity and operations. It is a direct reference to the sun-shaped stars that Venezuelan military officers wear on their uniforms. Indeed, three former military officers of the highest rank are charged in this indictment. At the direction of Maduro, and in pursuit of their own personal profits, these officers: negotiated drug sales; protected the FARC's transportation of coca leaves from Colombia; provided safe haven in Venezuela for cocaine manufacturing facilities; and supplied authorization codes and cover for the planes and boats that transported the shipments as they began their journey to the United States."[40]

83.     Assistant Attorney General Brian A. Benczkowski explained the role of Defendant Padrino Lopez in the narcotrafficking conspiracy:  "[The Venezuelan] military—led by Padrino Lopez—was responsible for interdicting suspected drug traffickers flying through Venezuelan air space.  But as Minister of Defense, Padrino Lopez instead wielded his power to allow drug traffickers to use Venezuela as a transshipment route for narcotics destined for the United States. Padrino Lopez allegedly accepted bribes from drug trafficking organizations to allow them free passage to fly through Venezuelan air space.  So long as he was paid off, cocaine-filled aircraft

---

[39] Maduro Indictment, *supra* n. 4, at ¶ 15(p).

[40] *See* Press Release, Dep't of Justice, U.S. Attorney Geoffrey S. Berman Announces Charges in *U.S. v. Maduro et al*. New York, N.Y. (March 26, 2020) available at https://www.justice.gov/opa/page/file/1262756/download.

could get by and avoid interdiction.  Far from stopping drug traffickers, the military – for the right price – gave safe passage to drug traffickers, terrorists, and other criminals."[41]

84.    The United States Attorney's Office for the Eastern District of New York has charged Defendant Torres (the former general director of Venezuela's DEA),  for his role in the Maduro Criminal Enterprise's narcotics trafficking.   According to the indictment, Torres "receive[d] payments from narcotics traffickers in exchange for assisting the narcotics traffickers in conducting their illicit drug trafficking business."[42]

85.    In exchange for payments from narcotics traffickers, Torres, among other things, (a) alerted narcotics traffickers to future drug raids or locations of law enforcement counter-narcotics activities so that the narcotics traffickers could change the storage locations of narcotics or alter transportation routes or times and thus avoid detection by law enforcement; (b) stopped or hindered ongoing narcotics investigations or counter-narcotics actions so that vehicles loaded with narcotics could depart from Venezuela; (c) arranged for the release of individuals detained for narcotics violations or for suspicion of narcotics trafficking activities; (d) arranged for the release of seized narcotics or narcotics-related currency; and (e) prevented the arrest or deportation of individuals sought for prosecution in foreign countries, including the United States.

86.    In 2017, two of Maduro's wife's cousins, Efrain Antonio Campo Flores and Franqui Francisco Flores, were convicted of conspiracy to smuggle cocaine into the United States and sentenced to 18 years in prison.  The Acting Manhattan U.S. Attorney explained that the crime

---

[41] *See* Press Release, Dep't of Justice, Assistant Attorney General Brian A. Benczkowski Delivers Remarks at Press Conference Announcing Criminal Charges Against Venezuelan Officials (March 26, 2020) available at  https://www.justice.gov/opa/speech/assistant-attorney-general-brian-benczkowski-delivers-remarks-press-conference-announcing.

[42] *See* Indictment, *United States v. Torres*, 15-cr-20 (E.D.N.Y.), at ¶ 4, available at https://www.justice.gov/doj/page/file/1261891/download.

was motivated, in part, by a desire to enhance Maduro's political power at home: "In part to fund an election campaign for the First Lady of Venezuela, Efrain Antonio Campo Flores and Franqui Francisco Flores de Freitas devised a plan to work with the FARC terrorist organization to send literally tons of cocaine to the United States."[43]

87.     As well, numerous Maduro Criminal Enterprise operatives have been indicted in Miami for their unlawful trafficking of narcotics:

a.     Pedro Luis Martin-Olivares, the former Chief of Economic Intelligence for Venezuela's secret police (SEBIN), was indicted in Miami for distributing more than five kilograms of cocaine for import into the United States and possessing with the intent to distribute more than five kilograms of cocaine on board an US registered aircraft.[44]

b.     Rodolfo McTurk-Mora, former head of Interpol in Venezuela, was indicted in Miami for conspiring to import more than five kilograms of cocaine into the United States and to corrupt and impede the South Florida federal prosecution of another narcotics trafficker.[45]

c.     Jesus Alfredo Itriago, the former Chief of Counter-narcotics of a main criminal investigative agency in Venezuela was indicted in Miami for conspiring to import more than five kilograms of cocaine into the United States.[46]

---

[43] Press Release, U.S. Dep't of Justice, Nephews Of Venezuela First Lady Each Sentenced To 18 Years In Prison For Conspiring To Import Cocaine Into The United States (Dec. 14, 2017), available at https://www.justice.gov/usao-sdny/pr/nephews-venezuela-first-lady-each-sentenced-18-years-prison-conspiring-import-cocaine.

[44] See United States v. Luis Martin-Olivares, Case No. 15-cr-20299 (S.D. Fla).

[45] See United States v. McTurk-Mora, Case No. 13-cr-20930 (S.D. Fla.).

[46] See United States v. Itriago, Case No. 13-cr-20050 (S.D. Fla.).

### 2. The Maduro Criminal Enterprise's Material Support for FARC Terrorism, Including Against the United States and Its Citizens.

88.     A defining feature of the Maduro Criminal Enterprise is the symbiotic relationship among its principal members: on one hand, Maduro, the apparatus of the Venezuelan state that he controls, and the Cartel of the Suns, and on the other hand, the FARC.

89.     As described above, FARC, Maduro and the Cartel of the Suns have worked hand in glove to perpetrate a massive, ongoing, highly profitable narcoterrorism conspiracy aimed at the United States.  But the collaboration goes much farther and deeper.

90.     Venezuela also provides a safe haven for FARC.[47]  As a result, the FARC has taken over state functions in parts of Venezuela and has a vested interest in supporting the Maduro regime. Expansion into Venezuela has enabled the FARC to carry out attacks in Colombia and withstand blows from Colombian security forces.[48]

91.     In addition, Maduro provides high-end military grade weapons and munitions to FARC, such as shoulder-launched anti-tank weapons.[49]  Years ago, Maduro attended a meeting with a FARC representative at which the attendees agreed that the Cartel of the Suns would provide the FARC cash and weapons in exchange for increased cocaine production.[50]

92.     Conversely, at Maduro's request, FARC supplied training to unsanctioned militia groups (known as Colectivos or "Collectives") that function as an armed-forces unit for the Cartel

---

[47] Reuters Staff, *Amid Colombia Rebel Rearmament, U.S. Sees Support from Maduro* (Aug. 31, 2019), available at https://www.reuters.com/article/us-venezuela-politics-usa/amid-colombia-rebel-rearmament-u-s-sees-support-from-maduro-official-idUSKCN1VL0FZ.

[48] Ross Dayton, *Maduro's Revolutionary Guards: The Rise of Paramilitarism in Venezuela*, 12 CTC Sentinel 7,  (Aug. 2019) available at https://www.ctc.usma.edu/maduros-revolutionary-guards-rise-paramilitarism-venezuela/.

[49] *See* CNN, *Colombia: FARC Arms Traced to Venezuela*, July 27, 2009, available at http://www.cnn.com/2009/WORLD/americas/07/27/colombia.venezuela.arms/.

[50] Maduro Indictment, *supra* n. 4, ¶ 15f.

of the Suns.[51]  The Colectivos engage in kidnapping, extortion, drug trafficking and murder.  They are associated with extrajudicial killings and terrorizing dissidents.

93.     Venezuela's democratically elected National Assembly has designated the Colectivos as terrorist groups due to their "violence, paramilitary actions, intimidation, murders and other crimes," declaring their acts to be nothing short of state-sponsored terrorism.  The Colectivos have attacked anti-government protesters and Venezuelan opposition television staff, sent death threats to journalists, and once even tear-gassed the Vatican envoy.

94.     FARC's ongoing acts of international terrorism are not limited to collaborating with South American terrorists.  US Attorney Geoffrey S. Berman—unsealing the indictment of Adel El Zabayar, a member of the Maduro Criminal Enterprise—explained that:  "As alleged, Adel El Zabayar was part of the unholy alliance of government, military, and FARC members using violence and corruption to further their narco-terrorist aims.  El Zabayar was allegedly a key part of the apparatus that conspired to export literally tons of cocaine into the U.S.  We further allege today, for the first time, that the *Cártel de Los Soles* sought to recruit terrorists from Hizballah and Hamas to assist in planning and carrying out attacks on the U.S., and that El Zabayar was instrumental as a go-between.  Allegedly, El Zabayar obtained from the Middle East a cargo planeload of military-grade weaponry."[52]

---

[51] *See* DOJ Press Release, *supra* n. 6, at ¶ 13.

[52] *See* Press Release, U.S. Dep't of Justice, Former Member Of Venezuelan National Assembly Charged With Narco-Terrorism, Drug Trafficking, And Weapons Offenses (May 27, 2020), available at https://www.justice.gov/usao-sdny/pr/former-member-venezuelan-national-assembly-charged-narco-terrorism-drug-trafficking-and.

### 3. The Maduro Regime's Terrorism Against the Civilian Population of Venezuela.

#### i.    Overview

95.     The Maduro Regime engages in violent and unlawful terroristic abuses against the Venezuela population to suppress political opposition, maintain its authoritarian grip on Venezuela, and facilitate the Maduro Criminal Enterprise's lucrative narcotics trafficking and public corruption income.

96.     The State Department's 2019 Country Reports on Human Rights Practices: Venezuela, explains:

> Significant human rights issues included: ***unlawful or arbitrary killings, including extrajudicial killings by security forces of the former Maduro regime***, including *colectivos* (regime-sponsored armed groups); ***forced disappearances***; ***torture by security forces***; ***arbitrary detention by security forces***; harsh and life-threatening prison conditions; political prisoners; unlawful interference with privacy; and lack of judicial independence. . . .  The former Maduro regime used violence to repress peaceful demonstrations and repressed freedom of assembly. Other issues included: ***intimidation, harassment, and abuse of [National Assembly] members***, including denial of due process and parliamentary immunity; pervasive corruption and ***impunity among all Maduro-aligned security forces*** and in other national and state regime offices, including at the highest levels; trafficking in persons; violence against indigenous persons; and the worst forms of child labor, which the former regime made minimal efforts to eliminate.[53]

97.     Expanding on the description of Maduro's use of torture described above, the State Department Report further explains that "[r]egime-aligned authorities reportedly subjected detainees to asphyxiation, electric shock, broken bones, being hung by their limbs, and being forced to spend hours on their knees. Detainees reported regime-aligned security forces moved them from detention centers to houses and other clandestine locations where abuse took place. Cruel treatment frequently involved former regime authorities denying prisoners medical care and

---

[53] *See* Venezuela Country Report at 2, *supra* n. 27.

holding them for long periods in solitary confinement. The latter practice was most prevalent with political prisoners. NGOs detailed reports from detainees whom regime-aligned authorities allegedly sexually abused."[54]

98.     In September of 2019, the United Nations Human Right Council ("UNHRC") established an independent fact finding mission (the "U.N. Fact Finding Mission" or "Mission") to Venezuela "to investigate extrajudicial executions, enforced disappearances, arbitrary detentions and torture and other cruel, inhumane or degrading treatment since 2014 with a view to ensuring full accountability for perpetrators and justice for victims."[55]   The Mission carried out 274 interviews with victims, witnesses, family members, former State officials, lawyers, representatives of non-Governmental organizations, and international personnel.[56]   The Mission produced a report, dated September 15, 2020, titled "Detailed findings of the independent international fact-finding mission on the Bolivarian Republic of Venezuela" (the "UNHRC Detailed Findings Report").

99.     Like the U.S. State Department Report, the UNHRC Detailed Findings Report documented "acts of torture and other ill-treatment" including the use of: (1) "[s]tress positions called the "crucifixion" (arms spread out and handcuffed to pipes or grilles) and 'the octopus'/'el pulpo' (a metal belt with chains attached to immobilize the wrist and ankles); (2) "[a]sphyxiation with plastic bags, chemical substances or a bucket of water"; (3) "[b]eatings, sometimes with a stick or other blunt object"; (4) "[e]lectric shocks to the genitals or other parts of the body"; (5) "[d]eath threats or threats of additional violence"; (6) "[t]hreats of rape against the victim and/or

---

[54] *Id.* at 5-6.

[55] *See* UNHRC Detailed Findings Report, *supra* n.1, at ¶ 1.

[56] *Id.* ¶ 9.

their relatives; (7) "[p]sychological torture including sensorial deprivation, constant lighting and extreme cold"; and(8) "[f]orced nudity including in rooms kept at extremely low temperatures."[57]

### ii.    The DGCIM

100.    The DGCIM reports directly to Maduro as *de facto* commander-in-chief of Venezuela's army, and administratively to Vladimir Padrino Lopez, as the *de facto* Minister of Defense.  Maduro has the power to appoint and remove the DGCIM's director, who also acts as an advisor to the President regarding the appointment of key military personnel.  The DGCIM has broad powers to "conduct, coordinate and execute activities aimed at the discovery, prevention and shutdown of enemy activity" and its duties including protecting President Maduro.

101.    The DCGIM is responsible for carrying out initial investigations into targeted dissidents, arresting them, interrogating them and detaining them. The detentions take place mainly at its headquarters offices in Boleíta Norte, Caracas, outside the purview of the penitentiary system. The DGCIM routinely tortures its prisoners.  "DGCIM torture methods evolved between 2014 and 2020, with a marked increase in violence since 2017."[58]

102.    On July 11, 2019, OFAC sanctioned the DGCIM in response to the "Maduro regime's inhumane treatment of political opponents, innocent civilians, and members of the military in an effort to suppress dissent."[59]

---

[57] *Id.* ¶ 285.

[58] UNHRC Detailed Factual Findings, ¶ 319.

[59] Press Release, Treasury Sanctions Venezuela's Military Counterintelligence Agency Following the Death of a Venezuelan Navy Captain (July 11, 2019), https://home.treasury.gov/news/press-releases/sm727.

### iii.    The "Playbook" for Oppressing Political Prisoners.

103.    When the Maduro Regime—through intelligence services such as the DGCIM—targets political prisoners, it has a typical modus operandi ("MO") for doing so.  In other words, it has a "playbook" that it typically follows.

104.    The "playbook" for the Maduro Regimes attacks on political prisoners begins with the arbitrary arrest of an innocent individual.  As the UNHRC Detailed Findings Report explains, the UNHRC "identified a pattern"—which was "commonplace"—"in which DGCIM officers failed to present arrest warrants and/or failed to explain the reason for the detention at the moment of arrest, in violation of [Venezuela] national and international human rights standards."[60]

105.    Second, "within hours or days of arrests, high-level Government authorities [typically] ma[k]e public declarations" falsely accusing the political prisoners of "crimes" against the Venezuelan state and/or Maduro himself, and smearing the victims with other spurious accusations.[61]  The statements are sometime accompanied by information "such as video footage collected by informants of meetings in which coup attempts were purportedly planned."[62]  Government representatives who often made declarations included "President Maduro;  . . . Minister of Defence, Vladimir Padrino López; and/or Minister of the Interior, Néstor Reverol."[63]

106.    Third, the DGCIM holds the prisoners incommunicado at secret locations, where they are tortured.  The "DGCIM frequently detain[s] people in secret or unofficial detention facilities, especially in the first hours or days of detention."[64] "The first days [often are] spent . . .

---

[60] UNHRC Detailed Factual Findings, ¶ 309.

[61] *Id.* ¶ 311

[62] *Id.*

[63] *Id.* ¶ 312.

[64] *Id.* ¶ 315.

in DGCIM [Headquarters in] Boleíta" Caracas.[65] "Acts of torture usually [occur] during interrogations, shortly after arrest while detainees [are] held incommunicado."[66]

107.    Fourth, prisoners are transferred to longer term holding cells, the location of which varies depending on the prisoner. "Cases of major importance (political enemies, high-ranking military personnel) are held in Boleíta, intermediate cases are transferred to Fort Tiuna and the simplest cases are transferred to Ramo Verde."[67]  The conditions at the locations are so cruel they constitute further torture. Among other things:

    a.    "Detainees are frequently not permitted calls to their relatives, with calls sometimes limited to two minutes every two weeks."[68]

    b.    "The cells in DGCIM Boleíta are in the basement, referred to as Basement 1, without natural light or ventilation. Cells are around 2.75 x 2 meters, often with two or three occupants. . . .  [A]rtificial lighting [is] on 24 hours a day, affecting the notion of time."[69]

    c.    "Cells [lack] bathrooms and detainees [must] to relieve themselves in bags."[70]

    d.    "Detainees [sleep] on a cement platform with a very thin mattress."[71]

    e.    "There [is] no access to drinking water and detainees suffered from stomach illnesses. Detainees interviewed complained of respiratory diseases and skin diseases due to the

---

[65] *Id.*

[66] *Id.* ¶ 317.

[67] *Id.* ¶ 329

[68] *Id.* ¶ 342.

[69] *Id.* ¶ 331.

[70] *Id.*

[71] *Id.* ¶ 332.

lack of sun and extreme weight loss, as well as psychological problems."[72]

      f.     "Detainees described a punishment cell known as 'El Cuarto de los Locos' (the Crazy Room). It was lined with padded walls and detainees slept on the floor. As with the regular cells, there [is] no bathroom access, so detainees had to use a plastic bag, which was changed once a week. Guards provided meals once or twice a day, in small portions, 'enough to keep you alive.'"[73]

### 4. Kleptocracy and Corruption

108.    In the words of United States District Attorney for the Southern District of Florida Ariana Fajardo Orshan, "[o]ver the last decade, corrupt Venezuelan government officials have systematically looted Venezuela of billions of dollars."[74]  The Maduro Regime's looting of *billions* of dollars from Venezuela's Treasury has played a major role in sending Venezuela's economy into a death spiral and in causing a humanitarian crisis of unfathomable proportions.[75]

### i.   Currency Control Scams

109.    Historically and continuing throuh today, one of the Maduro Regime's most profitable schemes for siphoning funds from the Venezuelan treasury into insiders' pockets has been a currency conversion scam that takes advantage of the strict currency controls that Maduro imposes on Venezuela's official currency, the bolívar. The basics of scheme, in its simplest form, are straightforward: Maduro's cronies buy US dollars on the official Venezuelan government exchange (which offers US dollars at a steep discount against the bolívar, and is accessible only to

---

[72] *Id.*

[73] *Id.* ¶ 333.

[74] DOJ Press Release, *supra* n. 6, at 1.

[75] Venezuela currently ranks number 1 of all countries on Hanke's Misery Index, available at https://www.cato.org/commentary/hankes-2020-misery-index-whos-miserable-whos-happy.

those select persons who enjoy the Maduro Regime's favor).  Then, Maduro's cronies resell the US dollars on Venezuela's black market at a hefty profit.

110.    A more detailed explanation of this scheme is set forth by a Homeland Security Investigations Special Agent in a criminal money laundering case against a member of the Maduro Criminal Enterprise: "Venezuela has a foreign-currency exchange system under which the government will exchange local currency (Bolivars) at a fixed rate for U.S. Dollars. The fixed exchange rate has been well below the true economic rate by a substantial factor for several years. For example, in 2014, the Venezuelan government fixed exchange rate was approximately six Bolivars to one U.S. Dollar. By contrast, the true economic exchange rate was approximately sixty Bolivars to one U.S. Dollar. The difference between the fixed rate and the true economic rate creates opportunity for fraud and abuse."[76]

111.    "For example, in 2014, an individual could exchange 10 million U.S. Dollars for 600 million Bolivars at the true economic rate. Then, if that individual had access to the government fixed rate, he could convert that same 600 million Bolivars into 100 million U.S. Dollars. Essentially, in two transactions, that person could buy 100 million U.S. Dollars for 10 million U.S. Dollars. Massive fraud and corruption is rampant throughout Venezuela's government-run foreign-exchange system. Estimates of the fraud range as high as $20 billion a year, and reports indicate that corrupt government officials take kickbacks to authorize exchanges at the fixed rate."[77]

---

[76] *United States v. Guruceaga*, 18-MJ-03119 (S.D. Fla.), Affidavit of George Fernandez, Special Agent, Homeland Security Investigations, available at https://www.justice.gov/criminal-fraud/file/1119981/download.

[77] *Id.*

112.    In a somewhat more sophisticated version of the same type of scheme, Maduro Criminal Enterprise operatives started with U.S. dollars and used them to purchase "bolivares on the black market. They then gave a loan to Venezuela's state-owned oil company—Petróleos de Venezuela, S.A.  ("PDVSA")—in bolivares, but PDVSA paid them back in dollars at the official exchange rate, which resulted in them having many more dollars than what they started out with. This allowed the group to increase their initial investment tenfold.  The operation began in December of 2014, and was meant to embezzle $600 million (about €534 million). By May 2015, the group had been able to double the amount to $1.2 billion (€1.07 billion)."[78]

### ii.    Bribery to Obtain Payments from PDVSA.

113.    U.S. law enforcement identified almost a billion dollars in transfers from subsidiaries PDVSA to the bank accounts of various Venezuelan contractors in South Florida.[79] From there, a substantial amount of money was transferred out of the contractors' accounts in Miami as bribes for the benefit of Venezuelan government officials.

114.    Defendant Moreno Perez, in his position as Chief Justice of the Venezuelan Supreme Court, supported this corruption by accepting massive bribes in exchange for affecting the outcomes of criminal and civil cases in Venezuela, including directing lower-court judges to dismiss particular cases or release certain defendants.

115.    For example, with respect to an individual charged in the United States for his role in a multibillion-dollar PDVSA fraud scheme, Moreno Perez helped the individual get the case

---

[78] *See* How Millions of Dirty Dollars were Laundered out of Venezuela, DW, available at https://www.dw.com/en/how-millions-of-dirty-dollars-were-laundered-out-of-venezuela/a-47867313.

[79] *See United States v. Moreno Perez,* 20-cr-2407 (S.D. Fla.), Affidavit of Shauna L. Willard, Special Agent, Homeland Security Investigations, ¶ 7, available online at https://www.justice.gov/opa/page/file/1261816/download.

against him in Venezuela dismissed.[80]  In exchange for a $1 million bribe—which came from a Miami bank account that held the proceeds of corruptly inflated PDVSA contracts—Moreno Perez arranged for a PDVSA contractor charged with corruption to be released from detention in Venezuela.[81]

### 5.  Money Laundering

116.    The Maduro Criminal Enterprise laundered the proceeds of its criminal endeavors through the United States, especially South Florida.

### i.  Proceeds of Currency Control Scams Received by Members of the Maduro Criminal Enterprise.

117.    The Maduro Criminal Enterprise choreographed a billion-dollar international scheme to launder the proceeds of the PDVSA foreign exchange scheme described above.[82]  The DOJ's investigation "revealed an international conspiracy to launder the PDVSA funds through Miami and several large-scale, international third-party money-laundering organizations.  More specifically, the investigation revealed the use of Miami real estate and sophisticated false-investment schemes to launder hundreds of millions of U.S. Dollars."[83]

118.    The affidavit supporting the criminal complaint relating to the Maduro Criminal Enterprise's laundering of the PDVSA foreign exchange scam proceeds details a sprawling, multifaceted money laundering conspiracy amongst eight members of the Maduro Criminal

---

[80] *Id.* ¶ 20.

[81] *Id.* ¶¶ 23-32.

[82] *See* Press Release, U.S. Dep't of Justice, Two Members of Billion-Dollar Venezuelan Money Laundering Scheme Arrested (July 25, 2018), available at https://www.justice.gov/opa/pr/two-members-billion-dollar-venezuelan-money-laundering-scheme-arrested#:~:text=Matthias%20Krull%2C%2044%2C%20a%20German,conspiracy%20to%20commit%20money%20laundering.

[83] *See* Affidavit of George F. Fernandez, *United States v. Guruceaga*, 18-MJ-3119-Torres (S.D. Fla.), available at https://www.justice.gov/criminal-fraud/file/1119981/download, ¶ 18.

Enterprise aided by a "network of professional money launderers" made up of money managers, brokerage firms, banks and real estate investment firms in the U.S. and abroad.[84]

119.    One of the co-conspirators who pleaded guilty to the charges of money laundering conspiracy admitted that he plotted with "Los Chamos" (Venezuelan slang for "the kids")—specifically, Maduro's steps sons, Yoswal, Yosser and Waler Flores, to launder $200 million of the proceeds from the PDVSA foreign exchange scam.[85]

### ii.    Proceeds of Bribery Received by Members of the Maduro Criminal Enterprise.

120.    Defendant Moreno Perez laundered and expended a significant portion of his ill-gotten gains in South Florida.  From 2012 to 2016—when his salary in Venezuela was $12,000 per year—Moreno Perez's bank records show approximately $3 million in expenditures primarily in the geographical area of South Florida. Additionally, bank records show that he paid approximately $1 million for a private aircraft and private pilot. Bank records also show that he spent more than $600,000 in credit or debit card purchases at stores primarily in the South Florida area (including tens of thousands of dollars at luxury stores in Bal Harbor, such as Prada and Salvatore Ferragamo), approximately $50,000 in payments to a luxury watch repair store in Aventura, and approximately $40,000 in payments to a Venezuelan beauty pageant director.

121.    Similarly, Motta Dominguez, the Venezuela Minister of Electrical Energy and President of Corporacion Electrica Nacional, S.A. ("Corpoelec"), Venezuela's state-owned electricity company, is a member of the Maduro Criminal Enterprise who participates in the Maduro Criminal Enterprise's public-corruption offenses.  He was part of a multimillion-dollar

---

[84] *Id.* ¶¶ 19-31.

[85] Joshua Goodman, Maduro's Stepsons Face Scrutiny in $1.2 Billion Graft Case (Aug. 28, 2018), AP, available at https://apnews.com/article/7a7fe8b6733a4971859f36df91d27b6f.

scheme in which Florida companies, in violation of the Foreign Corrupt Practices Act, paid bribes to receive awards of Corpoelec contracts.  He was indicted in the United States District Court for the Southern District of Florida for conspiracy to launder the bribe proceeds in this district.[86]

### iii.   Proceeds of Narcotics Trafficking Received by Members of the Maduro Criminal Enterprise.

122.    In addition, "Maduro and others agreed to launder many millions of dollars from the FARC by purchasing palm oil extraction equipment from Malaysia with drug proceeds, which would be used to support the operation of African palm plantations in Venezuela that would appear legitimate."[87]

### F.  The DolarPro.com website

123.    In September 2016, the Venezuela economy began to experience hyperinflation, with the bolívar losing 99% of its value by December 2017, and with the bolívar  losing yet another 99% of its value again by October 2018.

124.    In light of the constant, rapid, and significant changes to value of the bolívar during this period of hyperinflation, Venezuelan citizens needed to know the free market exchange rate of bolívars to U.S. dollars.  That is, Venezuelan citizens needed to be able to value of their home country currency; otherwise, they would not be able to engage in commerce.

125.    But Venezuelans could not obtain true exchange rate information from the Maduro Regime.  Instead, the Maduro Regime published *only* the official government exchange rate, *i.e.*, a rate that (a) overvalued to bolívar and (b) was useless to ordinary Venezuela citizens because

---

[86] *See* Indictment, *United States v. Luis Alfredo Motta Dominguez*, 19-cr-20388 (S.D. Fla. 2019), available online at https://www.justice.gov/opa/page/file/1261781/download.

[87] *See* Maduro Indictment, *supra* n. 4, at ¶ 15c.

they were not permitted to use the government's currency exchange and take advantage of its favorable pricing.

126.    The chart below shows the discrepancy between the plummeting value of the bolívar on the free market versus artificially high value of the bolivar on the Maduro Regime's official exchange.

a.    The free market value of the bolivar is shown on top line of the chart, i.e., $1 USD was worth 1,000 bolívars in September 2016, then 100,000 bolívars in December 2017, and then 1,000,000 bolívars in August 2018.

b.    The Maduro Regime's valuation of the bolívar is shown on the bottom line of the chart, i.e., $1 USD was worth 10 bolívars on the official Venezuelan exchange in September 2016, and was still worth 10 bolívars December 2017, and was worth around 100,000 bolívars in August 2018.



127.    Because Venezuelan citizens could not obtain true bolívar to USD exchange rates from the Maduro Regime, Venezuela citizens turned to websites maintained outside of Venezuela for this vital information.  There were a number of such websites that gained popularity with Venezuela citizens.

128.    The Maduro Regime was extremely hostile toward websites that published true dollar to bolívar exchange rates.  For example, in 2016, a Wall Street Journal article characterized the President of one such website (DolarToday.com, a website managed by a Venezuela expatriate who worked in a hardware store in Alabama) as "Public Enemy No. 1 of Venezuela's revolutionary government," and reported that the Maduro Regime "turned to hackers to launch constant attacks" against it.[88]

129.    There are many reasons why the Maduro Regime opposed websites publishing the true U.S. dollar to bolívar exchange rate.  For one thing, the Maduro Regime was embarrassed by its inability to manage the Venezuelan economy and by the fact that its official exchange rate had no bearing in reality.  For another, as explained above (¶¶ 107-117), the Maduro Criminal Enterprise was utilizing the official exchange rate to steal billions of dollars and—given that "sunshine is the best disinfectant"—likely felt that the less said about exchange rates, the better.

130.    Thus, when the DolarPro website owned by Mr. Marrón first began to publish the dollar to bolívar exchange rate,[89] Mr. Marrón incurred the wrath of the Maduro Regime.

---

[88] Anatoly Kurmanaev, *Venezuela's Nemesis Is a Hardware Salesman at a Home Depot in Alabama*, Wall Street Journal (Nov. 20, 2016), available online at https://www.wsj.com/articles/venezuelas-nemesis-is-a-screw-salesman-at-a-home-depot-in-alabama-1479672919.

[89] A historical view of the DolarPro website is available online at https://web.archive.org/web/20170826191840/http://www.dolarpro.com/.

131.     In addition, the DolarPro website published other accurate information concerning the situation in Venezuela, including addressing topics such as politics, economics, international relations, and public health.  Because these articles did not adhere to the Maduro Regime's party line (e.g., falsely denying Venezuela's hardships and/or wrongly blaming the United States and other outsiders, rather than the Maduro Regime, for Venezuela difficulties), the DolarPro site further infuriated the Maduro Regime.

## II.     THE MADURO CRIMINAL ENTERPRISE'S CRIMES AGAINST MR. MARRÓN AND HIS FAMILY

### A.  The DGCIM Kidnapping and Torture of Mr. Marrón's Father.

132.     Because Mr. Marrón was living in Miami, and because DolarPro.com was being managed and hosted from  the United States, the Maduro Criminal Enterprise's options for striking at Mr. Marrón or DolarPro.com directly were limited.

133.     To overcome that hurdle, on Tuesday, April 10, 2018, DCGIM operatives kidnapped Mr. Marrón's elderly father, Ramon Antonio Marrón Moreno.[90]  At the time, Mr. Marrón's father was going on his typical morning walk in the Valle Arriba neighborhood of Caracas, Venezuela.

134.     On video of the incident, a car can be seen parked near the curb, waiting for Mr. Marrón's father to walk past.  As soon as Mr. Marrón's father comes near the parked car, a plain clothes DGCIM agent can be seen exiting the car on the passenger side, grabbing Mr. Marrón's father and herding him into the car.  The kidnappers' car then can be seen making a hasty U-turn and driving off frame.  The entire kidnapping is smooth, professional, and takes under 15 seconds.

---

[90] Daniel Andrade, *DGCIM Plays the Gestapo Game Like They Invented It*, Caracas Chronicles (May 22, 2018) ("on Tuesday, April 10, members of the DGCIM forcibly pushed Carlos' father inside a car in Valle Arriba when he was having a morning walk.").

135.    When Mr. Marrón learned that his father had been kidnapped, he immediately decided to fly to Venezuela to help.  At the time, he still had no idea that the Maduro Criminal Enterprise was behind the kidnapping.

**B.  The DGCIM Kidnapping of Mr. Marrón.**

136.    On April 11, 2018, the day after his father was kidnapped, Mr. Marrón traveled to Caracas, Venezuela, to help assist in negotiating with his father's kidnappers and securing the release of his father.

137.    The DCGIM kidnapped Mr. Marrón when he landed at Simon Bolivar International Airport in Caracas on April 11, 2018.[91]  The DCGIM had been lying in wait for him, and the moment the immigration officer on duty saw Mr. Marrón's name on his passport (without even having to check her computer terminal), she alerted DCGIM operatives so that they could snatch up Mr. Marrón.  The DCGIM did not have an warrant for Mr. Marrón's arrest, or probable cause to arrest him.[92]  Nevertheless, armed DGCIM agents grabbed Mr. Marrón from the airport and whisked him away to their Boleíta headquarters in Caracas.

138.    The DGCIM also stole Mr. Marrón's luggage at the same time they kidnapped him; it has never been returned.

**C.  The Maduro Regime Brings Bogus Charges Against Mr. Marrón and Defames Him.**

---

[91] UNHRC, Working Group on Arbitrary Detention, Views Approved by the Working Group on Arbitrary Detention at its eighty-sixth session, Nov. 18-22, 2019, Opinion no. 80/2019, related to Carlos Marrón Comenares (Bolivarian Republic of Venezuela), A/HRC/WGAD/2019/80 (Mar. 2, 2020)          ("UNHRC          Marrón          Report")          at          ¶          6,          available          at https://undocs.org/en/A/HRC/WGAD/2019/80.

[92] *Id.*

139.    Shortly after the DGCIM kidnapped Mr. Marrón, and consistent with the Maduro Regime's playbook for suppression of political prisoners (*see* ¶¶ 93-105, *supra*), the Maduro Regime announced bogus charges against Mr. Marrón.

140.    Specifically, on April 13, Mr. Marrón was charged with having disseminated "false" information regarding the price of the bolívar (meaning any rate other than the official, government approved dollar to bolívar exchange rate that had no basis in reality).

141.    Supposedly, Mr. Marrón's publication of the true dollar to bolívar exchange rate violated Venezuela's Article 24 of Decree 2167 of the December 29, 2015 (known as the Law of the Foreign Exchange Regime and Its Unlawful Acts); however, in fact, this was not a law but rather a Presidential decree, and accordingly, detaining Mr. Marrón pursuant to this is a violation of international law.[93]  Moreover, Article 24 was repealed by Venezuela's National Assembly on August 2, 2018.[94]  Accordingly, there was no lawful basis to charge Mr. Marrón.

142.    In fact, Mr. Marrón was arrested simply for exercising his rights of freedom of speech in the United States.  As the UNHRC explained, its Working Group is "convinced that the conduct for which the [Venezuelan] Government intends to sanction Mr. Marrón is due to the fact that he disseminated information through an Internet portal. . . .  In other words, Mr. Marrón is detained because he is accused of having used his right to freedom of expression based on a criminal offense that the Working Group has found to be non-existent."[95]

---

[93] UNHRC Marrón Report ¶ 86 ("In this sense, the Working Group received convincing information that the legal basis for charging the crime of spreading false information about the exchange rate is not provided for in a law in the formal sense of the term, which implies that it was not discussed and approved by a democratically elected congress with constitutional competence for these purposes.").

[94] *Id.* ¶ 88 ("Mr. Marrón is arbitrarily deprived of his liberty, since the norm that provides for the crime that the motivated was repealed by the Assembly National Constituent.").

[95] *Id.* ¶ 95.

143.   On April 13, 2018, *de facto* Attorney General Saab appeared on Venezuela television to discuss Mr. Marrón's case.[96] Defendant Saab made a number of false and defamatory statements about Mr. Marrón, including that Mr. Marrón was a "criminal of the worst ilk," a "financial terrorist," a "coward," as well as asserting that Mr. Marrón had engaged in conduct "worse than mass murder," and urging that Mr. Marrón's name as a "bad actor" be "spread across the country."[97]   Saab further said that Mr. Marrón was guilty of money laundering, conspiracy, and financing terrorism.[98]   Saab also noted that the Dolar Pro site is based in Miami, Florida.[99]

144.   The statements were false:  Mr. Marrón is not a criminal, a financial terrorist or a coward.  His lawful exercise of free speech is not "worse than murder."  He was not, and is not, guilty of money laundering, conspiracy, or financing terrorism.

145.   These false statements were available on YouTube and other internationally available media and, on information a belief, were viewed by the persons in Florida, including members the large population of Venezuelan ex-patriots in South Florida.

---

[96] *Id.* ¶ 12; Televen TV, *Saab: Detenido propietario del portal Dólar Pro* (April 13, 2018), available at https://www.youtube.com/watch?v=s5TQFglk7NU; La Patilla News, *Saab anuncia detención del dueño del portal Dólar Pro*, available at https://www.youtube.com/watch?v=pMFINqfkpYE; Union Radio (@ Unionradio.net), Twitter (April 12, 2018), at https://mobile.twitter.com/unionradionet/status/984568903799013376; *Prosecutor accused Carlos Eduardo Marrón, owner of the DolarPro portal, in the agenda*, Newsbeezer.com (May 31, 2018) (quoting Saab as saying "This page outside the law aims to apply financial terrorism, promote currency speculation and destroy the Venezuelan currency"), available at https://newsbeezer.com/venezulaeng/prosecutor-accused-carlos-eduardo-marron-owner-of-the-dolarpro-portal-in-the-agenda/.

[97] *Id.*

[98] *Supra,* at n. 90. ("Tarek William Saab publicly said that the crimes [Marrón] was guilty of (because you are guilty until proven innocent) were "spreading false information" (according to the Law of Currency Exchange), money laundering, conspiracy to commit a crime and financing terrorism.")

[99] Noticias Financieras, *Attorney General announces arrest of the owner of the digital portal Dólar Pro,* 2018 WLNR 11037660 (April 12, 2018).

146.    Similarly, Saab stated that "DolarPro is a page outside the law; Its objective was to apply financial terrorism, promote exchange speculation and destroy the Venezuelan currency. This is a signal that we are sending to those who imitate this criminal; the era of impunity is over in this country."[100]

147.    The statements were false:  Mr. Marrón is not a criminal, and DolarPro was not attempting to "apply financial terrorism," "promote exchange speculation," or "destroy the Venezuela currency."

148.    These false statements were available on internationally available media and, on information and belief, were viewed by the persons in Florida, including members the large population of Venezuelan ex-patriots in South Florida.

149.    The Maduro Regime's attack on Mr. Marrón and the DolarPro website were not isolated incidents. Rather, those actions were part of a broader effort by the Maduro Regime to roundup and persecute dozens of persons involved in the exchange of bolívars for dollars at fair market prices—and to scapegoat those persons and the United States for Venezuela's economic crisis.  In Venezuela's words:  "Venezuela is facing . . . barbaric and continued attacks on the economy that significantly affect the welfare and quality of life of our people. The Venezuelan government has spared no effort in the short and medium term, to get out of these vicious criminal actions promoted by the American Empire and its domestic and regional acolytes."[101]

---

[100] *They Accuse the Owner of DolarPro of Spreading False Information*, Cuentas Claras Digital (April 18, 2018), available at https://www.cuentasclarasdigital.org/2018/04/imputan-al-dueno-de-dolarpro-por-difusion-de-informacion-falsa/ (Google translation).

[101] *See* UNHRC Venezuelan Response to Independent Expert Report, ¶ 42(xii).

150.     The foregoing illustrates that, in making the false statements described above, Saab likely was specifically attempting to injure Mr. Marrón's reputation in the United States, particularly in Florida, where Mr. Marrón resides.

151.     The Maduro Regime dubbed its efforts to arrest and penalize persons involved in unofficial exchanges of Venezuela currency "Operation Paper Hands."

152.     The same day the Mr. Marrón's father was kidnapped, the then Executive Vice President of Venezuela, Tareck El Aissami, reported that 86 people had been subject to mass arrests as part of Operation Paper Hands.[102]   The Maduro Regime further stated that "[a]mong those captured 31 people have direct links with Carlos Eduardo Marrón, owner of the website Dolar Pro. . . .   The operation was centered on Carlos Eduardo Marrón, who is accused of the crimes of dissemination of false information on the exchange rate, money laundering and criminal association. He was responsible for the marking and the imposition of the criminal dollar to attack and destabilize the Venezuelan financial system."[103]

153.     On or about April 23, 2018, Defendant Reverol stated that pursuant to Operation Paper Hands, more than 125 persons had been arrested for "destabilizing the Venezuelan financial system," including "the owner of the DolarPro page, Carlos Eduardo Marrón."[104]

---

[102] *Id.* ¶ 42(xxiv).

[103] *Id.* ¶ 42 (xxv).

[104] *See, e.g., There are more than 125 arrested for operation "Hands of Paper", says Reverol*, Noticiero Digital (April 23, 2018), available at https://htr.noticierodigital.com/2018/04/van-mas-125-dtenidos-operacion-manos-papel-dice-reverol/.  Similar statements appear on Maduro Regime's website, available at https://yaracuy.gob.ve/web/noticias/more/17881-Operacin-Manos-de-Papel-ha-capturado-125-personas-por-contrabando-de-billetes and http://www.minci.gob.ve/conoce-los-nuevos-avances-de-la-operacion-manos-de-papel/.

154.    These statements that Defendant Reverol made were false.  Mr. Marrón was not engaged in any criminal conduct, and was not trying to attack or destabilize the Venezuelan financial system.

155.    These false statements were available on internationally available media, including the Maduro Regime's website.[105]  On information and belief, these false statements were viewed by the persons in Florida, including members the large population of Venezuelan ex-patriots in South Florida, who were among the Maduro Regime's intended audience.

**D.  The Maduro Regime's Detention and Horrific Torture of Mr. Marrón.**

156.    At DGCIM headquarters, during the first 48 hours after Mr. Marrón was initially kidnapped, the DGCIM subjected Mr. Marrón to intensive torture and interrogation, including the following:

a.      **Restraints.**  DGCIM officers tightened handcuffs around Mr. Marrón's wrists until they dug into his skin and cut off circulation.  They placed a hood over his head, effectively blinding him.

b.      **Beatings.**  DGCIM beat Mr. Marrón all over his body, including his feet, legs, shoulders and head.  This included beating his feet with wooden boards, beating his shoulders with metal rebar rods, punching and kicking him, and beating his head until he lost consciousness.

c.      **Wet Asphyxiation (simulated drownings aka waterboarding).**    The DGCIM asphyxiated Mr. Marrón with water, *i.e.*, simulating drownings aka waterboarding.  This is a particularly brutal means of torture that "can cause extreme pain, damage to lungs, brain damage, from oxygen deprivation, other physical injuries including broken bones due to struggling

---

[105] *Id.*

against restraints, and lasting psychological damage.  Adverse physical effects can last for months, and psychological effects for years."[106]

       d.    One retired interrogator from the U.S. military who experienced simulated drownings said of the experience:  it is "slow motion suffocation with enough time to contemplate the inevitability of black out and expiration — usually the person goes into hysterics" and "It is an overwhelming experience that induces horror, triggers a frantic survival instinct."[107]

       e.    Another former U.S. military interrogation instructor who experienced simulated drowning said:  "It was the worst thing I've ever felt. . . . There's no way to tell your body that this is going to end. Your body thinks you're drowning and stops acting appropriately . . .  It's physically painful. I don't know if you've ever gotten water up your nose while you're swimming. It's that over and over again until who's doing it makes it stop. You've got water in your lungs, your brain is on fire, your nasal cavity is on fire, your throat is completely swollen up."

       f.    **Dry asphyxiation (Plastic Bags and Hoods with Chemical Irritants).** The DGCIM also asphyxiated Mr. Marrón with plastic bags and by releasing tear gas inside the hood covering Mr. Marrón's head.  This form of torture is known as "dry asphyxiation."[108] Physical consequences of dry asphyxiation included "petechiae (pin-point sized skin bleedings

---

[106] *See* Wikipedia, https://en.wikipedia.org/wiki/Waterboarding#:~:text=Waterboarding%20is%20a%20form%20of, experience%20the%20sensation%20of%20drowning.&text=However%2C%20if%20the%20wat er%20is,asphyxia%2C%20also%20called%20dry%20drowning..

[107] Jessica Schulberg¸ *Here's What Waterboarding Is Really Like, According To People Who Suffered Through It*, Huff Post (May 9, 2018), available at https://www.huffpost.com/entry/what-waterboarding-is-really-like_n_5ab3b4bae4b008c9e5f4d6b5.

[108] *See* Torture by Asphyxiation (Dry), Dignity (Danish Institute Against Torture) ("Torture by dry asphyxiation is the prevention of normal respiration by obstruction of the airways, pressure or ligature around the neck or by forced aspiration of dust, gas, cement etc."), available at https://www.dignity.dk/en/dignitys-work/health-team/torture-methods/torture-by-asphyxiation/.

caused by broken capillary blood vessels) on the skin and conjunctivae (eyes), bleeding from the ears or nose, mouth infections, acute or chronic respiratory problems, cerebral hypoxia (brain oxygen deprivation) leading to loss of consciousness, chronic cognitive impairment, brain damage, and even death."[109]

g.     **Verbal and Psychological Abuse.**  The DGCIM also subjected Mr. Marrón to intensive verbal and psychological abuse during these torture sessions.  They threatened the health of his father, taunting Mr. Marrón that his father likely would not survive DGCIM captivity because the DGCIM would deny Mr. Marrón's elderly father access to his medicine—and the DGCIM made clear that they did not care if Mr. Marrón's father died.  They repeatedly threatened the rape and kill Mr. Marrón's entire family, going into crude detail.

h.     Mr. Marrón was seen by a "doctor" provided by the Maduro Regime, who told Mr. Marrón that it was "a shame" that the Maduro Regime had not tortured Mr. Marrón more, because he deserved it.

157.   **Stress Position Torture and Further Beatings.**   The DGCIM then took Mr. Marrón to another part of its headquarters building (likely its basement) to continue with Mr. Marrón's torture and interrogation.  In the new location, the DGCIM left Mr. Marrón handcuffed, blindfolded and required to stand upright against a wall for days at a time.  Indeed, Mr. Marrón was forced to stand until he fainted or fell unconscious from pain, exhaustion, and lack of circulation.  The DGCIM would then beat Mr. Marrón until he stood up again.

158.   **Torturous Conditions of Confinement (the "Crazy Room").**  The DGCIM then locked up Mr. Marrón on the notorious "Crazy Room"—a punishment cell in the basement of DGCIM headquarters—likely for around 36 days.  The cell is a cube approximately five feet wide

---

[109] *Id.*

by five feet deep, completely dark, with padded walls.  Mr. Marrón was crammed into the darkness of the Crazy Room with two other prisoners.  The prisoners were given just two miniscule meals a day, at irregular intervals, often consisting of rotted food with live insects on it.  Prisoners were denied anything that would allow them to assess the time of day, leaving them disoriented and confused.  The cell has no furnishings, no toilet, and no running water.  The prisoners were forced to defecate and urinate in plastic bags and bottles, which guards collected only once a week.  Often when the guards entered the cell, they would beat the prisoners.

159.  **Torturous Conditions of Confinement (Another Punishment Cell).**  After the Crazy Room, the DGCIM moved Mr. Marrón to another punishment cell.  This cell, which was built for two prisoners, housed four.  The lights were never turned off.  The conditions of confinement were otherwise similar to the Crazy Room:  No running water; bags and bottles instead of a toilet; and spoiled, insufficient food.  After five to six months, in September 2018, the DGCIM allowed Mr. Marrón and the other prisoners in his cell to share a single toilet with the 109 other prisoners in the DGCIM basement.

160.  **Continued Beatings.**  DGCIM guards routinely searched the cells, and when they did so, they beat the prisoners, including Mr. Marrón.

161.  **Isolated and Held Incommunicado.**  During the first 60 days, when Mr. Marrón asked to see his family or a lawyer, not only was request denied, but moreover, he was informed he had no rights and he was beaten for making the request.  Further, Mr. Marrón and the other prisoners were frequently subjected to collective punishment for events occurring outside the prison (e.g., social media posts describing the inhumane conditions in which prisoners were being held), which included keeping the prisoners isolated for months at a time.

162.  **Inadequate Medical Care.**  The poor food, and the water that prisoners were permitted to drink from the sink, caused Mr. Marrón (and the other prisoners) chronic stomach illnesses.

163.  These medical problems were exacerbated because Mr. Marrón was denied adequate medical care.  Every time that Mr. Marrón requested medical care, he was denied access to it for at least two weeks, during which times his illnesses often were exacerbated.  Similarly, when Mr. Marrón needed to be hospitalized, he was denied access to a hospital for over a month.

164.  As a result, Mr. Marrón lost 66 pounds during his time in captivity.  He weighed only 130 pounds (down from 196) when he was hospitalized following his escape from Venezuela.

### E.  The Maduro Criminal Enterprise Tortures and Abuses Mr. Marrón's Father and Stepmother.

165.  Shortly after the DGCIM kidnapped Mr. Marrón's father, DGCIM officers posing as ordinary kidnappers contacted Mr. Marrón's step-mother.  Mr. Marrón's step-mother, who did not yet realize that the kidnappers were part of the Maduro Regime, went to the Venezuelan authorities (specifically, the Anti-Extortion and Kidnapping Division of the Venezuela's largest national policy agency, the Corps of Scientific, Penal and Criminal Investigation or "CICPC"), to seek assistance.

166.  In response, the CICPC arrested Mr. Marrón's step-mother and held her in custody for eight hours.[110]  The CICPC was not seeking to locate Mr. Marrón's father; instead, the CICPC was trying to determine who had recorded the video of the DGCIM kidnapping Mr. Marrón's father, as the video was an embarrassment to the Maduro Regime.  The CICPC's unusual questions to Mr. Marrón's step-mother alerted her that the Maduro Regime was behind the kidnapping.

---

[110] *Supra,* at n. 90.

167.    At the same time, the DGCIM continued to hold Mr. Marrón's elderly father against his will, torturing him by confining him to a plywood box without light, and providing him with water (no food) only once a day.  Mr. Marrón's father was not released until Mr. Marrón had been in custody for several days.

### F.  The Maduro Criminal Enterprise's Acts of Robbery, Bank Fraud, Money Laundering, Extortion and Kidnapping in Miami.

168.    The Maduro Criminal Enterprise tortured Mr. Marrón until he revealed the information necessary for the Maduro Criminal Enterprise to access Mr. Marrón's US bank accounts, including accounts that Mr. Marrón had opened in Miami with Bank of America, Wells Fargo and Citibank in Miami.

169.    Members of the Maduro Criminal Enterprise then used the information they had obtained from Mr. Marrón to access his U.S. bank accounts.  In so doing, members of the Maduro Criminal Enterprise falsely represented to the foregoing U.S. financial institutions that (1) they were Mr. Marrón and (2) they were authorized to access Mr. Marrón's accounts.

170.    Under Fla. Stat. § 812.13 (prohibiting robbery), "robbery . . . means the taking of money or other property which may be the subject of larceny from the person or custody of another, with intent to either permanently or temporarily deprive the person or the owner of the money or other property, when in the course of the taking there is the use of force, violence, assault, or putting in fear."

171.    The actions of Maduro Criminal Enterprise in stealing from Mr. Marrón were robbery in violation of Fla. Stat. § 812.13, because (a) they took money or property from Mr. Marrón (b) with the intent to permanently deprive him of those monies, (c) and used force (that is, torturing Mr. Marrón for his electronic access information) to do so.   These same actions are also a crime of violence, under 18 U.S.C. § 16.

172.     Further, the actions of Maduro Criminal Enterprise are subject to Florida state criminal jurisdiction.  Under Fla. Stat. § 910.0015 ("state criminal jurisdiction"), "[a] person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct or that of another for which the person is legally accountable, if: (a)  The offense is committed wholly or partly within the state."  Here, the robbery was committed in part in Florida, which is where the Maduro Criminal Enterprise accessed Mr. Marrón's bank accounts and directed that assets be transferred out of Mr. Marrón's accounts.

173.     Under 18 U.S.C. § 1344 ("Bank Fraud"), it is unlawful to "knowingly execute" a "scheme or artifice" to "obtain any of the monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."

174.     The Maduro Criminal Enterprise violated 18 U.S.C. § 1344, by obtaining money under the custody of a financial institution (specifically, accounts that Mr. Marrón had opened at Citibank, Wells Fargo and Bank of America) by falsely representing their identities (as Mr. Marrón) and their rights (to access Mr. Marrón's accounts) to the foregoing financial institutions in Miami, Florida, where Mr. Marrón opened his accounts.

175.     The Maduro Criminal Enterprise violated 18 U.S.C. § 1956 ("Laundering of Monetary Instruments" or "Money Laundering"), by moving the proceeds of their robbery from the above-referenced bank accounts to Coinbase, converting the funds to cryptocurrency, and transferring the cryptocurrency to their own wallets, knowing that the money was stolen and intending to conceal their ill-gotten gains.

176.     The Maduro Criminal Enterprise contacted Mr. Marrón's wife, Jane Doe, in Miami Florida and told her that if she did not send money to Maduro Criminal Enterprise agents, they

would break Mr. Marrón's arms, poison him, or transfer him to a prison where he would be mistreated and possibly killed. In response, Jane Doe sent money from Miami to Maduro Criminal Enterprise agents in Venezuela on a regular basis.

177.    Under Fla. Stat. § 787.01, "[t]he term 'kidnapping' means forcibly, secretly, or by threat confining, abducting, or imprisoning another person against his or her will and without lawful authority, with intent to: 1. Hold for ransom or reward or as a shield or hostage. 2. Commit or facilitate the commission of any felony. 3. Inflict bodily harm upon or to terrorize the victim or another person. 4. Interfere with the performance of any governmental or political function."

178.    The Maduro Criminal Enterprise kidnapped Mr. Maduro because (a) it forcibly abducted and imprisoned Mr. Marrón, (b) Mr. Marrón did not consent, (c) the Maduro Criminal Enterprise acted without lawful authority, both because the Maduro Regime is not a legitimate recognized government and because there was not a basis to arrest and detain Mr. Marrón under Venezuelan law, (d) the Maduro Criminal Enterprise intended to hold Mr. Marrón (i) for a ransom or reward, as evidenced by their demand for money from Mr. Marrón's wife, (ii) to commit a felony, robbery, as described above, (iii) to inflict bodily harm on Mr. Marrón, and (iv) to terrorize Mr. Marrón's wife.

179.    The crime of kidnapping is subject to Florida state criminal jurisdiction under Fla. Stat. § 910.0015 because part of the crime of kidnapping occurred in Florida, i.e., the Maduro Criminal Enterprise communicated the ransom demand to Mr. Marrón's wife in Miami, Florida, terrorized Mr. Marrón's wife in Miami, Florida, and took payment of the ransom amounts coming from Miami, Florida.

180.    Under Fla. Stat. § 836.05 (Threats; extortion), it is a crime to "verbally . . . maliciously threaten[] injury to another person . . . with the intent thereby to extort money." The

Maduro Criminal Enterprise committed this offense when they threatened Jane Doe that they would break Mr. Marrón's arms, poison him, or transfer him to a dangerous prison where he would be mistreated and possibly killed, if she did not either pay them money or meet other capricious demands for items on a "wish list" that varied with the kidnappers' whims, e.g., a gas tank for a motorcycle.

181.    Once the Maduro Criminal Enterprise realized that they could keep squeezing more from Jane Doe, they made a habit of calling her to renew their extortionate demands.  Time and again, an increasingly distraught and impoverished Jane Doe had to deplete her family's limited resources and even borrow money from relatives so that she could keep pace with the Defendants' demands.  She typically sent $5,000 to $20,000 to Venezuela at a time, totaling hundreds of thousands of dollars in all.  The Maduro Criminal Enterprise committed these acts of criminal extortion in Miami, because that is where they contacted Jane Doe, calling her Miami cell phone to deliver the threats that lie at the heart of the offense directly to her.

### G.  Escape and Rescue

182.    On January 6, 2020—after the Maduro Criminal Enterprise had arbitrarily detained and tortured Mr. Marrón for 1 year, 8 months, and 24 days (totaling 635 days)—the Maduro Regime released Mr. Marrón from the DGCIM—but not from Venezuela—along with 13 other political prisoners.  His release coincided with the Maduro Regime's loosening of the strict control over official dollar to bolívar exchange rate.

183.    Although the Maduro Regime was no longer holding Mr. Marrón in DGCIM cells, it was still keeping Mr. Marrón from returning home.  The Maduro Regime kept Mr. Marrón's passport and forbade him from leaving Venezuela, using any of bank accounts, or utilizing any other assets.  Moreover, the Maduro Regime indicated that it intended to continue its bogus

criminal case against Mr. Marrón.  Thus, rather than being at home with his family, Mr. Marrón was broke and trapped in the country ranked highest in the worldwide Misery Index. [111]

184.    Mr. Marrón, who was suffering from malnutrition, anemia, severe weight loss, and a host of other illnesses, was concerned for his life, health and safety if he remained in Venezuela.

185.    Accordingly, Mr. Marrón contact the U.S. embassy in Bogota, Colombia.  The U.S. Ambassador in Colombia told Mr. Marrón that there was little that the United States could do to help so long as Mr. Marrón remained stuck in Venezuela, but further said that if Mr. Marrón could make it to the U.S. embassy in Bogota, then the U.S. ambassador would help him.

186.    Buoyed by the hope of help from the U.S. ambassador, Mr. Marrón decided to make a daring escape from Venezuela to Colombia.  First, he arranged for transportation to the Colombian/Venezuelan border.  Then, upon reaching the border, Mr. Marrón hiked for 15 days through the jungle until he reached Bogota.  He forded rivers, avoided local bandits, and hid from the FARC and various militias along the way.

187.    On Saturday, September 5, 2020, the U.S. embassy arranged for an emergency visa for Mr. Marrón to reenter the United States.  That day, Mr. Marrón flew from Bogota, Colombia to Miami, Florida, and was reunited with his family.  Accordingly, the total time that Mr. Marrón was arbitrarily detained by the Maduro Regime, including the time in the DGCIM dungeons (635 days) and the time before he escaped from Venezuela and returned to Miami (243 days), is 878 days.

### H.  Additional Injuries to Mr. Marrón.

188.    Mr. Marron suffered personal injuries in addition to those listed above, including:

---

[111] *Supra*, at n.75.

a.      Mr. Marrón was severely traumatized in Venezuela, and continues to suffer emotional and psychological injury.

b.      Mr. Marrón's personal difficulties have taken a toll on his marriage. Although he and his wife continue to love one another, and although Mr. Marrón's wife has enormous sympathy for his ordeal, the two of them believe that it is unlikely that they will be able to stay married.

**I.   Additional Injuries to Jane Doe, S.A. and C.R.**

189.    Jane Doe has suffered atrocious injuries from her ordeal.  As a direct consequence of Defendants' misconduct, Jane Doe—a formerly healthy, happy, and vibrant woman—has succumbed to cripplingly painful diseases that cannot be cured.  She endures lasting mental trauma and unabating emotional misery.

a.      When Mr. Marrón was kidnapped, Jane Doe began to suffer, and continues to suffer, from severe and debilitating insomnia.   Immediate effects of insomnia include depression, fatigue, memory loss, concentration difficulties, and relationship struggles. Complications from insomnia can include high blood pressure, heart disease, stroke and mood disorders.  Jane Doe's condition was aggravated by Defendants' continued direct contact with her, during which they repeatedly threatened to harm Mr. Marrón.

b.      As the result of stress caused by the Defendants, Jane Doe began to suffer to from Raynaud's syndrome, in which  blood vessels in the hands and feet appear to severely overreact to stress.  During an attack of Raynaud's, Jane Doe's fingers turn white, swell, and throb with extreme pain.  There is no cure for Raynaud's syndrome, and Jane Doe has not succeeded in preventing attacks through medicine.  She relies primarily upon compresses and other minimally

effective pain management techniques.  Her Raynaud's attacks have not materially declined since her husband escaped from the Defendants' clutches.

        c.     As the result of stress caused by the Defendants, Jane Doe began to suffer to from outbreaks of carbuncles all over her body.  A carbuncle is a cluster of boils (i.e., painful, puss-filled bumps) that form a connected area of infection. Compared with single boils, carbuncles cause a deeper and more severe infection and are more likely to leave a scar. People who have a carbuncle often feel unwell in general and may experience a fever and chills.  Jane Doe's carbuncles have not materially abated since her husband escaped from his kidnappers.

        d.     As the result of stress caused by the Defendants, Jane Doe began to suffer to from PTSD.  People with PTSD have intense, disturbing thoughts and feelings related to their experience that last long after the traumatic event has ended. They may relive the event through flashbacks or nightmares; they may feel sadness, fear or anger; and they may feel detached or estranged from other people. People with PTSD may avoid situations or people that remind them of the traumatic event, and they may have strong negative reactions to something as ordinary as a loud noise or an accidental touch.  Jane Doe is plagued with nightmares and flashbacks.  Even discussing her and her husband's ordeal causes Jane Doe to relive the event surrounding his kidnapping and torture and is deeply disturbing to her emotional health.

        e.     The foregoing problems have, in turn, caused troubles detrimental to Jane Doe and Mr. Marrón's marriage.  Troubles that, but-for Defendants' misconduct, would not have occurred.

190.     Plaintiffs S.A. and C.R. also suffer ongoing physical and emotional injuries.

**J.  Injuries to Business and/or Property.**

191.     Plaintiffs suffered a number of additional injuries to their business or property.

a. During the time that Mr. Marrón was kidnapped, the DolarPro.com website ceased operations, rather than tolerate the risk that the Maduro Regime would take additional retaliatory actions against Mr. Marrón while he was in captivity.

b. Mr. Marrón had a business, based in Miami, Florida, that engaged in ticket sales. Shortly before Mr. Marrón was kidnapped, the business (through Mr. Marrón's personal efforts) had closed a $7 million contract to sell tickets for Cirque du Soleil. That business collapsed during the two years when Mr. Marrón was unable to maintain the business because the Maduro Criminal Enterprise had kidnapped him.

## COUNT I
### Violation of the Federal Anti-Terrorism Act, 18 U.S.C. § 2333
### (Jane Doe, C.R., and S.A.)

192. Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

193. The federal Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2333, provides:

> **Action and jurisdiction.—** Any national of the United States injured in his or her person, property, or business by reason of an act of international terrorism, or his or her estate, survivors, or heirs, may sue therefor in any appropriate district court of the United States and shall recover threefold the damages he or she sustains and the cost of the suit, including attorney's fees.

194. Plaintiffs Jane Doe, C.R. and S.A., as U.S. citizens, are nationals of the United States.

195. Plaintiff Jane Doe suffered injury to her person, property and business. Among other things, she suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice and, counsel. She also suffered loss of household services and loss of income.

196.     Plaintiff S.A. suffered injury to her person, property and business.  Among other things, she suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, and counsel.   She also suffered loss of household services and loss of income.

197.     Plaintiff C.R. suffered injury to her person, property and business.  Among other things, he suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, and counsel.  He also suffered loss of household services and loss of income.

198.     Plaintiffs Jane Doe, C.R. and S.A. suffered the injuries described above by reason of acts of terrorism by the Defendants.

199.     Under 18 U.S.C. § 2331 ("Definitions"), the term "International Terrorism," for purposes of the ATA, means activities that:

> **(A)** involve violent acts or acts dangerous to human life that are a violation of the criminal laws of the United States or of any State, or that would be a criminal violation if committed within the jurisdiction of the United States or of any State;

> **(B)** appear to be intended—
> **(i)** to intimidate or coerce a civilian population;
> **(ii)** to influence the policy of a government by intimidation or coercion; or
> **(iii)** to affect the conduct of a government by mass destruction, assassination, or kidnapping; and

> **(C)** occur primarily outside the territorial jurisdiction of the United States, or transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum;

200.     The Defendants' provision of material support to the Maduro Criminal Enterprise through the sale of narco-terrorist sales of cocaine in United States is an act of terrorism that gives rise to liability under the ATA.

a.       First, the narcoterrorism is dangerous to human life.  It is dangerous to human life in the United States.  *See* Maduro Indictment, ¶ 4 ("the Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America").  As well, narcoterrorism is also dangerous to human life in Venezuela, because it funds the Maduro Regime's terrorism against political dissidents and the Venezuela civilian population.

b.       Second, the narcoterrorism violations by the Defendants violate both state and federal law prohibiting the trafficking of drugs.  In addition, because the narcoterrorism violations were intended to fund acts of terrorism by FARC, the Cartel of the Suns, and the Maduro Regime, the Defendants trafficking also violated federal prohibitions against providing material support to terrorists.

i.       18 U.S.C. § 2339B makes it a crime to knowingly provide material support or resources to a U.S. designated foreign terrorist organization ("FTO").  The Defendants violated Section 2339B by knowingly selling narcotics in the United States (including Florida) for the benefit of FARC, and providing the proceeds of narcotics sales from the United States (including from Florida) to the FARC, which is at all relevant times was a U.S. designated FTO.

ii.       18 U.S.C. § 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action.  The Defendants violated Section 2339C by knowingly collecting funds (through sales of narcotics in in the United States, including in Florida) for the benefit of the FARC and the Maduro Regime, and knowingly providing funds (the proceeds of narcotics sales from the United States, including Florida) to the FARC and Maduro Regime, intending that (1) the FARC would use the funds, in whole or in part, to cause death or injury to a

civilian, for the purpose of compelling Colombia to meet various FARC demands, and for the purpose of compelling the United States to cease various anti-drug interdiction activities, and (2) the Maduro Regime use the funds, in whole or in part, to cause injury or death to a civilian, for the purpose of intimidating Venezuela's civilian population, to compel the legitimate government of Juan Guaidó to cease its opposition to the Maduro Regime, and to compel the government of the United States to lift sanctions against Venezuela.

      c.    The violations described above appear to be intended:

      i.    to intimidate or coerce a civilian population, in that a reasonable, neutral observer would conclude that the intention behind the Defendants provision of funds (i.e., the proceeds of cocaine sales) to the FARC was to intimidate the civilian population of Colombia; that the intention behind the provision of funds (i.e., the proceeds of cocaine sales) to the Maduro Regime is to intimidate the civilian population of Venezuela; and that the intention behind the narco-terrorist sales of cocaine in the United States is to intimidate the civilian population of the United States;

      ii.    to influence the policy of a government by intimidation or coercion in that a reasonable, neutral observer would conclude that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to the FARC was to influence the policy of Colombia by intimidation or coercion, with FARC using the funds to force various policy changes in Colombia by violence; that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to the Maduro Regime was to influence the policy of legitimate Venezuelan government under President Juan Guaidó by intimidation or coercion, with Maduro Regime using the funds to support the violent suppression of the Guaidó government; and that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to the

Maduro Regime was to influence the policy of U.S. government, with Maduro Regime using the funds to continue narco-terrorism in opposition to U.S. sanctions on Venezuela;

iii.        to affect the conduct of a government by mass destruction, assassination, or kidnapping, in that a reasonable, neutral observer would conclude that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to the FARC was to affect the conduct of Colombia by mass destruction, assassination, or kidnapping, with FARC using the funds to conduct a campaign of violence in Colombia; that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to the Maduro Regime was to affect the conduct of the legitimate government of Venezuela by mass destruction, assassination, or kidnapping, with Maduro Regime using the funds to conduct a campaign of violence against the government under President Juan Guaidó; and that the intention behind the Defendants' provision of funds (i.e., the proceeds of cocaine sales) to the Maduro Regime was to affect the conduct of U.S. government by mass destruction, assassination, or kidnapping, with Maduro Regime using the funds to continue narco-terrorism in opposition to U.S. sanctions on Venezuela;

d.        The acts of terrorism described above transcend national boundaries in terms of the means by which they are accomplished, the persons they appear intended to intimidate or coerce, or the locale in which their perpetrators operate or seek asylum, in the (1) the terrorist fund raising begins with narcotics shipments from South American, continues with narcotics sales in the United States, and continues with funds being repatriated to FARC and the Maduro Regime in South America, (2) the perpetrators are based in Venezuela and Colombia and seek refuge in Venezuela and Colombia, while the victims of narco-terrorism are located in the United States, and (3) in the case of Mr. Marrón, the terrorism against him included luring him from the United

States to Venezuela, and extorting his wife while she was Miami and the Defendants were in Venezuela.

201.    The Defendants' funding of terrorists, including the Maduro Regime, was the cause of the injuries suffered by Jane Doe, C.R. and S.A.  The kidnapping, murder and torture of Mr. Marrón were entirely foreseeable consequence of the Defendants (1) raising massive amounts of funds to prop up the struggling Maduro Regime and (2) funneling money to the Maduro Regime knowing that it uses funds to commit acts of terrorism against the Venezuela population and the legitimate Guaidó  government, to intimidate the Venezuela civilian populace and to coerce the Guaidó  government to refrain from challenging the Maduro regime.

202.    The kidnapping (and false imprisonment) of Mr. Marrón from Simón Bolivar International Airport in Caracas, was an act of terrorism.

      a.    First, kidnapping (and false imprisonment) is a crime dangerous to human life.

      b.    Second, the kidnapping (and false imprisonment) of Mr. Marrón would be a criminal violation if committed within the jurisdiction of the United States or of any State.

      c.    Third, the kidnapping (and false imprisonment) of Mr. Marrón appear to be intended to intimidate or coerce a civilian population, in that it was meant as a punishment for the exercise of free speech offensive to the Maduro Regime, meant to serve as an "example" to the Venezuelan people;

      d.    Fourth, the kidnapping (and false imprisonment) of Mr. Marrón transcends national boundaries in that Mr. Marrón was lured from Miami to Venezuela, kidnapped at an international airport, and the Defendants communicated ransom and extortion demands from Venezuela to Jane Doe in Miami.

203.    The Defendants kidnapping (and false imprisonment) of Mr. Marrón was the cause of the injuries suffered by Jane Doe, C.R. and S.A.

204.    The torture of Mr. Marrón at DGCIM headquarters in Caracas was an act of terrorism.

        a.      First, torture is a crime dangerous to human life.

        b.      Second, the torture of Mr. Marrón would be a criminal violation if committed within the jurisdiction of the United States or of any State.

        c.      Third, the torture of Mr. Marrón appears to be intended to intimidate or coerce a civilian population, in that it was meant as a punishment for the exercise of free speech offensive to the Maduro Regime, meant to serve as an "example" to the Venezuela populace;

        d.      Fourth, the torture of Mr. Marrón transcends national boundaries in that Mr. Marrón was lured from Miami to Venezuela, kidnapped at an international airport, and the Defendants communicated ransom and extortion demands from Venezuela to Jane Doe in Miami.

205.    The Defendants torture of Mr. Marrón was the cause of the injuries suffered by Jane Doe, C.R. and S.A.

## COUNT II
### Violation of the Florida Anti-Terrorism Act, Fla. Stat. § 772.13
### (All Plaintiffs Against All Defendants)

206.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

207.    Florida Statute Section 772.13 provides in relevant part:

> A person who is injured by an act of terrorism as defined in § 775.30 or a violation of a law for which the penalty is increased pursuant to § 775.31 for facilitating or furthering terrorism has a cause of action for threefold the actual damages sustained and, in any such action, is entitled to . . . reasonable attorney fees and court costs in the trial and appellate courts.

208.    Plaintiffs (a) Mr. Marrón, (b) Jane Doe, (c) their son, C.R., a minor, and (d) their daughter, S.A., a minor, are "persons."  *See*  Fla. Stat. § 1.01(3) (defining "person" to include "individuals, children, firms, associations, joint adventures, partnerships, estates, trusts, business trusts, syndicates, fiduciaries, corporations, and all other groups or combinations.").

209.    An "act of terrorism" is "[a] violent act or an act dangerous to human life which is a violation of the criminal laws of this state or of the United States," that "[i]s intended to: 1. [i]ntimidate, injure, or coerce a civilian population; 2. [i]nfluence the policy of a government by intimidation or coercion; or 3. [a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy."

210.    The provision of material support to the Maduro Criminal Enterprise through the sale of narco-terrorist sales of cocaine in Florida is an act of terrorism that gives rise to liability under the Florida ATA.

a.      First, the narcoterrorism is dangerous to human life in the United States. *See* Maduro Indictment, ¶ 4 ("the Cartel de Los Soles, under the leadership of [Maduro] and others, prioritized using cocaine as a weapon against America").  As well, the narcoterrorism is also dangerous to human life in Venezuela, because it funded the Maduro Regime's terrorism against political dissidents.

b.      Second, the Maduro Criminal Enterprise's narcoterrorism was intended to "[i]ntimidate, injure, or coerce a civil population."  As set forth above, the purpose of the narcoterrorism was to harm the U.S. civilian population, i.e. to weaponized cocaine to undermine the health of American civilians.  And, the purpose of the funds raised to the support the Maduro Regime included intimidating the Venezuelan civilian population.

      c.    Third, the narcoterrorism violations by the Maduro Criminal Enterprise violate both state and federal law prohibiting the trafficking of drugs.  In addition, because the narcoterrorism violations were intended to fund acts of terrorism by FARC, the Cartel of the Suns, and the Maduro regime, the Maduro Criminal Enterprise's trafficking also violated federal prohibitions against providing material support to terrorists.

      i.    18 U.S.C. § 2339B makes it a crime to knowingly provide material support or resources to a U.S. designated foreign terrorist organization ("FTO").  The Maduro Criminal Enterprise violated Section 2339B by knowingly selling narcotics in Florida (and elsewhere in the United States) for the benefit of FARC, and providing the proceeds of narcotics sales from Florida (and elsewhere in the United States) to the FARC, which is at all relevant times was a U.S. designated FTO.

      ii.    Section 2339C makes it a crime to knowingly provide or collect funds with the intention that the funds be used, in full or in part, to cause death or serious injury to a civilian, for the purpose of intimidating a civilian population, or for the purpose of compelling a government to take or refrain from taking an action.   The Maduro Criminal Enterprise violated Section 2339C by knowingly collecting funds (through sales of narcotics in Florida and elsewhere in the United States) for the benefit of the FARC and the Maduro Regime, and providing funds (the proceeds of narcotics sales from Florida and elsewhere in the United States) to the FARC and Maduro Regime, knowing that (1) the FARC would use the funds, in whole or in part, to cause death or injury to a civilian, for the purpose of compelling Colombia to meet various FARC demands, and for the purpose of compelling the United States to cease various anti-drug interdiction activities, and (2) the Maduro Regime use the funds, in whole or in part, to cause injury

or death to a civilian, for the purpose of intimidating Venezuela's civilian population and to compel the legitimate government of Juan Guaidó to cease its opposition to the Maduro Regime.

211.   The Maduro Criminal Enterprise's funding of terrorists, including the Maduro Regime, was the cause of the kidnapping and torture of Mr. Marrón, and were entirely foreseeable consequence of the Maduro Criminal Enterprise (1) raising massive amounts of funds to prop up the struggling Maduro Regime and (2) funneling money to the Maduro Regime knowing that it uses funds to commit acts of terrorism against the Venezuela population and the legitimate Guaidó government, to intimidate the Venezuela civilian populace and to coerce the Guaidó  government to refrain from challenging the Maduro regime.

212.   The kidnapping of Mr. Marrón from Simón Bolivar International Airport in Caracas, was an act of terrorism.

a.   The kidnapping of Mr. Marrón from Simón Bolivar International Airport was a crime of violence that is an act dangerous to human life.

b.   The kidnapping of Mr. Marrón from Simón Bolivar International Airport was in violation of United States law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood the United States with cocaine and to launder the proceeds through the United States.

c.   The kidnapping of Mr. Marrón from Simón Bolivar International Airport in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through the Florida, and acts in furtherance of the conspiracy occurred in Florida.  *See* Fla. Stat. § 910.005 (State Criminal Jurisdiction) ("A person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct

or that of another for which the person is legally accountable, if . . . The conduct outside the state constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state.").

   d. The kidnapping of Mr. Marrón from Simón Bolivar International Airport was in violation of Fla. Stat. § 787.01, which prohibits kidnapping, because part of the crime—the ransom demand to Ms. Marrón and the payment of ransom amounts from Florida to the DGCIM in Venezuela—occurred in Florida.

   e. The kidnapping of Mr. Marrón from Simón Bolivar International Airport was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses the by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela.  Indeed, Defendants discussed Mr. Marrón's arrest on Venezuela television and Defendant Saab even stated that the Maduro Regime's actions against Mr. Marrón were meant to send a "signal" (i.e., a threat) to any civilian who might not accept the regimes artificial inflation of the value of the bolívar.

   f. The kidnapping of Mr. Marrón from Simón Bolivar International Airport was intended to "[i]nfluence the policy of a government by intimidation or coercion," and in fact was part of a pattern of human rights abuses by the Maduro Criminal Enterprise designed influence to policies of the government of the United States, which Maduro blamed for Venezuela's economic disaster, and which Maduro wished to punish for its sanctions against the Maduro Regime and for permitting Venezuelan ex-patriots to speak out against the regime and publish the true dollar to bolívar exchange rate.

g. The kidnapping of Mr. Marrón from Simón Bolivar International Airport was intended to "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy," in fact was part of a pattern of kidnapping by the Maduro Criminal Enterprise designed influence policies of the government of the United States, which Maduro blamed for Venezuela's economic disaster, and which Maduro wished to punish for its sanctions against the Maduro Regime and for permitting Venezuelan ex-patriots to speak out against the regime and publish the true dollar to bolívar exchange rate.

213. The torture of Mr. Marrón at DGCIM headquarters in Caracas was an act of terrorism.

a. The torture of Mr. Marrón at DGCIM headquarters in Caracas was an act dangerous to human life.

b. The torture of Mr. Marrón at DGCIM headquarters in Caracas was in violation of United States law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood the United States with cocaine and to launder the proceeds through the United States.

c. The torture of Mr. Marrón at DGCIM headquarters in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a narco-terrorism conspiracy designed to flood Florida with cocaine and to launder the proceeds through the Florida, and acts in furtherance of the conspiracy, including trafficking and sales of cocaine and transfers of ill-gotten gains occurred in Florida.  *See* Fla. Stat. § 910.005 (State Criminal Jurisdiction) ("A person is subject to prosecution in this state for an offense that she or he commits, while either within or outside the state, by her or his own conduct or that of another for which the person is

legally accountable, if . . . The conduct outside the state constitutes a conspiracy to commit an offense within the state, and an act in furtherance of the conspiracy occurs in the state.").

        d.      The torture of Mr. Marrón at DGCIM headquarters in Caracas was in violation of Florida law because it occurred pursuant to, and in furtherance of, a conspiracy to engage in public corruption offenses including currency exchange scams and to launder the proceeds through the Florida, and acts in furtherance of the conspiracy, including laundering and transfers of ill-gotten gains from public corruption offenses occurred in Florida.

        e.      The torture of Mr. Marrón at DGCIM headquarters in Caracas was intended to "[i]ntimidate, injure, or coerce a civilian population," and in fact was part of a pattern of human rights abuses the by the Maduro Criminal Enterprise designed to suppress civilian opposition to the Maduro Criminal Enterprise's acts of public corruption and authoritarian control of Venezuela. Indeed, Defendants discussed Mr. Marrón's arrest on Venezuela television and Defendant Saab even stated that the Maduro Regime's actions against Mr. Marrón were meant to send a "signal" (i.e., a threat) to any civilian who might not accept the regimes artificial inflation of the value of the bolívar.

        f.      The torture of Mr. Marrón at DGCIM headquarters in Caracas was intended to "[i]nfluence the policy of a government by intimidation or coercion," and in fact was part of a pattern of human rights abuses by the Maduro Criminal Enterprise designed influence to policies of the government of the United States, which Maduro blamed for Venezuela's economic disaster, and which Maduro wished to punish for its sanctions against the Maduro Regime and for permitting Venezuelan ex-patriots to speak out against the regime and publish the true dollar to bolívar exchange rate.

g.    The torture of Mr. Marrón at DGCIM headquarters in Caracas was intended to "[a]ffect the conduct of government through destruction of property, assassination, murder, kidnapping, or aircraft piracy," in fact was part of a pattern of kidnapping by the Maduro Criminal Enterprise designed influence policies of the government of the United States, which Maduro blamed for Venezuela's economic disaster, and which Maduro wished to punish for its sanctions against the Maduro Regime and for permitting Venezuelan ex-patriots to speak out against the regime and publish the true dollar to bolívar exchange rate.

214.    The Defendants and/or their agents kidnapped and tortured Mr. Marrón.

215.    Plaintiff Jane Doe was injured by the acts of terrorism set forth above.  She suffered loss of solatium,  loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, marital care, attention, advice and, counsel. She also suffered loss of household services and loss of income.

216.    Plaintiff S.A. was injured by the acts of terrorism set forth above.  She suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, and counsel.   She also suffered loss of household services and loss of income.

217.    Plaintiff C.R. was injured by the acts of terrorism set forth above.  He suffered loss of solatium, loss of consortium, mental anguish, past and future emotional pain and suffering, loss of society, companionship, comfort, protection, parental care, attention, advice, and counsel.  He also suffered loss of household services and loss of income.

218.    Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT III
## Federal Civil RICO, 18 U.S.C. § 1964(c)
**(By Plaintiffs Jane Doe and Mr. Marrón against Maduro and the Individual Defendants)**

219.     Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

220.     18 U.S.C. § 1962(c) makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . " 18 U.S.C. § 1962(c).

221.     **Persons.**  Each Defendant is a "person" capable of holding legal or beneficial interest in property within the meaning of 18 U.S.C. § 1961(3).

222.     **The Enterprise.**  The FARC, the Cartel of the Suns, and the Maduro Regime form an association in fact for the common and continuing purpose described here, i.e., for purpose of exerting unlawful authoritarian control over Venezuela, furthering the Maduro Criminal Conspiracy and engaging in (a) narcotics trafficking; (b) narco-terrorism and other terrorism against the United States and its citizens; (c) acts of terrorism designed to intimidate Venezuela civilian population, including kidnapping, torture, arbitrary detention, "disappearances," and murder; (d) public corruption offenses including foreign exchange scams that rely on the artificially inflated value of the bolívar on Venezuela's official currency exchanges; and (e) money laundering.  The Maduro Criminal Enterprise constitutes an "enterprise" within the meaning of 18 U.S.C. § 1961(4) engaged in the conduct of their affairs through a continuing pattern of racketeering activity.  The members of the enterprise functioned as continuing unit with an ascertainable structure separate and distinct from that of the conduct of the pattern of racketeering activity.  The Maduro Criminal Enterprise is the poster child for what Congress had in mind when

it created a civil RICO remedy: a well-organized, long standing, hierarchical crime syndicate engaged in myriad violent criminal endeavors.

223.    In the alternative FARC, the Cartel of Suns, and Maduro Regime each constitute a separate enterprise within the meaning of 18 U.S.C. § 1961(4) (the "Alternative Enterprises").

224.    **Interstate and Foreign Commerce.**  The Maduro Criminal Enterprise and the Alternative Enterprises have engaged in, and their activities have affected, interstate and foreign commerce.

225.    **Pattern of Racketeering Activity.**  Defendants, each of whom are persons associated with, or employed by, the Maduro Criminal Enterprise and/or the Alternative Enterprises, did knowingly, willfully and unlawfully conduct or participate, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity within the meaning of 18 U.S.C. §§ 1961(1), 1961(5), and l962(c). The racketeering activity was made possible by Defendants' regular and repeated use of the facilities and services of the enterprise. Defendants had the specific intent to engage in the substantive RICO violation alleged herein.

226.    Defendants each committed at least two predicate acts of racketeering activity that are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1), as more specifically alleged below.

227.    The acts of racketeering were not isolated, but rather the acts of Defendants were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by Defendants have been continuous and have continued over a substantial period of time. There was repeated conduct during a period of time beginning in 2013 (when Maduro became President of Venezuela following the death of Hugo

Chavez), if not sooner, and continuing to the present. Moreover, there is a continued threat of repetition of such conduct.

228.     Plaintiffs specifically allege that Defendants participated in the operation and management of the Maduro Criminal Enterprise and the Alternative Enterprises by overseeing and coordinating the commission of multiple acts of racketeering as described below.

229.     **Predicate:  Conspiracy to commit narco-terrorism.**  RICO predicates include "any offense involving . . . the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."  *See* 18 U.S.C. § 1961.  Defendant Maduro committed acts indictable for an offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a narco-terrorism conspiracy beginning in 1999 and continuing through today, in violation of 21 U.S.C. § 960a, the object of which was to violate 21 U.S.C. § 841(a) (distribution of five kilograms or more of cocaine), "knowing and intending to provide, directly and indirectly, something of pecuniary value to a person and organization that has engaged and engages in terrorism and terrorist activity, to wit, the FARC."  Maduro committed this offense in conspiracy with Individual Defendants.

230.     **Predicate: Cocaine importation conspiracy.**  RICO predicates include "any offense involving . . ." the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance."  *See* 18 U.S.C. § 1961.  Defendant Maduro committed acts indictable for an offenses "involving the felonious manufacture, importation, receiving, concealment, buying, selling, or otherwise dealing in a controlled substance," and in fact has been indicted for a cocaine importation conspiracy that began in 1999 and continues through today, including importing cocaine into the United States from abroad in violation of 21

U.S.C. § 952(a) and 21 U.S.C. § 960(a)(1), and including manufacturing, distributing and possessing with intent distribute cocaine knowing, and having reasonable cause to believe that the cocaine would be unlawfully imported in the United States, in violation of 21 U.SC. § 959(a) and 21 U.S.C. § 960(a)(3), and possessing cocaine with intent to distribute on board an aircraft registered in the United States in violation of 21 U.S.C. § 959(c) and 21 U.S.C. § 960(a)(3). Maduro committed this offense in conspiracy with the Individual Defendants.

231.   **Predicate:  Conspiracy to commit kidnapping.**  RICO predicates include "any act or threat involving . . . kidnapping . . . which is chargeable under State law and punishable by imprisonment for more than one year." *See* 18 U.S.C. § 1961. Conspiracy to commit kidnapping is an act involving kidnapping that is chargeable under State law (including the law of Florida) and punishable by imprisonment of more than a year.  The Defendants conspired to kidnap Mr. Marrón.  That conspiracy is chargeable in Florida because part of the offense occurred in Florida. Specifically, overt acts in furtherance of the conspiracy occurred in Florida, in that agents of Maduro Criminal Enterprise communicate ransom demands to Mr. Marrón's wife in Miami, Florida and accepted payment from Mr. Marrón's wife that originated from Florida.  Maduro and the Individual Defendants were all members of the conspiracy to kidnap Mr. Marrón.

232.   **Predicate: Extortion.**  RICO predicate offenses include extortion chargeable under state law.  *See* 18 U.S.C. 1961(1)(A).  Under Fla. Stat. § 836.05 (Threats; extortion), it is a crime to "verbally . . . maliciously threaten[] injury to another person . . . with the intent thereby to extort money."  The Maduro Criminal Enterprise violated this offense when they threatened Jane Doe that they would break Mr. Marrón's arms or poison him if she did not pay them (which she did, at least seven times).  They committed this crime in Miami, because that is where they contacted Jane Doe to deliver the thereat that lies at the heart of the offense.

233.     **Predicate:  Multiple instances of bank fraud.**  RICO predicate offences include violations of 18 U.S.C. § 1344 ("Bank Fraud"), under which it is unlawful to "knowingly execute" a "scheme or artifice" to "obtain any of the monies, funds, credits, assets, securities, or other property owned by, or under the custody or control of, a financial institution, by means of false or fraudulent pretenses, representations, or promises."  The Maduro Criminal Enterprise violated 18 U.S.C. § 1344, by obtaining money under the custody of a financial institution (specifically, accounts that Mr. Marrón had opened in Miami at Bank of America, Wells Fargo, and Citibank) by falsely representing their identities (as Mr. Marrón) and their rights (to access Mr. Marrón's accounts) to the foregoing financial institutions in Miami, Florida, where Mr. Marrón opened his accounts.

234.     **Predicate: Theft from an Foreign Shipment.**  RICO predicates include 18 U.S.C. § 659, which deems guilty of a felony "[w]hoever . . . steals, or unlawfully takes, carries away, or conceals . . . from any . . . from any aircraft, air cargo container, air terminal, airport, aircraft terminal or air navigation facility. . . with intent to convert to his own use any goods or chattels moving as or which are a part of or which constitute an interstate or foreign shipment of freight, express, or other property" as well as "[w]hoever buys or receives or has in his possession any such goods or chattels, knowing the same to have been embezzled or stolen."  Section 659 prohibits unlawfully taking baggage from an airport, including baggage shipped internationally from the United States.  Defendants committed acts indictable under 37 U.S.C. § 37, because they stole Mr. Marrón's luggage at Simón Bolivar International Airport before he received it.

235.     **Predicate: Travel Act violations.**  Violations of the Travel Act, 18 U.S.C. § 1952, are RICO predicate offenses.  Under the Travel Act, it is unlawful to use "any facility of interstate or foreign commerce" (which includes any "means of communication," *see* 18 U.S.C. §

1958(b)(2)) to "promote, manage, establish, carry on or facilitate the promotion, management, establishment and carrying on, of any unlawful activity" or to "commit any crime of violence to further unlawful activity." The Travel Act defines the term "unlawful activity" to include, among other things, "any business enterprise involving . . . narcotics or controlled substances" or "extortion in violation of the laws of the state in which is committed." *Id.* § 1952(b). Here, Defendants committed offenses indictable under the Travel Act because they used a facility of interstate or foreign commerce (i.e., the communications devices by which they relayed demand to Mr. Marrón's wife in Miami, Florida, to make payments or else they would injure or maim Mr. Marrón) to promote, carry on or facilitated an unlawful activity (i.e., the extortion of Mr. Marrón's wife and Defendants' narcotics trafficking business). The kidnapping and torture of persons whose speech was contrary to the Maduro Regime's propaganda, such as Mr. Marrón, was integral to the Maduro Regime maintaining authoritarian control over Venezuela, which in turn was the backbone of the narcotics trafficking conspiracy.

236.    **Predicate: Providing Material Support to Terrorists**.  For the reasons set forth above, the Defendants also violated 18 U.S.C. § 2339B and 18 U.S.C. § 2339C through the US actions to raise and supply funds to FARC and the Maduro Regime with the intent that the funds be used to facilitate acts of terrorism.

237.    **Continuity of Conduct**.  Defendants' violations of state and federal law as set forth herein, each of which directly and proximately injured Plaintiffs, constituted a continuous course of conduct spanning a period from at least 2013 to the present, which was intended to obtain money through narcoterrorism, narcotics trafficking, public corruption, currency scams, money laundering, and other improper and unlawful means. Therefore, said violations were a part of a pattern of racketeering activity under 18 U.S.C. § 1961(l) and (5).

238.  **Conduct of Affairs.**  Defendants have conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the Maduro Criminal Enterprise and the Alternative Enterprises through a pattern of racketeering activity as alleged above in violation of 18 U.S.C. § 1962(c).

239.  **Proximate cause and damages to business and property.**  The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to the Plaintiffs in their business or  property. Plaintiff seeks an award of damages in compensation for, among other things, the property that Defendants stole from Mr. Marrón (e.g., luggage, cell phone, other personal effects), the legal costs that Defendants imposed upon Mr. Marrón and his wife (e.g., legal costs associated with attempting to free Mr. Marrón and the extortion payments made to protect Mr. Marrón's health and wellbeing), and the businesses (the DolarPro.com website, Mr. Marrón's ticket sales business) that the Maduro Regime destroyed.

240.  Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

### COUNT IV
### Conspiracy to Violate Federal Civil RICO, 18 U.S.C. § 1962(d)
### (By Jane Doe and Mr. Marrón Against Maduro and the Individual Defendants)

241.  Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

242.  In violation of 18 U.S.C. § 1962(d), Maduro and the Individual Defendants, and each of them, knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as alleged in paragraphs above.

243.  The conspiracy commenced at least as early as 2013 and is ongoing.

244.   The conspiracy's purpose is to exercise unlawful authoritarian control over Venezuela, further the Maduro Criminal Conspiracy, and engage in (a) narcotics trafficking; (b) narco-terrorism and other terrorism against the United States and its citizens; (c) acts of terrorism designed to intimidate Venezuela civilian population, including kidnapping, torture, arbitrary detention, "disappearances," and murder; (d) public corruption offenses including foreign exchange scams that rely on the artificially inflated value of the bolívar on Venezuela's official currency exchanges; and (e) money laundering.

245.   Each Defendant committed at least one overt act in furtherance of such conspiracy. These acts in furtherance of the conspiracy included kidnapping, torturing and falsely imprisoning Mr. Marrón, communicating in foreign and/or interstate commerce in support of the kidnapping including to make ransom demands, and stealing Mr. Marrón's property from international shipments.

246.   Even if some of the Defendants did not agree to harm Plaintiff specifically, the purpose of the acts they engaged in was to advance the overall object of the conspiracy, and the harm to Plaintiff was in furtherance of the conspiracy.

247.   Plaintiff has been injured and continues to be injured in her business and property by Defendants' conspiracy in violation of 18 U.S.C. § 1962(d). The unlawful actions of Defendants, and each of them, have directly, illegally, and proximately caused and continue to cause injuries to Plaintiff in her business and property.

248.   Plaintiffs seek an award of compensatory damages (including treble damages) for the foregoing injuries, plus reasonable attorneys' fees and costs.

## COUNT V
### Defamation *Per Se*
### (By Mr. Marrón against all Defendants)

249.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

250.    On April 13, 2018, Defendant Saab—acting as Maduro's agent—published a false statement about Mr. Marrón when he said on Venezuela television that Mr. Marrón was a "financial terrorist," a "money launderer," and "worse than a mass murderer."

251.    Defendant Saab's false statements are defamation *per se* because it accuses Mr. Marrón of several infamous crimes (e.g., terrorism) and such a falsehood tends to subject one to hatred, distrust, ridicule, contempt, or disgrace.

252.    Saab's Venezuelan TV broadcast was published on Televen's official YouTube channel, where it remains through today.

253.    On information and belief, Saab's false statement that Mr. Marrón had committed crimes including terrorism was viewed by persons in South Florida including members the large population of Venezuelan ex-patriots in South Florida, who were among the Maduro Regime's intended audience.

254.    Saab made the false statement that Mr. Marrón had committed terrorism, money laundering, and was worse than a mass murderer, with the specific intent to harm Mr. Marrón's reputation.  The Maduro Criminal Enterprise wished to blame Mr. Marrón for Venezuela's economic failings, to distract from their own role in mismanaging the country's economy, and to move the spotlight away from the Maduro Criminal Enterprise's own foreign exchange scams.

255.     On or about April 23, 2018, Defendant Reverol stated that pursuant to Operation

Paper Hands, more than 125 persons had been arrested for "destabilizing the Venezuelan financial

system," including "the owner of the DolarPro page, Carlos Eduardo Marrón."

256.     These statements that Defendant Reverol made were false.  Mr. Marrón was not

engaged in any criminal conduct, and was not trying to attack or destabilize the Venezuelan

financial system.

257.     These false statements were available on internationally available media, including

the Maduro Regime's website.  On information and belief, these false statements were viewed by

the persons in Florida, including members the large population of Venezuelan ex-patriots in South

Florida, who were among the Maduro Regime's intended audience.

258.     Saab and Reverol made the foregoing false statements as agents of Maduro and the

Cartel of the Suns.

## COUNT VI
### Conspiracy
### (By All Plaintiffs Against All Defendants)

259.     Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint

as if fully set forth herein.

260.     All of the Defendants agreed to the Maduro Criminal Conspiracy to perform

unlawful acts including (a) narcotics trafficking; (b) narco-terrorism and other terrorism against

the United States and its citizens; (c) acts of terrorism designed to intimidate Venezuela civilian

population, including kidnapping, torture, arbitrary detention, "disappearances," and murder; (d)

public corruption offenses including foreign exchange scams that rely on the artificially inflated

value of the bolívar on Venezuela's official currency exchanges; and (e) money laundering.

261.    The kidnapping, torture and false imprisonment of Mr. Marrón were overt  acts in furtherance of that Maduro Criminal Conspiracy.

262.    The Maduro Regime's defamation of Mr. Marrón were overt acts in furtherance of the Maduro Criminal Conspiracy.

263.    Plaintiffs seek an award of compensatory damages for the foregoing injuries, the imposition of punitive damages sufficient to deter Defendants from committing such unlawful conduct in the future, and reasonable attorneys' fees and costs.

## COUNT VII
### False Imprisonment
### (By Mr. Marrón Against All Defendants)

264.    Plaintiffs incorporate by reference all the preceding paragraphs of this Complaint as if fully set forth herein.

265.    The Defendants, starting from when they kidnapped Mr. Marrón at Simón Bolivar International Airport and continuing until Mr. Marrón escaped and returned to Miami, unlawfully and intentionally restrained Mr. Marrón against his will and through unlawful use of force prevented him from leaving DGCIM custody and the country of Venezuela.

266.    As a result of Defendants' misconduct in falsely imprisoning Mr. Marrón, Mr. Marrón was harmed, in that he was unable to leave while Defendants subjected him to torture. Defendants' false imprisonment of Mr. Marrón was both a but-for and proximate cause of Mr. Marrón's injuries.

## Count VIII
### Intentional Infliction of Emotional Distress
### (By All Plaintiffs Against All Defendants)

267.    The Defendants' conduct in torturing Mr. Marrón was extreme and outrageous.

268.    The Defendants' conduct was intentionally designed to cause, indeed, to maximize, emotional distress to the Plaintiffs.  In addition to the torture itself, the outrageousness of Defendants conduct if further is evidenced by, among other things, (a) the fact that the Defendants demanded a ransom from Mr. Marrón's wife, compounding her worry, heartbreak and concern; (b) the fact that the Maduro Regime's method of operation is to terrorize and intimidate those whose free speech it finds objectionable; and (c) the fact that the Maduro regime followed up with false and defamatory statements about Mr. Marrón.

269.    The Defendants' conduct in torturing Mr. Marrón's father was extreme and outrageous.  In addition to the torture itself, the outrageousness of Defendants conduct if further is evidenced by, among other things, the fact that the Defendants (a) kidnapped and torture Mr. Marrón's father to lure Mr. Marrón to Venezuela, and (b) mocked Mr. Marrón once they had him in custody, suggesting that they would deny his father medicine and allow his father to die in their captivity.

270.    The Defendants' conduct in falsely imprisoning and interrogating Mr. Marrón's step mother when she sought assistance from the Maduro Regime to address her husband's kidnapping was extreme and outrageous.

271.    As a result of the Defendants' conduct, Plaintiffs have suffered severe emotional distress.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully requests that the Court:

A.    An award of compensatory and consequential damages, including treble damages, in an amount to be determined at trial;

B.      An award of exemplary and punitive damages in an amount to be determined at trial;

C.      An award of attorneys' fees and costs;

D.      A jury trial on all issues so triable; and

E.      Such other relief as is just and proper.

Respectfully submitted on September 2, 2021.

| | |
|---|---|
| /s/ Jaime D. Guttman | /s/ Alex C. Lakatos |
| Fla. Bar No. 44076 | D.C. Bar. No. 453763 |
| jaime@scale.law | *Pro Hac Vice forthcoming* |
| Scale Law Partners, LLC | alakatos@mayerbrown.com |
| 777 Brickell Avenue, Suite 500 | Stephen M. Medlock |
| Miami, FL 33131 | D.C. Bar No. 995636 |
| (786) 273-9033 (Main) | *Pro Hac Vice forthcoming* |
| | smedlock@mayerbrown.com |
| | Jonathan S. Klein |
| | Fla. Bar No. 125254 |
| | jklein@mayerbrown.com |
| | Mayer Brown LLP |
| | 1999 K Street NW |
| | Washington, DC 20006 |
| | (202) 263-3000 (Main) |