IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 1:21-cv-23190-FAM

CARLOS EDUARDO MARRÓN; JANE DOE;
C.R., A MINOR; and S.A., A MINOR,

      Plaintiffs,

vs.

NICOLAS MADURO MOROS;
FUERZAS ARMADAS REVOLUCIONARIAS
DE COLOMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; TAREK WILLIAM
SAAB; and TARECK EL AISSAMI,

      Defendants,

_____/

## **AFFIDAVIT OF CARLOS EDUARDO MARRÓN**

I, Carlos Eduardo Marrón, declare:

    1.    I am a plaintiff in the above-captioned matter.  I am over the age of 18 and qualified

to testify based upon personal knowledge to the matters herein.

    2.    Before April 2018, I lived happily in Miami with my then-wife Maria and our two

children, S.A. (at that time, age 4) and C.R. (at that time, age 10). Our family was happy, healthy,

and stable (emotionally and financially).

    3.    On April 10, 2018, I learned that my father, Ramon Antonio Marrón Moreno, had

been kidnapped in Caracas, Venezuela, where he lived at that time.

    4.    I later saw a video that showed my father's kidnapping. In the video, which is

available at online at https://twitter.com/i/status/984808307767562241, the camera follows my CM

1

father's movements as he walks through his neighborhood. As he walked by a parked car, men jumped out and forcibly shoved him into the car, which sped off.

5.  I was extremely distressed when I learned of my father's kidnapping and the threat to his life. I immediately bought a plane ticket and flew from Miami to Caracas. I wanted to do whatever I could to secure my father's release.

6.  On April 11, 2018, when I landed at the Simón Bolivar International Airport in Venezuela, I was kidnapped by the Defendants' agents, who were also employees of the General Directorate of Military Counterintelligence ("DGCIM").[1] The Defendants' agents did not present me with an arrest warrant when they kidnapped me, and I feared for my life and safety. Further, I recognized them as DGCIM agents. Because the DGCIM is a Venezuelan military intelligence agency, loyal to Defendant Maduro and notorious for its torture, unlawful detention, and extrajudicial killing of arrestees, this magnified my fear.

7.  I was taken from the airport to the DGCIM's headquarters. After several hours, Defendants' agents began questioning me, and they tortured me to extract the answers I believed they wanted to hear.

8.  The torture lasted for multiple days. In torturing me, Defendants' agents:

    a.  Handcuffed me so tightly that the handcuffs dug into my skin and cut off circulation to my hands and fingers.

    b.  Repeatedly kicked and punched me all over my body.

    c.  Beat my feet with wooden boards and cut the soles of my feet, which made it agonizing for me to walk or stand up.

---

[1] The Defendants' agents stole my luggage, which contained my passport and money I brought to Venezuela to help with my father's release. None of my luggage or possessions was ever returned to me after I escaped from Venezuela.

d.    Beat my shoulders with metal rebar.

e.    Beat my head until I lost consciousness. This happened multiple times, and I do not know the exact number of times that I lost consciousness or passed out.

f.    Sprayed me with teargas, which caused my eyes, throat, and lungs to burn in excruciating pain.

g.    Waterboarded me by putting a fabric hood over my head and then dousing me with water. I tried to hold my breath as long as I could but they kept waterboarding me until I ran out of breathe and gasped for air. When I gasped for air, I would swallow water instead. I thought I would die from drowning if I was not beaten to death.

9.    The torture left me severely injured and in extreme pain throughout my body. My eyes, throat, and lungs were in extreme pain from the tear gas. My lungs and throat also were in extreme pain from the waterboarding. Most of my body, including my head, chest, abdomen, shoulders, arms, legs, and feet, was also in extreme pain from the beatings.

10.    In addition to the physical torture, the Defendants' agents subjected me to verbal and mental torture. At the time of the kidnapping and torture, I had family in Venezuela, and the Defendants' agents threatened to kill my entire family, including my father (whom I believed they were holding captive at that time). Defendants' agents also went into crude, graphic detail about how they would rape my family members before killing my entire family.

11.    Using the torture methods discussed above, the Defendants' agents also forced me to tell them the passwords to my phone and my bank accounts, including accounts at Bank of America, Wells Fargo and Citibank in Miami. After my escape from Venezuela, I learned that Defendants or their agents had drained over $100,000 (representing my life's savings) from my

3

bank accounts. I have never received any of that money back.

12.     After the torture, I was seen by a medical doctor who worked for the DGCIM. He asked if I had been tortured, and when I said yes, he said "it's a shame that they did not torture you more because you deserved it."   The doctor then forced me to affix an ink fingerprint on a certificate that falsely affirmed I was in perfect health.

13.     After the torture and the sham medical appointment, I was moved to a different room within DGCIM headquarters that was called "the crazy room" (*el cuarto de los locos*).

14.     The "crazy room" was tiny, and I later learned that it was about 2 x 2 meters. I was confined to the "crazy room" with two other prisoners, and I generally had to stand up because the size of the room made it impossible to lay down.

15.     I was locked in the "crazy room" for over a month after the Defendants' agents tortured me. During this time, I remained in excruciating pain from the torture and from having to stay on my feet—which had not fully healed from the beating of my feet with wooden boards and the cuts to the soles of my feet—much of the time.

16.     The "crazy room" did not have running water or a toilet, and I (along with the two others in my cell) were not allowed access to a bathroom. Instead, we were given a plastic bag or a bottle to use as a toilet. Because the plastic bag or bottle was not changed on a regular basis, it sometimes overflowed, and the "crazy room" reeked of urine and human waste.

17.     While locked in the "crazy room," I was given two miniscule meals a day, often consisting of rotten food filled with live insects. At times, Defendants' agents would enter the room and beat me and the other prisoners.

18.     Because of the conditions in the "crazy room," I was sometimes confused or disoriented.  I now understand that a purpose of the "crazy room" was, in the words of a former *CM*

DGCIM officer, "to put psychological pressure on the prisoner."[2]

19.     During this time in the "crazy room," I consistently thought that I would die, either from mistreatment or execution.

20.     While I was locked in the "crazy room," I was not provided with information about my father. At one point, the Defendants' agents told me that they thought my father would die in captivity if he did not receive a particular medication that he needs, and Defendants' agents said they did not care if my father lived or died.  Defendants' agents never told me that my father had eventually been released from their custody. For over a year, I suffered extreme emotional distress as I wondered whether my father had been killed or whether he remained hostage under tortious conditions.

21.     I was eventually moved from the "crazy room" to a different cell that was underground. The underground cell had artificial lighting that stayed on 24 hours a day, which often made it difficult or impossible for me to sleep or even tell the time of day. I was allowed outside twice in the twenty-one months that I was held captive. At times, Defendants' agents would enter the room and beat me and the other prisoners.

22.     For the first six months in the underground cell, I was given only a plastic bag to use as a bathroom. I was eventually allowed to share one toilet with more than 100 other prisoners.

23.     While in the underground cell, I continued to receive tiny portions of often-rotten food.  The lack of adequate food caused me to suffer severe stomach pains on a continual basis and to develop a gastro-intestinal disorder. As a result, I dropped from about 198 pounds to 127

---

[2] Human Rights Council, *Detailed findings of the independent international fact-finding mission on the Bolivarian Republic of Venezuela*, at 89 (Sept. 15, 2020), https://www.ohchr.org/sites/default/files/Documents/HRBodies/HRCouncil/FFMV/A_HRC_45_ CRP.11.pdf.

pounds. I understand from medical professionals that a weight of 127 pounds for a person of my stature is severely malnourished and poses a danger to my health. The mistreatment while I was held captive also caused me to develop prostatitis, and I experienced severe pain in my groin and genitals, and severe pain or difficulty urinating.

24.     While I was held captive, the Defendants' agents denied me access to medical care for extended periods of time. Often when I requested medical care, instead of providing it, Defendants' agents would beat me. A Venezuelan court eventually ordered my transfer to a hospital on an urgent basis, and Defendants' agents waited over a month after the court order to transfer me to the hospital. I was hospitalized due to my extreme malnutrition and resulting symptoms (including lethargy and extremely painful gastrointestinal problems). After one day at the hospital, Defendants' agents took me back to a cell with substantially the same conditions as the previous cells where I was kept captive.

25.     In total, I was held captive in the DGCIM headquarters for approximately twenty-one months (from April 11, 2018, to January 6, 2020, or 635 days).

26.     On January 6, 2020, I was released from the DGCIM headquarters on the condition that I could not leave Venezuela. When I was released, I did not have a passport or money because Defendants' agents had stolen them from me. I continued to suffer from malnutrition, digestive illnesses, anemia, and severe pain from the torture inflicted on me while I was held captive.

27.     In August 2020, I began my escape from Venezuela. I traveled by car to the Colombian border and hiked through the jungle. Over the course of fifteen days, I waded through rivers, avoided local bandits, and hid from the FARC and FARC splinter groups. Throughout this time, I lived in constant fear that bandits or militants (especially those aligned with Defendants) would capture or kill me.

28.     I successfully made it to the U.S. Embassy in Bogotá, Colombia, and on September 5, 2020, the State Department arranged for me to receive an emergency visa and return to Miami, Florida.

29.     The torture, malnutrition, and mistreatment that I experienced while being held hostage left me physically bruised and injured. I continue to experience severe pain to this day, including pains in my stomach, back, and hips.  Additionally, I have lost part of my vision, and also experience frequent stress headaches.

30.     I have experienced extreme emotional distress starting as soon as I was kidnapped from the Simon Bolivár International Airport and continuing to this day. I have had difficulty returning to society after being held captive for almost two years in traumatic and abusive conditions in the DGCIM headquarters.

31.     As a result of the kidnapping, torture, and my treatment in captivity, I was diagnosed with Post-Traumatic Stress Disorder. My symptoms include severe anxiety, flashbacks and repetitive memories of the kidnapping and torture, nightmares, severe insomnia, depression, paranoia, irritability, emotional instability, loneliness, insecurity, and what has been described to me by a medical professional as persecutory delirium. To this day, I continue to suffer from these symptoms, and they have not abated materially since my escape from Venezuela.

32.     My anxiety manifests in anxiety attacks, which often make it difficult or impossible for me to interact with friends and family as I did before the kidnapping and torture.

33.     The Defendants' conduct also ruined my marriage and my family life. Before I was kidnapped, my then-wife Maria and I had a harmonious marriage, and we lived happily with our two children. As noted above, I continue to experience severe pain (both physical and emotional) from the kidnapping and torture, and it has changed my personality, as noted above. As noted in

the affidavit of Maria de Marrón, Maria also experienced severe emotional distress—which manifested in her suffering physical illness—from my kidnapping and torture.  Our physical and emotional pain, from the kidnapping and torture orchestrated by the Defendants, led to an irretrievable breakdown of our marriage, and Maria and I filed for divorce in February 2022.

34.     The Defendants' conduct has also severely harmed my relationship with my children, S.A. and C.R.[3] While I was held captive by Defendants' agents or trapped in Venezuela, I missed out on several formative years of S.A.'s and C.R.'s childhood. Even though my absence was Defendants' fault (not mine), my children felt abandoned, and they resent me for my absence.

35.     S.A. and C.R. have also suffered as a result of my kidnapping and torture, which destroyed the stable and safe social environment where they were growing up before April 2018. S.A. and C.R. have also suffered mistreatment and accusations from our friends and family, and S.A. and C.R. have treated me with reproachment and a loss of affection because of my absence and because of the difficulties I continue to suffer as a result of the injuries Defendants' agents inflicted on me while I was held captive.

36.     In addition to ruining my marriage and family life, Defendants' conduct also ruined my livelihood. Before my kidnapping, I ran a lucrative ticket-sales business. For example, in the first quarter of 2018, through my personal efforts and labor, I secured a $7 million contract to sell tickets for Cirque du Soleil. While I was held captive, my business collapsed. Based on my familiarity with, and connections to, the ticket industry, I believe my business likely would have secured additional contracts but for my kidnapping and the resulting collapse of my business.

37.     The emotional and physical trauma that I continue to suffer has also prevented me

---

[3] Because the children are minors (ages 8 and 15), we have not asked them to submit their own affidavits, and believe that their doing so would detrimental to their wellbeing.

8

from holding gainful employment, as I did before the kidnapping and torture. My depression, anxiety attacks, stress, and emotional instability (among other symptoms) make it impossible for me to perform work and interact normally with colleagues, customers, or others with whom I would come into contact while working. As a result, I am currently not employed.

38.     Defendants' conduct has also caused injury to my reputation. For example, Defendant Tarek William Saab made a number of false and defamatory statements about me on Venezuelan national television, including that I was a "criminal of the worst ilk," a "financial terrorist," a "coward," as well as asserting that I had engaged in conduct "worse than mass murder," and urging that my name as a "bad actor" be "spread across the country."  Defendant Saab further stated that I was guilty of money laundering, conspiracy, and financing terrorism. All of these accusations are categorically and entirely false. The accusations have caused people within my social circle to question whether I am a "criminal" or "financial terrorist," and to this day I experience stigma from Defendants' defamatory statements.

39.     As much as I would have hoped and expected that the Defendants' lies about me would not affect my reputation, and that persons in my social circles in Miami would appreciate that Defendants routinely lie about their adversaries, that unfortunately has not been the case.  Many persons in my social circle ceased associating with Maria and me in response to Defendants' defamatory statements about me.  Moreover, a number of people, believing that there is some veracity to Defendants' lies, have said that they believe that I had "suspicious" dealings with the Maduro regime.

40.     After my escape, I gave an interview to a United Nations Human Rights Council fact-finding mission, discussing my kidnapping and torture. I gave the interview because I feel strongly that the world should know about the human-rights abuses caused by Defendants. I

understand that the United Nations conducted additional research to confirm my account of events.

A true and correct copy of the United Nations first report is attached as **Exhibit A** to this affidavit.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on December 6, 2022.

_____

Carlos Eduardo Marrón

BEFORE ME, by means (✓) physical presence or (_) online notarization appeared Carlos E. Marron who, by me duly sworn, deposes and says that he has read the foregoing Affidavit and attest that the same is true and correct. *Produced ID: FL DL.*

_____

Notary Public

_____

My Commission
Expires: 08/02/23

Print Name

# Exhibit A

United Nations

**A**/HRC/WGAD/2019/80



# General Assembly

Distr.: General
2 March 2020
English
Original: Spanish

**Human Rights Council**
**Working Group on Arbitrary Detention**

## Opinions adopted by the Working Group on Arbitrary Detention at its eighty-sixth session, 18–22 November 2019

### Opinion No. 80/2019 concerning Carlos Marrón Colmenares (Bolivarian Republic of Venezuela)

1.     The Working Group on Arbitrary Detention was established in resolution 1991/42 of the Commission on Human Rights. In its resolution 1997/50, the Commission extended and clarified the mandate of the Working Group. Pursuant to General Assembly resolution 60/251 and Human Rights Council decision 1/102, the Council assumed the mandate of the Commission. The Council most recently extended the mandate of the Working Group for a three-year period in its resolution 42/22.

2.     In accordance with its methods of work (A/HRC/36/38), on 31 July 2019 the Working Group transmitted to the Government of the Bolivarian Republic of Venezuela a communication concerning Carlos Marrón Colmenares. After requesting an extension of the deadline for replying, which was granted, the Government replied to the communication on 18 October 2019. The State is a party to the International Covenant on Civil and Political Rights.

3.     The Working Group regards deprivation of liberty as arbitrary in the following cases:

      (a)     When it is clearly impossible to invoke any legal basis justifying the deprivation of liberty (as when a person is kept in detention after the completion of his or her sentence or despite an amnesty law applicable to him or her) (category I);

      (b)     When the deprivation of liberty results from the exercise of the rights or freedoms guaranteed by articles 7, 13, 14, 18, 19, 20 and 21 of the Universal Declaration of Human Rights and, insofar as States parties are concerned, by articles 12, 18, 19, 21, 22, 25, 26 and 27 of the Covenant (category II);

      (c)     When the total or partial non-observance of the international norms relating to the right to a fair trial, established in the Universal Declaration of Human Rights and in the relevant international instruments accepted by the States concerned, is of such gravity as to give the deprivation of liberty an arbitrary character (category III);

      (d)     When asylum seekers, immigrants or refugees are subjected to prolonged administrative custody without the possibility of administrative or judicial review or remedy (category IV);

      (e)     When the deprivation of liberty constitutes a violation of international law on the grounds of discrimination based on birth, national, ethnic or social origin, language, religion, economic condition, political or other opinion, gender, sexual orientation,

GE.20-03256 (E)    070420    080420



Please recycle 



disability, or any other status, that aims towards or can result in ignoring the equality of human beings (category V).

**Submissions**

*Communication from the source*

4.      Mr. Marrón is a Venezuelan national who was born in 1977. He is a lawyer by profession and a resident of the State of Florida in the United States of America.

5.      According to the information received, Mr. Marrón travelled to the Bolivarian Republic of Venezuela on 11 April 2018 because his father was being unlawfully detained there.

6.      Mr. Marrón was arrested on 11 April 2018 at Simón Bolívar International Airport by officers from the Directorate General of Military Counter-Intelligence who allegedly did not show a warrant or any other decision issued by a public authority ordering the arrest.

7.      The source notes that, under article 44.1 of the Constitution, a person may be arrested only on the basis of a court order issued at the request of the Public Prosecution Service, unless he or she is caught in flagrante delicto.

8.      According to the source, after Mr. Marrón was arrested, an arrest warrant supposedly issued on 10 April 2018 by the judge of the Third Supervisory Court of the Caracas Metropolitan Area was added to his case file. The source claims that this warrant was not issued prior to the arrest but rather on 12 April 2018. This would explain why it was not shown when the arrest was made. The source alleges that the official letter from the prosecutor's office to the supervisory judge requesting the issuance of an arrest warrant bore the printed date of 12 April 2018; the request was therefore submitted after the arrest. The source notes that the official who received the request wrote down 12 April 2018 as the date of receipt but the number 12 was later crossed out and changed to a 9. According to the source, the fact that the prosecutor's office submitted its request to the supervisory judge after Mr. Marrón's arrest makes it impossible for the arrest warrant to have been issued before he was deprived of his liberty.

9.      The source notes that, even leaving aside the fact that the dates do not match up, the prosecutor's office could not possibly have requested the arrest warrant on 9 April 2018, since that was the day on which the investigation was opened. The prosecutor's office therefore would not have had enough time to investigate the facts and to gather the evidence needed to support a request for an arrest warrant.

10.     In addition, the source reports that the Directorate General of Military Counter-Intelligence submitted its investigation report on 12 April 2018, three days after the prosecutor's office supposedly requested the arrest warrant and two days after the supervisory judge supposedly issued it. Both the request and the warrant are based solely on that report, yet they supposedly predate it. According to the source, the only rational explanation for this inconsistency is that both the submission of the request by the prosecutor's office and the issuance of the warrant by the supervisory judge took place after the arrest.

11.     According to the information received, Mr. Marrón was brought before the judge of the Third Supervisory Court of the Caracas Metropolitan Area on 13 April 2018, having been accused of the following offences:

       (a)     Dissemination of false information on the exchange rate, an offence defined in article 24 of the Decree-Law on the Foreign Exchange Regime and Illegal Practices;

       (b)     Money-laundering and criminal association, offences defined in articles 35 and 37 of the Organized Crime and Financing of Terrorism Act.

12.     The source reports that before the arraignment hearing at the Third Supervisory Court, the Attorney General of the Republic made public statements on the State-run television channel Venezolana de Televisión in which he described Mr. Marrón as "a criminal of the worst kind", "a financial terrorist", "a coward", "a hypocrite" and "in no way a Venezuelan". He also said: "What difference is there between this man and one who

promotes serial killing? ... This is worse than mass murder. ... This man, Carlos Eduardo Marrón Colmenares, whose name and wrongdoing should be made known throughout the country, is the worst kind of criminal there is."

13.     At the oral arraignment hearing on 13 April 2018, the Third Supervisory Court reportedly decided that Mr. Marrón should remain in pretrial detention and should be held at the Simón Bolívar Centre for Foreign Defendants in Caracas; it also decided to maintain the prohibition on the transfer and encumbrance of assets and the blocking and preventive freezing of his bank accounts.

14.     The source reports that the defence appealed against this decision, invoking article 439 of the Code of Criminal Procedure, on 21 May 2018. Regarding the place of detention, the source notes that the Directorate General of Military Counter-Intelligence never carried out the transfer that had been ordered by the court.

15.     According to the source, on 7, 14 and 18 May 2018, the defence requested that certain investigative measures be taken. On 23 May 2018, the Third Supervisory Court granted the defence's request. However, on 25 May 2018, the prosecutor's office refused to conduct the investigations that had been requested.

16.     On 28 May 2018, the prosecutors filed a formal charge of dissemination of false information on the exchange rate and requested that Mr. Marrón be kept in pretrial detention, that the other measures imposed at the arraignment hearing remain in place and that an order to open the trial be issued.

17.     The source reports that the court scheduled the preliminary hearing for 30 May 2018. However, the hearing was postponed on the grounds that the court was "not handling cases" that day; it was rescheduled first for 26 June 2018 and then for 26 July 2018, but it was not held on either date and has not yet taken place.

18.     On 2 August 2018, the National Constituent Assembly repealed the Decree-Law on the Foreign Exchange Regime and Illegal Practices of 29 December 2015 by issuing a constituent decree that was published in *Official Gazette* No. 41452 of 2 August 2018. As a result, the offence with which Mr. Marrón was charged no longer exists under Venezuelan law.

19.     According to the source, on 17 August 2018, the defence requested the judge of the Third Supervisory Court to order the unconditional release of Mr. Marrón, pursuant to articles 1 and 2 of the Criminal Code and article 24 of the Constitution, since the repeal of the Decree-Law on the Foreign Exchange Regime and Illegal Practices by the National Constituent Assembly on 2 August 2018 meant that the acts with which he had been charged were no longer offences and he should therefore be released, in accordance with the principle of legality and the retroactive application of the most favourable criminal law.

20.     The source reports that the judge of the Third Supervisory Court rejected this request on 31 October 2018. The judge's decision was appealed on 15 November 2018.

21.     On 31 January 2019, the defence submitted two written requests to the Ombudsman's Office and to the Directorate for the Protection of Fundamental Rights of the Attorney General's Office, asking that effective measures be taken promptly in order to ensure that the unconditional release of Mr. Marrón was ordered and that a hearing was granted so that the issues covered in the written requests could be raised in person. To date, there has been no response.

22.     On 22 January 2019, chamber 6 of the Court of Appeal of the Caracas Metropolitan Area criminal court circuit ruled on the appeal that had been lodged on 21 May 2018, declaring it partially admissible. It dismissed the charges of money-laundering and criminal association. However, it upheld the charge of dissemination of false information on the exchange rate and the decision to keep Mr. Marrón in pretrial detention. The source notes that the charge that was upheld by the Court of Appeal judge was based on legislation that had been repealed prior to her decision.

23.     The source reports that on 1 February 2019, chamber 9 of the Court of Appeal of the Caracas Metropolitan Area criminal court circuit ruled on the appeal that had been lodged on 15 November 2018, declaring it inadmissible.

24.     On 6 February 2019, the defence requested clarification from chamber 9 of the Court of Appeal on its decision of 1 February 2019. Chamber 9 dealt with this request on 11 February 2019, confirming the content of its decision.

25.     The source reports that on 19 February 2019, the defence filed an application for *amparo* against the ruling handed down by chamber 9 of the Court of Appeal, which had declared inadmissible the appeal against the decision of 31 October 2018 of the Third Supervisory Court, which had in turn declared inadmissible the request for unconditional release on the basis of articles 1 and 2 of the Criminal Code and article 24 of the Constitution.

26.     The Ombudsman's Office and the Directorate for the Protection of Fundamental Rights of the Attorney General's Office were requested again, on 7 March and 22 April 2019 respectively, to take effective measures promptly in order to ensure that the unconditional release of the victim was ordered and that a hearing was granted to the defence so that the issues mentioned in the written requests to these authorities could be raised in person.

27.     The defence submitted written requests to the Third Supervisory Court of First Instance and to the Anti-Corruption Director of the Public Prosecution Service on 9 and 18 March 2019 respectively, asking for the case to be dismissed since the offence in question no longer existed in law, following the repeal of the Decree-Law on the Foreign Exchange Regime and Illegal Practices on 2 August 2018.

*Category I: Principle of legality*

28.     The source claims that the so-called "law" on the foreign exchange regime and illegal practices, which establishes the offence of disseminating false information on the exchange rate, is in fact a decree: Decree No. 2167 of 29 December 2015, promulgated by the President of the Republic.

29.     The source claims that, despite what its name suggests, the normative instrument that was used as a pretext for arresting Mr. Marrón is not a formal law as defined in article 202 of the Constitution, which states that: "A law is an act that has been passed by the National Assembly in its role as a legislative body."

30.     According to the source, it is beyond doubt that the Decree-Law on the Foreign Exchange Regime and Illegal Practices is not an act passed by the National Assembly in the exercise of its legislative functions. Rather, it is an act of government, as defined in the preamble to the Decree-Law itself, which states that it is imperative for the national Government, acting through the executive branch, to fulfil its leading role in the national economy and, above all, its social responsibility to regulate economic freedom and to prevent it from becoming an additional cause of disruption.

31.     The source claims that since the Decree-Law on the Foreign Exchange Regime and Illegal Practices is not a law, detention on this basis clearly violates article 9 (1) of the International Covenant on Civil and Political Rights. It also violates the principle of formal legality and article 49 (6) of the Constitution, which states that no one may be punished for acts or omissions that are not defined as serious, ordinary or minor offences in existing law.

32.     The source claims that, even leaving aside the fact that the Decree-Law on the Foreign Exchange Regime and Illegal Practices is not a law, Mr. Marrón is being detained arbitrarily given that the instrument establishing the offence for which he is being detained has been repealed by the National Constituent Assembly.

33.     The source insists that the offence of disseminating false information on the exchange rate no longer exists because it was abolished on 2 August 2018 when the constituent decree repealing the Decree-Law on the Foreign Exchange Regime and Illegal Practices entered into force. The source notes that article 15 (1) of the Covenant states that if, subsequent to the commission of the offence, provision is made by law for the imposition of a lighter penalty, the offender should benefit thereby. The same provision can be found in article 24 of the Constitution and article 2 of the Criminal Code, which stipulate that criminal laws may be applied retroactively if they are favourable to the defendant.

34.     In addition, the source notes that, according to article 236 of the Code of Criminal Procedure, the first requirement that must be met in order for detention to be imposed and maintained is the existence of an offence that carries a custodial sentence; in this case, no such offence exists.

35.     More generally, the aforementioned article 15 (1) of the Covenant, like article 49 (6) of the Constitution, states that no one may be held guilty of a criminal offence, and consequently no one may be prosecuted, on account of any act that does not constitute a criminal offence.

36.     The source argues that even if the alleged acts were to have taken place, the law did not and still does not establish any offence that could be imputed to Mr. Marrón and that would justify the proceedings brought against him and his consequent detention. The source maintains that the offence of disseminating false information on the exchange rate never existed and even if it were considered to have existed, there can be no doubt that it ceased to exist under Venezuelan law as from 2 August 2018. This fact should benefit Mr. Marrón, in line with the most-favourable-law principle.

37.     Since no offence exists, the first requirement that must be satisfied in order for Mr. Marrón to be kept in pretrial detention has not been met and there are no grounds on which to prosecute him.

38.     On 17 August 2018, these arguments were presented to the supervisory judge, who was obliged to dismiss the case, since the relevant criminal legislation had been repealed. However, the supervisory judge allegedly refused to order the release of Mr. Marrón, claiming that the offence itself had not been abolished because it fell under the exception provided for in article 3 of the constituent decree repealing the Decree-Law on the Foreign Exchange Regime and Illegal Practices. Yet article 3 of the constituent decree refers specifically to the offences that were set out in articles 21 and 23 of the repealed Decree-Law, whereas the offence imputed to Mr. Marrón was defined in article 24. It is therefore clear that the exception in question does not apply in this case and the supervisory judge's refusal to release Mr. Marrón has no legal basis.

39.     According to the source, it is clearly impossible to invoke any legal basis justifying Mr. Marrón's detention. Leaving aside the question of the evidence put forward and assuming that the alleged acts took place, the only charge brought against him that would have justified his detention concerns an offence that no longer exists. In short, Mr. Marrón is being detained without charge.

40.     The source notes that, although Mr. Marrón was charged only with disseminating false information on the exchange rate and is being detained on the basis of this charge, at the time when the detention order was issued, he was also accused of criminal association and money-laundering.

41.     However, the source notes that these offences cannot be invoked as grounds for his detention, not only because the charges were never officially filed but also because they were dismissed by chamber 6 of the Court of Appeal on 22 January 2019. That is to say, he can no longer be accused of criminal association and money-laundering because these charges were dropped.

42.     The source claims that this is another reason why Mr. Marrón's detention has no legal basis. Just as he should not be detained for an offence that no longer exists, keeping him in detention even though the charges of criminal association and money-laundering have been dismissed is equivalent to detaining a person who has committed no crime.

*Category II: Detention for conducting research and disseminating findings on the value of the bolívar in relation to foreign currencies*

43.     The source also claims that Mr. Marrón is being deprived of his liberty for supposedly having disseminated information on the value of the bolívar that differed from the information published by the Central Bank of Venezuela and the national executive. In other words, according to the source, Mr. Marrón is being detained because he is accused of having exercised his right to freedom of expression.

44.     Article 24 of (repealed) Decree No. 2167 of 29 December 2015, known as the Decree-Law on the Foreign Exchange Regime and Illegal Practices, imposed a penalty of 10 to 15 years' imprisonment on those who had, directly or indirectly, participated in the development of any hoax or scheme that involved the dissemination, by any means of communication, of false or fraudulent information on the exchange rate applicable to foreign currencies in the Bolivarian Republic of Venezuela. False or fraudulent information was defined as information that contradicted or distorted the rate set by the national executive and the Central Bank of Venezuela. Ultimately, this was not a definition of a genuine offence but rather a ban on dissent, since anyone who published information on the exchange rate that differed from the information published by the State was liable to be imprisoned.

45.     The source reports that when the prosecutor's office completed its investigation and filed the charges, it maintained that Mr. Marrón had engaged in the mass dissemination of a parallel exchange rate through electronic media and had thus disrupted the socioeconomic order, since only the Central Bank of Venezuela had the authority to set the exchange rate.

46.     The evidence for this claim is a report by the Directorate General of Military Counter-Intelligence dated 2 February 2018, in which officials of that agency claim to have consulted the public directory of domain names and to have found that the website dolarpro.com had been registered – but not operated – by a person called Carlos Marrón, whose email address supposedly matched the one that Mr. Marrón had given on his tax returns and to the authorities in charge of issuing identification documents in the Bolivarian Republic of Venezuela.

47.     The source therefore concludes that Mr. Marrón is being detained for allegedly having registered the domain name dolarpro.com in his name. According to the source, this means that the deprivation of liberty results from Mr. Marrón's exercise of his right to freedom of expression and opinion under article 19 of the Universal Declaration of Human Rights, article 19 of the Covenant and article 57 of the Constitution, and is therefore arbitrary under category II.

*Category III: lack of impartiality and failure to ensure due process*

48.     The source claims that, leaving aside the allegations that have already been made concerning the principle of legality and freedom of expression, the criminal proceedings brought against Mr. Marrón were marked by very serious irregularities that in themselves render the deprivation of liberty arbitrary.

49.     It is alleged that: (a) Mr. Marrón's father was deprived of his liberty in order to force Mr. Marrón to come to the Bolivarian Republic of Venezuela, where he could then be arrested; (b) the Attorney General stated publicly that Mr. Marrón was guilty before he had been tried; (c) the officials who arrested him stole his personal property; and (d) the defence was not granted access to the record of the investigation and none of the investigative measures requested by the defence in order to prove Mr. Marrón's innocence were carried out.

50.     Firstly, the source is concerned that Mr. Marrón's father was deprived of his liberty by persons presumed to be officials from the Directorate General of Military Counter-Intelligence, who then informed Mr. Marrón of the situation in order to force him to leave the United States and travel to the Bolivarian Republic of Venezuela. On 11 April 2018, Mr. Marrón was arrested upon arrival at Simón Bolívar International Airport by officials from the Directorate General of Military Counter-Intelligence. Just hours after the arrest, Mr. Marrón's father was released.

51.     This fact was reported to the Extortion and Kidnapping Division of the Scientific, Criminal and Forensic Investigation Unit. However, after conducting an initial inquiry, the officials concerned reported verbally that, as State agents had been involved in the detention of Mr. Marrón's father, they had decided to close the investigation.

52.     Secondly, the source claims that the Attorney General made statements in which he described Mr. Marrón as an offender, even though at that stage Mr. Marrón had not even been told why he was being investigated. On Venezolana de Televisión at 7.12 p.m. on 12

April 2018, the Attorney General reported that Mr. Marrón had been arrested. He made the following statement:

> Carlos Eduardo Marrón Colmenares, a true criminal of the worst kind who had no qualms about setting a parallel exchange rate against the dollar just as he pleased, in almost terrorist terms. This man thought that his acts would go unpunished because his website is located or registered in Florida in the United States. He was wrong. The laws that apply in [the Bolivarian Republic of] Venezuela, where the Public Prosecution Service operates, have no borders. ... I want to say that the Directorate General of Military Counter-Intelligence helped us to arrest this criminal and this is the signal that we are sending to anyone who imitates him. The age of impunity in this country is over.

53.     Thirdly, the source claims that the officials from the Directorate General of Military Counter-Intelligence stole Mr. Marrón's personal property. They omitted to mention in the chain of custody documentation or in the arrest report that the objects seized included credit and debit cards that had been issued to Mr. Marrón by foreign banks. There is a record of this in the statement made by his defence lawyers to the supervisory judge. It was later found that someone had accessed the online banking system made available to Mr. Marrón by the foreign banks and had ordered the electronic transfer of the money deposited in his accounts.

54.     Fourthly, the source argues that, for 35 of the 45 days that the investigation lasted, the prosecutor's office arbitrarily refused to allow the defence to look at the record of the investigation in order to find out what steps had been taken to determine whether Mr. Marrón was criminally responsible.

55.     The source also claims that the prosecutor's office ignored the defence's request for investigative measures to be taken in order to obtain evidence that would prove Mr. Marrón's innocence. The prosecutor's office responded to the defence's request once the investigation had been completed. It was only after the charges had been filed against Mr. Marrón that the prosecutor's office decided to reject all the requests that had been made. The purpose of such requests is to avoid charges being filed, so it only makes sense to respond to them before the investigation has been completed.

56.     The source notes that persons under investigation have the right to look at the records kept by the Public Prosecution Service and the right to request that body to take investigative measures, as expressly stated in articles 286 and 287 of the Code of Criminal Procedure.

57.     The source claims that the fact that the Attorney General stated his opinion in advance of the trial, that members of Mr. Marrón's family were deprived of their liberty so that he could be arrested, that Mr. Marrón's personal property was stolen by those responsible for guarding him and that his participation in the investigation was restricted renders his detention arbitrary under category III.

*Response from the Government*

58.     On 31 July 2019, the Working Group transmitted the source's allegations to the Government and requested that it submit a response by 30 September 2019. The Government requested an extension of this deadline and was given until 21 October 2019 to reply. The Government submitted its response on 18 October 2019.

59.     The Government notes that Mr. Marrón was arrested on 11 April 2018 for his suspected involvement in the commission of offences under Venezuelan law relating to the dissemination of false information on the exchange rate via the website dolarpro.com.

60.     Mr. Marrón is currently in detention after being prosecuted for the offence of disseminating false information on the exchange rate, which is punishable under article 24 of the Decree-Law on the Foreign Exchange Regime and Illegal Practices.

61.     The criminal proceedings against Mr. Marrón were initiated on the basis of investigations by the Directorate General of Military Counter-Intelligence which had revealed that Mr. Marrón, as the owner of the website dolarpro.com, was manipulating the

price of foreign currency by distorting the official exchange rate set by the national executive and the Central Bank of Venezuela.

62.     On the basis of the evidence gathered, the Third Supervisory Court of the Caracas Metropolitan Area issued a warrant for the arrest of Mr. Marrón. He was arrested by the authorities when he arrived at Simón Bolívar International Airport on 11 April 2018.

63.     The Government states that once Mr. Marrón had been arrested, he was notified of his rights as an accused person and of the reasons for his arrest. He was subsequently taken to the Third Supervisory Court of the Caracas Metropolitan Area for a hearing. He was able to exercise his right to appoint a defence lawyer of his own choosing.

64.     During the arraignment hearing, the Public Prosecution Service charged Mr. Marrón with the offences of disseminating false information on the exchange rate, money-laundering and criminal association, which are punishable under article 24 of the Decree-Law on the Foreign Exchange Regime and Illegal Practices and articles 35 and 37 of the Organized Crime and Financing of Terrorism Act.

65.     The judge confirmed the pretrial detention measure imposed on Mr. Marrón, as well as the prohibition on the transfer and encumbrance of assets and the preventive freezing of his bank accounts.

66.     According to the Government, Mr. Marrón has enjoyed all the constitutional guarantees applicable to an accused person at all times, due process has been ensured and his right of defence has been respected, in line with the principles enshrined in the relevant international instruments.

67.     The Government states that Mr. Marrón is being deprived of his liberty on the basis of a judicial decision, in the context of criminal proceedings against him, and that his detention therefore cannot be considered arbitrary under category I since it has a legal basis. Mr. Marrón is being deprived of his liberty on the basis of a court order, in accordance with article 44 of the Constitution.

68.     The Government maintains that the Decree-Law on the Foreign Exchange Regime and Illegal Practices has the status of a law because it was issued by the President of the Republic in the exercise of the legislative powers delegated to him by the National Assembly through the law that authorizes the President to issue decrees with the status, value and force of law on matters that are delegated to him, in accordance with articles 203 and 236 (8) of the Constitution.

69.     The Government also maintains that Mr. Marrón's detention cannot be considered arbitrary under category II for it does not result from, is not related to and did not coincide with his exercise of the rights and freedoms that are enshrined in article 19 of the Universal Declaration of Human Rights, article 19 of the Covenant and article 57 of the Constitution. The acts that he is alleged to have carried out are not covered by the legitimate exercise of the right to freedom of expression and opinion. The conduct attributed to Mr. Marrón constitutes an offence under Venezuelan law.

70.     The Government maintains that Mr. Marrón's detention cannot be considered arbitrary under category III either, since the judicial proceedings that followed his arrest were conducted in full compliance with the due process guarantees set forth in articles 10 and 11 of the Universal Declaration of Human Rights and articles 9 and 14 of the Covenant.

71.     The Government reiterates that Mr. Marrón has, at all times, been assisted by a defence lawyer, who has continuously defended his rights and interests. Furthermore, his defence lawyer has lodged appeals and applied for special remedies in order to provide him with the best possible defence; these applications have been duly processed by the court hearing the case, ensuring that Mr. Marrón enjoys his right to due process.

*Additional comments from the source*

72.     The Working Group transmitted the Government's response to the source on 18 October 2019. The source submitted final comments and observations concerning the Government's response on 29 October 2019.

73.     In its final observations, the source maintains that the Decree-Law on the Foreign Exchange Regime and Illegal Practices is not a law in the strict and formal sense, because it was not passed by the National Assembly, which is the only body of the legislative branch that has the power to enact laws, according to article 202 of the Constitution. This means that there has been a violation of the principle of legality, because the rule established in article 11 (2) of the Universal Declaration of Human Rights has not been followed.

74.     In addition, the source points out that the legal instrument invoked by the Government to justify the detention of Mr. Marrón is no longer in force, as it was repealed on 2 August 2018 through a decree of the National Constituent Assembly. It is therefore indisputable that there is no longer any regulation, decree or law in force that establishes a penalty for the conduct attributed to Mr. Marrón and that could serve as the legal basis for his continued detention. The source notes that the Constitution does not give the President the power to enact laws. A decree that has the force of law is not a law and cannot be equated with one.

75.     According to the source, this is a case of a person being criminalized for exercising the right to conduct research and to disseminate economic information through digital media, on the pretext that the information differed from that published by the Government. This constitutes a restriction on freedom of expression.

76.     Lastly, according to the source, the Government fails to address the following issues: (a) the lack of investigation into the kidnapping of Mr. Marrón's father in the context of his arrest; (b) the fact that the Attorney General stated publicly that Mr. Marrón was guilty before he had been tried; (c) the fact that the officials who arrested Mr. Marrón stole his personal property and that the chain of custody was not properly maintained; (d) the fact that the defence was not allowed to look at the record of the investigation and that the investigative measures requested by the defence in order to strengthen Mr. Marrón's case were not carried out; and (e) the inconsistency between the date on which Mr. Marrón was deprived of his liberty and the dates of the prosecutor's request for detention, the court order and the subsequent report of the military body that made the arrest. The source maintains that these arguments show that Mr. Marrón's detention is arbitrary, since the rules of due process have been disregarded and seriously violated.

**Discussion**

77.     The Working Group thanks the parties for their initial communication and subsequent contributions to the resolution of the present case.

78.     The Working Group is mandated to investigate all cases of deprivation of liberty imposed arbitrarily that are brought to its attention. In the discharge of its mandate, it refers to the relevant international standards set forth in the Universal Declaration of Human Rights and the Covenant and to other relevant international legal standards, in accordance with its methods of work.

79.     The Working Group has in its jurisprudence established the ways in which it deals with evidentiary issues. If the source has established a prima facie case for breach of international requirements constituting arbitrary detention, the burden of proof should be understood to rest upon the Government if it wishes to refute the allegations. Mere assertions that lawful procedures have been followed will not be sufficient to rebut the source's allegations.[1]

80.     The Working Group is convinced by the claim that Mr. Marrón travelled to the Bolivarian Republic of Venezuela on 11 April 2018 because his father was being unlawfully detained there.

81.     The Working Group was alarmed by the claim that Mr. Marrón's father had been deprived of his liberty by persons presumed to be State officials, who then informed Mr. Marrón of the situation in order to force him to leave the United States and travel to the

---

[1]   A/HRC/19/57, para. 68.

Bolivarian Republic of Venezuela, and that just hours after the arrest, Mr. Marrón's father was released.

*Category I*

82.     The Working Group notes that anyone who is arrested should be informed, at the time of arrest, of the reasons for the arrest[2] as well as of the judicial avenue for challenging the lawfulness of the deprivation of their liberty.[3] The reasons for the arrest must include the legal basis and factual specifics to indicate the substance of the complaint and the wrongful act committed. The term "reasons" is understood to mean the official basis for the arrest, not the subjective motivations of the arresting officer.[4]

83.     In its jurisprudence, the Working Group has consistently held that a person is considered to have been arrested in flagrante delicto when the accused is deprived of liberty during or immediately after the commission of a crime or when the arrest is made in hot pursuit moments after the crime has been committed.[5]

84.     The Working Group notes that Mr. Marrón was arrested at Simón Bolívar International Airport on 11 April 2018 by officers from the Directorate General of Military Counter-Intelligence, without being shown a warrant or any other decision issued by a public authority, and that he was not arrested in flagrante delicto.

85.     The Working Group notes that on 13 April 2018, Mr. Marrón was accused of the following offences:

        (a)     Dissemination of false information on the exchange rate, an offence allegedly defined in article 24 of the Decree-Law on the Foreign Exchange Regime and Illegal Practices;

        (b)     Money-laundering and criminal association, offences defined in articles 35 and 37 of the Organized Crime and Financing of Terrorism Act.

86.     The Working Group wishes to recall that article 15 (1) of the Covenant stipulates that:

        No one shall be held guilty of any criminal offence on account of any act or omission which did not constitute a criminal offence, under national or international law, at the time when it was committed.

The Working Group has received convincing information to the effect that there is no law in the formal sense of the term that would serve as a legal basis for charging someone with the offence of disseminating false information on the exchange rate, that is to say, no such instrument has been discussed and approved by a democratically elected congress with the constitutional power to do so. Article 202 of the Constitution states that: "A law is an act that has been passed by the National Assembly in its role as a legislative body." In other words, the so-called "law" on the foreign exchange regime and illegal practices, which establishes the offence of disseminating false information on the exchange rate, is in fact a decree issued by the President of the Republic, or an act of government.

87.     Since the Decree-Law on the Foreign Exchange Regime and Illegal Practices is not a law, detention on the basis of this instrument clearly violates article 9 (1) of the Covenant.

88.     Furthermore, it is claimed that, even leaving aside the fact that the Decree-Law on the Foreign Exchange Regime and Illegal Practices is not a law, Mr. Marrón is being detained arbitrarily, since the instrument establishing the offence for which he is being detained has been repealed by the National Constituent Assembly. The Working Group is

---

[2]  Covenant, art. 9 (2).
[3]  A/HRC/30/37, principle 7, right to be informed.
[4]  Human Rights Committee, general comment No. 35 (2014) on liberty and security of person, para. 25.
[5]  See opinions No. 13/2019, para. 53; No. 9/2018, para. 38; No. 36/2017, para. 85; No. 53/2014, para. 42; No. 46/2012, para. 30; No. 67/2011, para. 30; and No. 61/2011, paras. 48–49. See also E/CN.4/2003/8/Add.3, paras. 39 and 72 (a).

convinced by the claim that the offence of disseminating false information on the exchange rate was abolished on 2 August 2018 when the constituent decree repealing the Decree-Law on the Foreign Exchange Regime and Illegal Practices entered into force. The Working Group is aware that article 15 (1) of the Covenant states that if, subsequent to the commission of the offence, provision is made by law for the imposition of a lighter penalty, the offender should benefit thereby.

89. The Working Group has received information confirming that the Court of Appeal dismissed the charges of criminal association and money-laundering on 22 January 2019. That is to say, Mr. Marrón can no longer be accused of criminal association and money-laundering because these charges have been dropped.

90. In view of the fact that Mr. Marrón was deprived of his liberty without a court order and was not arrested while committing a crime or immediately afterwards, as well as the fact that one of the charges against him concerns an offence that has not been established by law and the other charges have been dismissed by the judicial authorities, the Working Group considers that the Government is unable to invoke any legal basis justifying the deprivation of liberty, which renders the detention arbitrary under category I.

*Category II*

91. The Working Group is of the view that freedom of opinion and freedom of expression are indispensable conditions for the full development of the person and constitute the foundation stone for every free and democratic society.[6]

92. The Working Group emphasizes that everyone has the right to freedom of expression, which includes the right to impart information and ideas of all kinds, whether orally or in any other form. The Working Group also reiterates that the exercise of this right may be subject to restrictions, provided that these are expressly established by law and are necessary to ensure respect for the rights or reputation of others, or for the protection of national security, public order, or public health or morals.[7]

93. The Working Group has stated that:

> The Internet is, in many respects, a mode of communication comparable to the diffusion or reception of information or ideas through any other means, such as books, newspapers, letters and other similar postal services, telephone, radio broadcasting or television. However, there also exist meaningful differences between the exercise of the freedom of expression via the Internet, and other, more traditional means of communication. Namely, the distribution and reception of information by the Internet is much wider and quicker. In addition, the Internet is more easily accessible to anyone. Even more significantly, the Internet is a mode of communication which operates not on a local but on a global scale, not depending on national territorial boundaries.[8]

94. The right to freedom of expression and freedom to seek, receive and impart information of all kinds, through any media of one's choice, including the Internet, carries with it special duties and responsibilities, and may be subject to such restrictions as are provided for by law and are necessary in order to protect national security, among other things.[9]

95. The Working Group is convinced by the claim that the conduct deemed punishable by the Government consists of the dissemination of information via a website. The Venezuelan authorities themselves acknowledge that Mr. Marrón was arrested for the commission of offences "relating to the dissemination of false information on the exchange

---

[6] Human Rights Committee, general comment No. 34 (2011) on the freedoms of opinion and expression, para. 2.

[7] Opinion No. 58/2017, para. 42.

[8] E/CN.4/2006/7, Deliberation No. 8 on deprivation of liberty linked to/resulting from the use of the Internet, para. 36.

[9] Covenant, art. 19 (3).

rate via the website dolarpro.com". They even accuse him of manipulating the price of foreign currency by distorting the official exchange rate set by the national executive and the Central Bank of Venezuela and of contributing, by means of the parallel dollar, to the economic war that is being waged against the country. This means that Mr. Marrón is being detained for allegedly having exercised his right to freedom of expression and the offence with which he is charged has been found by the Working Group not to exist under Venezuelan law.

96.     Furthermore, the Working Group is of the opinion that the exercise of the right to express and disseminate ideas and information of all kinds, including information on economic and foreign exchange matters that differs from official information, is encompassed by the right to freedom of expression and opinion, which is enshrined in article 19 of the Universal Declaration of Human Rights and article 19 of the Covenant. Detaining a person in contravention of the above constitutes arbitrary detention under category II. The Working Group therefore concludes that Mr. Marrón's detention is arbitrary and falls within category II.

*Category III*

97.     As mentioned above in the analysis of the claims made under category I, the Working Group considers that Mr. Marrón's detention is arbitrary because he was not shown an arrest warrant at the time of his arrest, he was not arrested in flagrante delicto and there are no criminal offences established by law with which he can be charged. Furthermore, in view of its finding under category II that the detention results from the exercise of the right to freedom of expression and freedom to seek, receive and impart information of all kinds through any media, including the Internet, the Working Group considers the pretrial detention and prosecution of Mr. Marrón to be disproportionate and unjustified. However, since a trial is taking place and could result in a long prison sentence, and in view of the source's allegations and the Government's response, the Working Group will proceed to analyse whether, in the course of the judicial proceedings, the fundamental components of a fair, independent and impartial trial have been respected.

*Presumption of innocence*

98.     The right of all persons charged with a criminal offence to be presumed innocent is enshrined in article 11 (1) of the Universal Declaration of Human Rights and article 14 (2) of the Covenant. This right gives rise to a series of obligations for all State institutions, requiring them to treat accused persons as innocent until their guilt has been established beyond all reasonable doubt. In the view of the Working Group and the Human Rights Committee, this right carries an obligation for all public authorities, including the executive branch, to avoid prejudging the outcome of a trial, which means refraining from making public statements affirming the guilt of the accused.[10]

99.     The Working Group has determined that statements publicly condemning the accused person before a sentence has been passed violate the presumption of innocence and constitute undue interference that undermines the independence and impartiality of the court.[11]

100.    The Inter-American Court of Human Rights has stated that:

> The right to the presumption of innocence requires that the State does not informally condemn or pass judgment on a person publicly, and thus contribute to the shaping of public opinion, until the person has been proved guilty according to law. Consequently, this right can be violated both by the judges in charge of the trial and by other public authorities; the latter must therefore be discreet and cautious when

---

[10]  Human Rights Committee, general comment No. 32 (2007) on the right to equality before courts and tribunals and to a fair trial, para. 30. See also *Kozulina v. Belarus* (CCPR/C/112/D/1773/2008), para. 9.8.

[11]  Opinions No. 90/2017, No. 76/2018 and No. 89/2018.

making public statements about a criminal case before the person has been tried and sentenced.[12]

101. The Working Group has reiterated that the public statements of high-ranking officials violate the right to the presumption of innocence if such statements declare persons guilty of an offence for which they have not yet been tried, thereby leading the public to believe them guilty and seeking to influence or prejudging the assessment of the facts by the competent judicial authority.[13]

102. The Working Group has been informed that the Attorney General made statements on the State-run television channel Venezolana de Televisión in which he described Mr. Marrón as "a criminal of the worst kind", "a financial terrorist", "a coward", "a hypocrite" and "in no way a Venezuelan". He also said: "What difference is there between this man and one who promotes serial killing? ... This is worse than mass murder. ... This man, Carlos Eduardo Marrón Colmenares, whose name and wrongdoing should be made known throughout the country, is the worst kind of criminal there is."

103. The Working Group is therefore convinced by the claim that Mr. Marrón's right to be presumed innocent was not respected by the authorities of the Bolivarian Republic of Venezuela, in contravention of article 11 (1) of the Universal Declaration of Human Rights and article 14 (2) of the Covenant.

*Right to be tried without undue delay*

104. The Covenant recognizes the right of all persons charged with a criminal offence to be tried without undue delay.[14] The Working Group, like the Human Rights Committee, considers that delays in criminal proceedings can be justified only by the complexity of the case or the behaviour of the parties; delays for any other reason are incompatible with the Covenant and compromise the impartiality of the trial.[15] The Committee has also stated that, where such delays are caused by a lack of resources, States should allocate supplementary budgetary resources, to the extent possible.[16]

105. The Working Group has previously stated that accused persons have the right to be brought before a judge in order to be tried without delay and when challenging the lawfulness of their detention.[17] The Working Group recognizes that, as the Human Rights Committee has stated, the physical presence of detainees at such hearings is important and also serves as a safeguard for their right to security and integrity of person.[18]

106. The Working Group notes that the preliminary hearing was initially supposed to take place on 30 May 2018. However, it was rescheduled for 26 June 2018, and then for 26 July 2018, and it still has not been held, as at the date of adoption of this opinion. In the light of the above, the Working Group finds that Mr. Marrón's right to be tried without undue delay has been violated, in contravention of article 14 (3) (c) of the Covenant.

*Proper defence*

107. The Working Group recalls that all persons charged with a criminal offence have the right to be informed promptly and in detail in a language which they understand of the nature and cause of the charge against them, and to have adequate time and facilities for the preparation of their defence and to communicate with counsel of their own choosing.[19] The

---

[12] *Pollo Rivera et al. v. Peru*, para. 177. See also *Tibi v. Ecuador*, para. 182; and *J. v. Peru*, paras. 244–247.
[13] Opinions No. 6/2019 and No. 12/2019.
[14] Covenant, art. 14 (3) (c).
[15] General comment No. 32, para. 27.
[16] Ibid.
[17] Opinion No. 78/2018, paras. 75–76.
[18] General comment No. 35, paras. 34 and 42.
[19] Covenant, art. 14 (3) (a) and (b).

Working Group wishes to stress that accused persons have the right to be assisted and defended by a lawyer of their own choosing.[20]

108.    Like the Human Rights Committee, the Working Group considers that the requirement that persons be informed promptly of the nature and cause of the charges against them may be satisfied orally, provided that the information is later confirmed in writing, that the applicable law is stated and that the facts on which the charge is based are described.[21]

109.    As regards the right to be assisted by counsel and to have adequate time and facilities for the preparation of a defence, the Working Group is of the view that accused persons must be given adequate time and facilities to this end. This means that they must be granted prompt access to counsel, the ability to communicate with their counsel privately and in conditions that ensure the confidentiality of their communication,[22] adequate time to prepare their defence[23] and access to the case file containing all the documents, evidence and other materials that the prosecution plans to offer in court.[24]

110.    The Working Group also takes the view that:

> The factual and legal basis for the detention shall be disclosed to the detainee and/or his or her representative without delay so as to provide adequate time to prepare the challenge. Disclosure includes a copy of the detention order, access to and a copy of the case file, in addition to the disclosure of any material in the possession of the authorities or to which they may gain access relating to the reasons for the deprivation of liberty.[25]

111.    The Working Group is convinced by the claim that, for 35 of the 45 days that the investigation lasted, the prosecutor's office arbitrarily refused to allow the defence to look at the record of the investigation in order to find out what steps had been taken to determine whether Mr. Marrón was criminally responsible. Consequently, the Working Group considers that the right to have access to all the information needed in order to prepare a defence in time was not respected, in contravention of article 14 (3) of the Covenant.

112.    Since the deprivation of liberty of Mr. Marrón is in contravention of articles 9, 10 and 11 of the Universal Declaration of Human Rights and articles 9 and 14 of the Covenant, the Working Group concludes that it is arbitrary under category III.

*Category V*

113.    The Working Group is of the view that the detention described in the present case is one of a series of arbitrary detentions carried out by the authorities of the Bolivarian Republic of Venezuela against members of political opposition parties, human rights defenders and people who are critical of the authorities' actions.[26]

114.    In this case, the detention of Mr. Marrón constitutes a violation of international law because it is based on discrimination on the grounds of his political opinion and his dissemination of economic and foreign exchange information that differed from the official information, in contravention of articles 2 and 26 of the Covenant and articles 2 and 7 of the Universal Declaration of Human Rights. His detention is therefore arbitrary under category V.

---

[20]   Covenant, art. 14 (3) (d).
[21]   General comment No. 32, para. 31.
[22]   Ibid., para. 34.
[23]   Ibid., para. 32.
[24]   Ibid., para. 33.
[25]   A/HRC/30/37, guideline 5, right to be informed, para. 56.
[26]   See opinions No. 86/2018; No. 49/2018; No. 41/2018; No. 32/2018; No. 52/2017; No. 37/2017; No. 18/2017; No. 27/2015; No. 26/2015; No. 7/2015; No. 1/2015; No. 51/2014; No. 26/2014; No. 29/2014; No. 30/2014; No. 47/2013; No. 56/2012; No. 28/2012; No. 62/2011; No. 65/2011; No. 27/2011; No. 28/2011; No. 31/2010; and No. 10/2009.

115.    In recent years, the Working Group has repeatedly expressed its views on multiple arbitrary arrests of political opponents of the Government and individuals who have exercised their rights to freedom of opinion, expression, association, assembly or political participation. In the Working Group's view, this is an attack by the Government on its political opponents or part of a systematic attempt to deprive them, particularly those who are seen as opponents of the regime, of their physical freedom, in violation of fundamental rules of international law, including the Universal Declaration of Human Rights and the Covenant. The Working Group wishes to recall that, under certain circumstances, imprisonment and other severe forms of deprivation of liberty in violation of internationally recognized standards may constitute crimes against humanity.[27]

116.    In the light of the recurrent pattern of arbitrary detention identified by this international human rights mechanism in recent years, the Government is urged to consider inviting the Working Group to make an official country visit. Such visits are an opportunity for the Working Group to engage in direct constructive dialogue with the Government and representatives of civil society, with the aim of better understanding the situation of deprivation of liberty in the country and the underlying reasons for arbitrary detention.

117.    In view of the information received concerning the violation of Mr. Marrón's right to freedom of expression and in accordance with paragraph 33 (a) of its methods of work, the Working Group refers the present case to the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression.

**Disposition**

118.    In the light of the foregoing, the Working Group renders the following opinion:

> The deprivation of liberty of Carlos Marrón Colmenares, being in contravention of articles 2, 7, 9, 10, 11 and 19 of the Universal Declaration of Human Rights and articles 2, 9, 14, 15, 19 and 26 of the International Covenant on Civil and Political Rights, is arbitrary and falls within categories I, II, III and V.

119.    The Working Group requests the Government to take the steps necessary to remedy the situation of Mr. Marrón without delay and bring it into conformity with the relevant international norms, including those set out in the Universal Declaration of Human Rights and the Covenant.

120.    The Working Group considers that, taking into account all the circumstances of the case, the appropriate remedy would be to release Mr. Marrón immediately and accord him an enforceable right to compensation and other reparations, in accordance with international law.

121.    The Working Group urges the Government to ensure a full and independent investigation of the circumstances surrounding the arbitrary deprivation of liberty of Mr. Marrón and to take appropriate measures against those responsible for the violation of his rights.

122.    In accordance with paragraph 33 (a) of its methods of work, the Working Group refers the present case to the Special Rapporteur on the promotion and protection of the right to freedom of opinion and expression, for appropriate action.

123.    The Working Group requests the Government to disseminate the present opinion through all available means and as widely as possible.

---

[27] See opinions No. 37/2011, para. 15; No. 38/2011, para. 16; No. 39/2011, para. 17; No. 4/2012, para. 26; No. 47/2012, paras. 19 and 22; No. 34/2013, paras. 31, 33 and 35; No. 35/2013, paras. 33, 35 and 37; No. 36/2013, paras. 32, 34 and 36; No. 38/2012, para. 33; No. 48/2013, para. 14; No. 22/2014, para. 25; No. 27/2014, para. 32; No. 34/2014, para. 34; No. 35/2014, para. 19; No. 44/2016, para. 37; No. 32/2017, para. 40; No. 33/2017, para. 102; and No. 36/2017, para. 110.

**Follow-up procedure**

124.    In accordance with paragraph 20 of its methods of work, the Working Group requests the source and the Government to provide it with information on action taken in follow-up to the recommendations made in the present opinion, including:

    (a)    Whether Mr. Marrón has been released and, if so, on what date;

    (b)    Whether compensation or other reparations have been made to Mr. Marrón;

    (c)    Whether an investigation has been conducted into the violation of Mr. Marrón's rights and, if so, the outcome of the investigation;

    (d)    Whether any legislative amendments or changes in practice have been made to harmonize the laws and practices of the Bolivarian Republic of Venezuela with its international obligations in line with the present opinion;

    (e)    Whether any other action has been taken to implement the present opinion.

125.    The Government is invited to inform the Working Group of any difficulties it may have encountered in implementing the recommendations made in the present opinion and whether further technical assistance is required, for example through a visit by the Working Group.

126.    The Working Group requests the source and the Government to provide the above-mentioned information within six months of the date of transmission of the present opinion. However, the Working Group reserves the right to take its own action in follow-up to the opinion if new concerns in relation to the case are brought to its attention. Such action would enable the Working Group to inform the Human Rights Council of progress made in implementing its recommendations, as well as any failure to take action.

127.    The Working Group recalls that the Human Rights Council has encouraged all States to cooperate with the Working Group and has requested them to take account of its views and, where necessary, to take appropriate steps to remedy the situation of persons arbitrarily deprived of their liberty, and to inform the Working Group of the steps they have taken.[28]

*[Adopted on 22 November 2019]*

------------

------------

[28]   See Human Rights Council resolution 42/22, paras. 3 and 7.