# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF FLORIDA

| | |
|---|---|
| **CARLOS EDUARDO MARRÓN; MARIA MARRÓN; C.R., a minor; and S.A., a minor.** | **Civil Action:  1:21-cv-32190-FAM** |
| **Plaintiffs,** | |
| **v.** | |
| **NICOLAS MADURO MOROS, et al.,** | |
| **Defendants.** | |

## MEMORANDUM OF LAW IN OPPOSITION OF PLAINTIFFS' EMERGENCY MOTION FOR WRITS OF EXECUTION

/s Adam S. Fels
Adam S. Fels
Florida Bar No. 0114917
FRIDMAN FELS & SOTO, PLLC
150 Alhambra Cir.
Suite 715
Coral Gables, FL 33134
Telephone: (305) 569-7701
afels@ffslawfirm.com

*Attorney for 6301 Collins Ave 1008 LLC, 9000 SW 63rd Court LLC*

This Court has invited 6301 Collins Ave 1008 LLC and 9000 SW 63rd Court LLC, the corporate owners of two properties in Miami-Dade County ("the LLCs") to respond to Plaintiffs' Expedited Ex Parte Motions for Writs of Execution (DE 47). This Court should deny Plaintiffs' motion because: 1) Plaintiffs' Default Judgments against Fuerzas Armadas Revolucionarias de Colombia ("FARC"), the Cartel of the Suns, and Tareck El Aissami do not allow Plaintiffs to collect from the LLCs; 2) even if the default judgment could allow collection from the LLCs, Plaintiffs have failed to show that either the LLCs or Mr. Samark López Bello is an agency or instrumentality of either the FARC, the Cartel of the Suns, or El Aissami; and 3) given the pending state court matter, this court should abstain. If the Court decides to issue the writs sought by Plaintiffs, it should only issue writs of attachment, not execution, and the LLCs expressly reserve all rights to move to intervene and to challenge any writs that are issued.

## I.    Introduction

Plaintiffs allege in their Complaint that Plaintiff Carlos Marrón is a lawful permanent resident of the United States, Complaint (DE 1) ¶ 9. They concede, however, that Mr. Marrón is not a United States national. Mot. for Def. Judgment (DE 41) at 26, n.7. Plaintiffs allege that Defendant Tareck El Aissami was the *de facto* Vice President of Venezuela from 2017 to 2018. Complaint ¶ 33. Plaintiffs' lone factual allegation about El Aissami's involvement with Mr. Marrón's alleged kidnapping, detention, and torture is that on the day that Mr. Marrón's father was arrested, El Aissami, as the Executive Vice President, reported that 86 people had been arrested as part of Operation Paper Hands. Complaint ¶ 152. Plaintiffs do not allege that El Aissami participated in the planning, authorization, or commission of Mr. Marrón's alleged kidnapping, torture, or any conduct involving Mr. Marrón.  Plaintiffs also do not allege that El Aissami participated in the planning, authorization, or commission of any conduct directed toward Mrs.

Marrón or her children. Similarly, Plaintiffs do not allege that the Cartel of the Suns or the FARC participated in the planning, authorization, or commission of any conduct involving either Mr. Marrón, Mrs. Marrón, or their children.

Plaintiffs instead allege that the kidnapping, torture, and extortion was committed by unnamed agents of Venezuela's General Directorate of Military Counterintelligence ("DGCIM")—a unit of the Venezuela security apparatus loyal to President Nicolas Maduro.  Complaint ¶¶ 10, 11, 13-16. While, again, Plaintiffs do not allege that Defendants FARC, El Aissami, or Cartel of the Suns played a role in the planning, authorization, or commission of any conduct involving either Mr. Marrón, Mrs. Marrón, or their children, Plaintiffs assert, at base, that these Defendants committed terrorist acts and are liable for the acts committed by the Venezuelan agency DGCIM under the Federal Anti-Terrorism Act ("ATA") because they provided material support to the Maduro regime. *See, e.g.,* Complaint ¶¶ 200, 201 ("The Defendants' funding of terrorists, including the Maduro Regime, was the cause of the injuries suffered by Jane Doe, C.R. and S.A.").

There is no allegation that Mr. López knew about, much less participated in any way, in the conduct alleged by Mr. Marrón, Mrs. Marrón, or their children; and indeed, neither Mr. López nor the LLCs were in any way involved in the conduct alleged in the Complaint.

In their *ex parte* filing to secure a writ against the LLCs, Plaintiffs include affidavits submitted in other cases by Luis Miguel Cote, Douglas Farah, and Paul Craine.  Mot. For Writ (DE 47). But notable, Plaintiffs did not include the testimony of these individuals in another civil case in the Southern District of Florida. Under oath, these three individuals made damaging concessions relating to bias, credibility and perception that undermined any conclusions they provided with respect to Mr. López.  For example, Farah acknowledged that he could not provide any facts to show Mr. López's association or assistance to the FARC. Exh. "A," *Stansell v. FARC,* SDFL Case No. 19-cv-20896, Transcript of Jun. 11, 2019 Hrg. (DE 230) at 74-75. When asked

about how he learned of an alleged connection between Mr. López and El Aissami from investigators in 2016, Farah refused to name those investigators and insisted that Mr. López and the Court would have to take him at his word that the meeting occurred. *Id*. at 74, 98-99. He acknowledged that he had reviewed no bank statements or financial information for Mr. López or his companies. *Id.* at 91-95.

Luis Miguel Cote Gomez, a former Colombian colonel, testified he "heard" Mr. López's name before he retired in 2016 but he could not give any details about what he heard. *Id.* at 116. He claimed that the reason he did not take notes was that the meeting was classified, but then later claimed, without support, that the meeting was later declassified, so he was free to testify about the meeting. *Id.* at 136-37. The credibility of Farah and Cote was irreparably impugned when counsel demonstrated that Farah and Cote provided "expert" reports that had identical language even though both witnesses testified that they independently authored their own reports. *Id.* at 128-29.

Paul Craine, a former DEA agent, could only testify that he was "aware" of Mr. López but admitted he had never reviewed any documents, records, or transactions related to Mr. López or Tareck El Aissami and could not provide any details about instances of money laundering. *Id.* at 182, 185, 188, 193, 195. Craine also provided his opinion that El Aissami engaged in illicit activities that had nothing to do with the FARC, such as skimming from oil contracts, and that Craine had no way to differentiate the money he claimed (without any documentary proof or evidence) that he claimed without support that Mr. López laundered for El Aissami. *Id*. at 195-96.

## II.     Analysis

A.     *The Writs Sought by Plaintiffs Reference Properties Blocked by the Kingpin Act; Therefore, Only Plaintiffs With a Valid Federal ATA Judgment May Seek Such Writs*

Plaintiffs seek a writ of execution under the Terrorist Risk Insurance Act ("TRIA") against two properties owned by the two LLCs. Motion for Writ (DE 47) at 1. TRIA provides that:

> …in every case in which a person has obtained a judgment against a terrorist party on a claim based upon an act of terrorism, or for which a terrorist party is not immune under section 1605(a)(7) of title 28, United States Code, the blocked assets of that terrorist party (including the blocked assets of any agency or instrumentality of that terrorist party) shall be subject to execution or attachment in aid of execution in order to satisfy such judgment to the extent of any compensatory damages for which such terrorist party has been adjudged liable.

TRIA, Section 201, 28 U.S.C. § 1610 (note). TRIA's definition of "blocked asset" does not, however, include assets that are blocked by Department of Treasury's Office of Foreign Assets Control ("OFAC") under the Foreign Narcotics Kingpin Designation Act ("Kingpin Act"). *See* TRIA, Section 201(d)(2), 15 U.S.C. § 1610 note (limiting definition of blocked assets to assets seized or frozen under Trading With Enemy Act or International Emergency Economic Powers Act). As Plaintiffs mention in their motion, Congress amended the laws in 2018 to allow for the seizure of assets blocked under the Kingpin Act. Mot. For Writ (DE 47) at 9, n.7. This amendment was made to supersede an Eleventh Circuit ruling correctly interpreting TRIA's definition of "blocked asset" as not encompassing assets blocked under the Kingpin Act. *Mercurio International, S.A. v. Stansell, et al.,* 704 F.3d 910, 917 (11th Cir. 2013).

But Congress restricted the seizure of such assets. Rather than amend TRIA's definition of "blocked assets" to include assets blocked under the Kingpin Act, Congress amended the federal Anti-Terrorism Act ("ATA") itself and decreed "[f]or purposes of section 201 of [TRIA] . . . in any action in which a national of the United States has obtained a judgment against a terrorist party *pursuant to this section,* the term 'blocked asset' shall include any asset of that terrorist party

(including the blocked assets of any agency or instrumentality of that party) seized or frozen . . . under . . . the Foreign Narcotics Kingpin Designation Act.". 18 U.S.C. § 2333(e) (emphasis added). The change to the law makes clear that only United States nationals with judgments against a terrorist party under the ATA may recover Kingpin Act-blocked assets from terrorist parties or their demonstrated agencies or instrumentalities. This is because only "nationals of the United States injured in his or her person, property, or business by reason of an act of international terrorism" have standing to bring a claim under the Federal ATA. 18 U.S.C. 2333(a). As Mr. Marrón admittedly is not a United States national and has no Federal ATA judgment, he may not seek to recover any Kingpin Act-blocked assets from the LLCs, Mr. López or any other party or entity.

B.    *Mrs. Marrón's and the Childrens' Federal ATA Judgment Does Not Allow for TRIA Recovery*

In order to obtain a writ on Kingpin Act-blocked assets, Mrs. Marrón and her children must demonstrate, among other things, that they have obtained a valid ATA judgment against a terrorist party that is either for a claim based on an act of terrorism or for a claim for which a terrorist party is not immune.  *Stansell v. Revolutionary Armed Forces of Colombia (FARC)* ("*Stansell II*")*,* 771 F.3d 713, 723 (11th Cir. 2014). The ATA provides two ways to secure a judgment based on an injury caused by reason of an act of international terrorism: either direct liability under § 2333(a) or through secondary liability—aiding and abetting, conspiracy, or material support of those who committed the act of international terrorism.  18 U.S.C. § 2333.

Primary liability under the ATA requires that a United States national prove that he or she was "injured in his or her person, property of business by reason of an act of international terrorism." At least one court in this district has held that "because §2333(a) supports only primary liability, a successful ATA plaintiff must allege and prove that the defendant directly committed

an "act of international terrorism" which caused the plaintiff's injuries." *In re Chiquita Brands International, Inc.,* 284 F.Supp.3d 1284, 1307 (S.D. Fla 2018) (Marra, J.) Courts interpret "by reason of" to impose a proximate cause requirement upon a pleading plaintiff. *See, e.g., Kemper v. Deutsche Bank AG,* 911 F.3d 383, 392 (7th Cir. 2018) (proximate cause under ATA requires inquiry into "foreseeability, directness, and the substantiality of the defendant's conduct."); *see also Moore v. Tolbert*, 490 F.Appx. 200, 206 (11th Cir. 2012) (interpreting federal RICO Act and holding plaintiff "meets the 'by reason of' requirement if he shows a 'sufficiently direct injury' . . . and proximate cause'" (quoting *Williams v. Mohawk Indus.*, 465 F.3d 1277, 1287 (11th Cir. 2006). Courts generally adopt a "substantial factor" test for proximate cause under the ATA, analyzing whether the Plaintiff has alleged that the defendant's acts were a "'substantial factor' in the sequence of events that led to the plaintiffs' injuries and whether those injuries were "reasonably foreseeable or anticipated as a natural consequence of defendants' conduct." *Crosby v. Twitter, Inc.,* 921 F.3d 617 (6th Cir. 2019), citing *Owens v. BNP Paribas, S.A.,* 897 F.3d 266, 273 (D.C. Cir. 2018); *Rothstein v. UBS AG,* 708 F.3d 82, 91 (2d Cir. 2013).

Plaintiffs here alleged that the Venezuelan DGCIM committed the acts of arresting and detaining Mr. Marrón, torturing him, and extorting both him and Mrs. Marrón, but do not allege that the FARC, the Cartel of the Suns, or El Aissami played any direct or substantial role in these alleged acts. To begin with, the ATA does not allow Plaintiffs to pursue the DGCIM, the country of Venezuela, or any Venezuelan governmental official acting in their official capacity. 18 U.S.C. § 2337 ("No action shall be maintained under section 2333 of this title against . . . "a foreign state, an agency of a foreign state, or an officer or employee of a foreign state or an agency thereof acting within his or her official capacity or under color of legal authority.").

El Aissami is alleged in the Complaint to be an officer of Venezuela acting within his official capacity or under color of legal authority, so even if Plaintiffs could demonstrate that El Aissami's alleged statement to the press about mass arrests the day before Mr. Marrón was arrested could somehow qualify as a substantial factor that led to Mrs. Marrón's or her childrens' injuries – which Plaintiffs do not even attempt to allege in their Complaint or their Motion for Default Judgment – El Aissami could not be sued under ATA anyway.

Rather than allege any facts indicating that the FARC, the Cartel of the Suns, or El Aissami planned, participated in, or caused the acts of arresting and detaining Mr. Marrón, torturing him, and extorting both him and Mrs. Marrón, Plaintiffs' theory for liability under the ATA is that the proceeds Defendants generated from narcoterrorism in Florida funded "acts of terrorism in Venezuela and the Defendants inflicted injuries on the U.S. population from Venezuela. These actions give rise to the injuries suffered by Maria Marrón and her children." Default Final Judgment (DE 44) at 7.

Plaintiffs do not, however, allege sufficient facts to allow a conclusion that any alleged "narcoterrorism acts" in the United States were a substantial factor causing Mrs. Marrón's and her childrens' injuries. Several recently decided cases involving the dismissal of ATA claims for insufficient allegations connecting a defendant's acts with the injuries are instructive. For example, the Sixth Circuit found that the ATA plaintiff had failed to allege a sufficient link between Twitter's provision of social media platform to a foreign terrorist organization (ISIS) and injuries caused by a shooter radicalized by ISIS. *Crosby,* 921 F.3d at 625 (also finding lack of allegation that ISIS's online Twitter content "compel[led]" shooter's actions). The Ninth Circuit recently affirmed the dismissal of an ATA claim against an oil company for violating U.N.-imposed sanctions by purchasing oil from Iraq, which allegedly used kickbacks to fund terrorist activity in

Israel, finding that the plaintiffs failed to plausibly show "at least some direct relationship between [the oil company's] acts and [Appellants'] injuries." *Brill v. Chevron Corp.,* 804 Fed.Appx. 630, 631 (9th Cir. 2020), citing *Fields v. Twitter, Inc.,* 881 F.3d 639, 744, 748 (9th Cir. 2018). A district court in New York recently concluded that a bank's alleged money laundering for a drug cartel that committed violent acts against victims did not proximately cause the injuries suffered by the victims by the cartel, noting that Plaintiffs' theory that the cartels would not exist without the laundered money provided by the defendant banks would "effectively hold HSBC liable for all Cartel violence, which is "precisely the kind of unlimited, sprawling, and speculative liability that proximate cause forbids." *Zapata v. HSBC Holding PLC*, 414 F.Supp.3d 342, 357 (E.D.N.Y. 2019).

The Seventh Circuit's decision in *Kemper v. Deutsche Bank AG* is particularly instructive here. There, the families of victims of a bomb attack in Iraq funded by the Iranian Revolutionary Guard and Hezbollah sought to hold a bank accountable for violating sanctions and funding the Iranian government. *Kemper v. Deutsche Bank AG*, 911 F.3d 383 (7th Cir. 2018). The Seventh Circuit affirmed an order dismissing an ATA claim against the bank, finding that the "central theory" that Iran was responsible for the terrorist attack and that the bank facilitated the attack by providing services to Iran and state-owned Iranian business suffered from a fatal flaw. Specifically, the court concluded, Iran, as a sovereign state, was engaged in substantial non-terrorist activities so Plaintiffs could not demonstrate that the funding of the sovereign state was a proximate cause of the injuries. *Id*. at 393. Notwithstanding the plaintiff's argument that Iran was a state-sponsor of terrorism – a fact not present here – the Seventh Circuit correctly concluded that there were too many superseding or intervening causes separating the bank from the terrorist act that killed the plaintiff's son.  *Id.*

Just as in *Kemper, Zapata, Brill,* and *Crosby,* Plaintiffs cannot show that any "narcoterrorism" in Florida proximately caused Plaintiffs' injuries. First, Venezuela is a sovereign state with "many legitimate agencies, operations, and programs to fund." *See Owens* 897 F.3d at 276; *see also Kemper*, 911 F.3d at 393 ("When one of the links on a causal chain is a sovereign state, the need for facts specifically connecting a defendant's actions to the ultimate terrorist attack is especially acute.") Just as in *Kemper*, Plaintiffs do not and cannot allege facts specifically connecting the funds from the alleged narcoterrorism to the DGCIM's acts. Moreover, as *Kemper* points out, "a sovereign's affirmative choice to engage in a wrongful act will usually supersede a third party's choice to do business with that sovereign." *Kemper,* 911 F.3d at 393 ("purchasers of Iranian oil and natural gas contribute funds to Iran that Iran might use to support terrorism, but those purchasers are not liable for the attacks that Iran may facilitate with those funds"). Just as in *Kemper,* the DGCIM's alleged kidnapping, torture, and extortion here are superseding acts which break any causal link between the FARC, the Cartel of the Suns, and El Aissami and the injuries allegedly suffered by Mrs. Marrón and her children.

It bears repeating that Iran is a state sponsor of terrorism, but Venezuela is not a state sponsor of terrorism. *Compare Kemper*, 911 F.3d at 394 *with Lubian v. Republic of Cuba*, 440 Fed.Appx. 866 (11th Cir. 2011) (lower court correctly found that Venezuela was not state sponsor of terrorism). If a company's provision of illegally obtained funds to a state sponsor of terrorism was insufficient to proximately cause liability for a terrorist act without more facts, then, *a fortiori,* the alleged provision of funds to the Venezuelan government without more facts tying the funds to the specific conduct involving Mr. and Mrs. Marrón cannot demonstrate proximate cause for Mrs. Marrón and her childrens' injuries. Just as it was insufficient for the victims in *Zapata* to show proximate cause for their injuries through claims that the cartels could not function without

the funds provided to them by the banks, it is as insufficient for Mrs. Marrón and her children to claim that the Defendants' narcotrafficking activities prop up the Venezuelan government, without more tying the alleged funneling of funds to the government to the specific acts committed by the DGCIM. Absent some specific allegations tying the FARC, the Cartel of the Suns, and El Aissami's alleged funding of the Maduro government to the alleged conduct against Mrs. Marrón, the federal ATA claims against FARC, the Cartel of the Suns, and El Aissami must fail as a matter of law.

To the extent that Plaintiffs seek to hold the FARC, the Cartel of the Suns, and El Aissami secondarily liable under Section 2333(d) of the ATA for aiding and abetting, conspiring or providing material support, this claim must also fail because the ATA expressly provides that such secondary liability exists if a designated foreign terrorist organization committed, planned, or authorized the act of international terrorism causing the injury.  18 U.S.C. § 2333(d)(2); *see also Colon v. Twitter,* 14 F.4th 1213 (11th Cir. 2021). There is no allegation that the FARC, the only designated foreign terrorist organization mentioned in the Complaint, committed, planned, or authorized the specific conduct against either Mr. Marrón or Mrs. Marrón, so there is no ATA secondary liability here. *See Colon,* 14 F.4th at 1222 (holding ATA aiding and abetting claim fails as matter of law because no allegation that FTO committed, planned, or authorized shooting – all "conscious actions at the time or before an act.") Again, the only actors alleged to have committed, planned, or authorized the kidnapping, torture and extortive acts were agents of the DGCIM, which is not a designated foreign terrorist organization.

Finally, it is not even apparent that the Court has personal jurisdiction over the FARC, the Cartel of the Suns, or El Aissami.  Courts have held that if personal jurisdiction is based on either the ATA's nationwide service of process provision or Rule 4(k)(2) of the Federal Rules of Civil

Procedure, then the Fifth Amendment's due process clause requires a "prima facie showing of each Defendant's personal or direct participation in the conduct giving rise to Plaintiff's injuries." *In re Terrorist Attacks on Sep. 11, 2011,* 349 F.Supp.2d 765, 809 (S.D.N.Y. 2005). As mentioned earlier, there is no allegation that the FARC, Cartel of the Suns, or El Aissami personally or directly participated in the arrest, detention, and torture of Mr. Marrón, or any acts of extortion involving either Mr. Marrón or Mrs. Marrón.

Mr. López expresses no opinion about whether Plaintiffs have valid judgments against Defendants on the rest of their counts against Defendants. It may well be that Plaintiffs can collect judgments against Defendants and be compensated for their alleged injuries. But they cannot collect judgments against Mr. López or any of his blocked properties because they cannot demonstrate that they have a valid federal ATA judgment against FARC, the Cartel of the Suns, or El Aissami, a prerequisite for obtaining a writ of attachment under TRIA for the properties in question here.

> C.   *The Plaintiffs' Cannot Establish that Mr. López is an Agency or Instrumentality of a Terrorist Party*
>
> 1.   <u>Neither El Aissami, the Cartel of the Suns, nor the FARC Constitutes a "Terrorist Party" as of the Date of the Default Judgment and the Date of the Motion for a Writ</u>

Not only do the Plaintiffs fail to have a valid ATA judgment against El Aissami, the Cartel of the Suns, and the FARC, they also cannot demonstrate that any of these entities are "terrorist parties" as of the date of the default judgment and the date they filed their motion for a writ under TRIA.

18 U.S.C. § 1333(e), by its express terms, does not allow collection of blocked assets from agencies or instrumentalities of *any* defendant against whom an ATA plaintiff has obtained judgment; rather, it only allows collection of blocked assets only from agencies or instrumentalities

of "terrorist parties" (or the terrorist parties themselves). TRIA defines "terrorist party" as either a 1) terrorist; 2) a terrorist organization as defined in 8 U.S.C. § 1182(a)(3)(B)(vi); or 3) a foreign state designated as a state sponsor of terrorism. TRIA, Section 201(d)(4). At least one court, relying on the Supreme Court's decision in *Ministry of Defense v. Elahi*, 556 U.S. 366 (2009) has interpreted TRIA as requiring that a judgment debtor be a "terrorist party" both at the time of the underlying judgment *and* at the time of the enforcement proceeding under TRIA.[1] *Ruth Calderon-Cardona v. JPMorgan Chase Bank, N.A.,* 867 F. Supp. 2d 389, 395-96 (S.D.N.Y. 2011), *aff'd in part, vacated in part, remanded sub nom. Calderon-Cardona v. Bank of New York Mellon*, 770 F.3d 993 (2d Cir. 2014).

The district court in *Calderon-Cardona* correctly interpreted that the first reference to the term "terrorist party" in TRIA § 201, written in the present perfect tense ("in every case in which a person has obtained a judgment against a terrorist party), indicated that the defendant must have been a "terrorist party" at the time of the judgment. *Id*. at 395. The court then correctly interpreted the second reference to "terrorist party," written in the present tense ("the blocked asset of that terrorist party . . . shall be subject to execution or attachment") as requiring a judgment debtor to be a "terrorist party" at the time of the TRIA enforcement proceeding as well. *Id*. at 396.

Neither the Cartel of the Suns nor the FARC can qualify as a "terrorist" because they are not natural persons. *Id.* at 396. Neither are the Cartel of the Suns or FARC a foreign state

---

[1] The Eleventh Circuit has not been asked to opine on this particular issue but has held that the agency and instrumentality determination in TRIA can rely upon past material support to a terrorist organization and acknowledged that the Second Circuit's contrary language in *Kirschenbaum v. 650 Fifth Ave. & Related Properties*, 830 F.3d 107 (2d Cir. 2016), *abrogated by Rubin v. Islamic Republic of Iran,* 138 S. Ct. 816 (2018), conflicted with the Eleventh Circuit's precedent. *Stansell v. Revolutionary Armed Forces of Colombia ("Stansell V"),* 45 F.4th 1340, 1350 (11th Cir. 2022).

designated as a state sponsor of terrorism. While FARC was once a designated foreign terrorist organization, it was, as Plaintiffs point out, removed from the list of FTOs before a final judgment against them here was entered.  *See* Mot. for Default Judgment (DE 26) at 6, n.2 ("FARC was recently removed from the list of FTOs"). Plaintiffs fail to show that the FARC and the Cartel of the Suns constitute a terrorist organization as defined in 8 U.S.C. § 1182(a)(3)(B)(vi) as of both the date of judgment and the date Plaintiffs first attempted to execute under TRIA, February 22, 2023.

El Aissami does not qualify as a terrorist organization as defined in 8 U.S.C. § 1182(a)(3)(B)(vi) because he is not a group of two or more people and is not designated as a foreign terrorist organization. He is also not designated as a state sponsor of terrorism. While there is no statutory definition of "terrorist," there are no allegations that he engaged in any terrorist activity as of the date of the judgment as well as the date Plaintiffs first attempted to execute under TRIA, February 22, 2023.

**2.** OFAC's Statements Are Not Entitled to Deference on Agency or Instrumentality Question

Plaintiffs assert that OFAC has concluded that Mr. López was a "key frontman" and money launderer for El Aissami and generates significant profits as a result of illegal activity benefitting El Aissami, and that Mr. López's designation by OFAC is entitled to "great deference." Mot. for Writ (DE 47) at 11, 13.  But while Mr. López's designation and the blocking of his assets by OFAC may establish that Mr. López's assets are blocked by OFAC, they do not conclusively establish that Mr. López is an agency or instrumentality of any terrorist party. See *Stansell*, 771 F.3d at 726 (second part of TRIA inquiry, whether owner of the asset is agency or instrumentality of the judgment debtor "is a separate determination in addition to blockage not dispositively decided by OFAC designation."). OFAC's allegations about Mr. López included on page 14 of Plaintiffs'

motion are not only *not* entitled to deference, but the allegations are based on inadmissible hearsay, are erroneous, and they do not establish that Mr. López is an agency or instrumentality under the standard for agency and instrumentality cited in *Stansell II,* 771 F.3d at 724 n.6. They do not demonstrate that Mr. López participated in any of FARC's alleged drug trafficking operations or that he provided any goods or services in support of FARC's alleged drug trafficking operations. OFAC does not in these allegations (or anywhere else) connect Mr. López to the FARC or the Cartel of the Suns. The OFAC language cited by Plaintiffs does not establish that Mr. López is an agency or instrumentality – as defined by the Eleventh Circuit in *Stansell II —of* either El Aissami, the FARC, or the Cartel of the Suns.

    **3.**    <u>The SDNY Indictment Does Not Support a Finding That Mr. López is an Agency or Instrumentality of Any Terrorist Party Under the *Stansell II* Test</u>

Similarly, the pending indictment in the Southern District of New York does not help Plaintiffs establish that Mr. López is an agency or instrumentality of any terrorist party under the *Stansell II* test. The Indictment charges Mr. López with sanctions evasion and conspiracy to evade sanctions, but notably does not include Mr. López in a money laundering conspiracy involving El Aissami. Exh. A to Ps' Motion for Writ (DE 47), at 16-18. If there was probable cause to believe that Mr. López had in fact been laundering El Aissami's proceeds, as Plaintiffs baselessly claim, then Mr. López would have been included as a defendant in this count. That he was not in fact charged with money laundering along with El Aissami speaks volumes about the lack of any credible information that Mr. López laundered El Aissami's proceeds.

**4.**   The Eleventh Circuit Found that Mr. Farah, Mr. Cote, and Mr. Craine's Testimony Did Not Conclusively Establish Mr. López Was an Agency or Instrumentality of the FARC

The affidavits Plaintiffs attach from Mr. Farah, Mr. Cote, and Mr. Craine similarly do not establish that Mr. López is an agency or instrumentality – as defined by the Eleventh Circuit in *Stansell II —of* either El Aissami, the FARC, or the Cartel of the Suns. Along with the obvious bias, hearsay, and other serious issues presented by each witness in their testimony in the *Stansell* case before Judge Scola, the Eleventh Circuit ultimately found that these witnesses had not conclusively established agency and instrumentality. Specifically, the Court found:

> First, Douglas Farah and Paul Craine acknowledged that they had not reviewed the financial statements or transactions of any of Mr. López's companies. *See* D.E. 230 at 91–92, 188. So even if Mr. López were individually characterized as an agency or instrumentality of the FARC, it is not apparent that the companies also had that status. Second, Mr. Farah and Luis Cote Gómez conceded that the OFAC did not link Mr. El Aissami to the FARC, did not tie Mr. López and his companies to the FARC, and did not connect Mr. López to the Cartel of the Suns. *See id.* at 101–02, 124–25. Third, when asked by the magistrate judge whether "Mr. El Aissami's activities also relate to potential things that have nothing directly to do with the FARC," such as corruption in the Venezuelan oil industry, Mr. Craine answered "[y]es, potentially." *Id.* at 190. And he admitted that crimes like embezzlement of government funds would not relate "directly to the FARC." *Id.* at 191.

*Stansell v. Revolutionary Armed Forces of Colombia ("Stansell V"),* 45 F.4th 1340, 1360 (11th Cir. 2022). The Eleventh Circuit also summarized the affidavits and statements of three witnesses for Mr. López:

> William Marquardt, a forensic accountant and director for Berkeley Research Group (BRG), was the first expert witness for the López appellants. He testified (1) that the 2017 OFAC determination of Mr. López as an SDNT did not mention the FARC; and (2) that he performed a data analysis comparing an OFAC list of individuals associated with the FARC but was unable to link any of those individuals to Mr. López or his companies (including the directors, officers, shareholders, and managers of those companies). *See* D.E. 230 at 20, 22. He opined, therefore, that none of the persons the OFAC directly tied to the FARC were

connected, linked, or associated with Mr. López or any of his companies. *See id.* at 23.

The López appellants' second expert witness was Ernesto Carrasco Ramirez, a Colombian attorney who specialized in criminal law and served as a director of BRG. While in Colombia, he worked for the Solicitor General's Office (from 1991 to 1994) and the Attorney's General's Office (from 1994 to 1998). In the latter position he served as the Director of the National Prosecutors' Office for a year or so and learned about the FARC and its activities. *See id.* at 32–35. In later jobs in the private sector, such as with Kroll International in Mexico City and ON Partners in Colombia, he maintained contacts with Colombian government sources who had information related to the FARC. *See id.* at 37–38.

Mr. Carrasco did not meet or interview Mr. López. *See id.* at 51. Based on his "personal knowledge" and contact with sources, however, he was "unable to establish any direct or indirect link between [Mr.] López ... and the FARC." *Id.* at 39. *See also id.* at 45 ("[T]here is no connection between [Mr.] López ... and [the] FARC."). With respect to the Cartel of the Suns—whom he described as a "group of Venezuelan generals and probably high-ranking officers" of the Chavez and Maduro regimes "dedicated to drug trafficking"—he testified that there was a "close link" between the FARC and the Chavez regime with the Cartel of the Suns "at an intellectual and political level." *Id.* at 44. But he did "not identify the connection between [Mr.] López ... and the Cartel [of the Suns]." *Id.*

* * *

Mr. Gregorie, a managing director of BRG, worked for the Department of Justice for 42 years and handled a number of complex prosecutions, including those of leaders of the Medellin and Cali drug cartels. While at the U.S. Attorney's Office in the Southern District of Florida, he served as the Chief of Narcotics and the Chief of the Criminal Division. *See* D.E. 97-3 at 1. In his declaration, submitted under penalty of perjury and pursuant to § 1746, Mr. Gregorie explained that he had reviewed the 2017 OFAC press release designating Mr. López an SDNT and the affidavits of the plaintiffs' experts. Based on that review, he opined (1) that the allegations in the OFAC designation were "unsupported"; (2) that there was no evidence, source, or document demonstrating that Mr. López (a) was ever involved in a narcotics transaction, (b) ever conducted a transaction with a member of the FARC, or (c) ever had any relationship with a member of the FARC; and (3) that the Cartel of the Suns, a Venezuelan organization, is not the FARC. *See id.* at 2.

17

*Stansell V*, 45 F.4th at 1358–59. The Court concluded that these three witnesses' testimony created issues of material fact as to whether Mr. López was an agency or instrumentality of the FARC. *Id.* at 1360. Mr. López attaches these affidavits, along with OFAC charts purportedly showing FARC's material support network (which do not include Mr. López) for the Court's consideration. *See* Exhs. B-E.

> D.   *The State Court Foreclosure Action Warrants Abstention Pending Its Disposition*

The Plaintiffs' Motion for a Writ fails to address the impact that its granting would have on the matter styled *Fryd Mortgage, LLC v. 9000 S.W. 63rd Court, LLC, et al.*, case no. 2020-016686 CA 01 brought in the Circuit Court of the Eleventh Judicial Circuit in and for Miami-Dade County, Florida (the "Foreclosure Action").  In this state court action, Plaintiff Fryd Mortgage, LLC ("Fryd") has sued *inter alia* the owner of the property, 9000 S.W. 63rd Court, LLC*,* seeking to foreclose a mortgage purportedly given in connection with a loan. The state court action will determine whether a party purporting to be a lienor of the 9000 S.W. 63rd Court property has a superior interest in the property that forecloses out all other interests. Plaintiffs have moved to intervene in the Foreclosure Action and assert their judgment lien as the superior interest ("Motion to Intervene") to that of Fryd and all other interests.  Plaintiffs, then, have submitted themselves to its subject matter and personal jurisdiction of the state court.

But while Plaintiffs have sought intervention in the Foreclosure Action, Plaintiffs have also asked this Court in essence for a determination of their superior interest in the property. By seeking a writ of execution, Plaintiffs claim that the final default judgment against third parties constitutes a lien against the Property and assert that its interests are superior to those of Fryd (and everyone else). Plaintiffs seek to force a Marshals' sale of the property so they can obtain the proceeds of the sale.

These parallel proceedings do not obtain of the same procedural process.  Here, the Court is asked to adjudicate the questions of Mr. López's and the LLCs' status as an agent and instrumentality.  In the Foreclosure Action, the question of Plaintiffs' judgment lien and its status *vis-a-vis* the owner of the property and Fryd can be fully determined. While postured differently, the issues for determination in the Motion and the Foreclosure Action are the same and the abstention doctrine does permit this Court to allow the Foreclosure Action to proceed to determine the Plaintiffs' rights *vis-a-vis* both the Property and the owner.  *See Ambrosia Coal and Const. Co. v. Pages Morales*, 368 F.3d 1320, 1331 (11th Cir. 2004) ("The doctrine of abstention, under which a District Court may decline to exercise or postpone the exercise of its jurisdiction, is an extraordinary and narrow exception to the duty of a District Court to adjudicate a controversy properly before it.") (quoting *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 96 S.Ct. 1236, 1244 (1976)).

In the Eleventh Circuit, courts are guided by six factors in assessing whether to decline or postpone the exercise of jurisdiction: 1) whether one of the courts has assumed jurisdiction over property; 2) the inconvenience of the federal forum; 3) the potential for piecemeal litigation; 4) the order in which the *fora* obtained jurisdiction; 5) whether state or federal law will be applied; and 6) the adequacy of the state court to protect the parties' rights. *Id.* While the inquiry is heavily weighted in favor of the exercise of jurisdiction, it is also true that the factors must be considered flexibly and pragmatically and not merely as a mechanical check list.  *Ambrosia Coal and Const. Co.* 368 F.3d at 1333 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Contr. Corp.*, 460 U.S. 1, 16, 103 S.Ct. 927, 937 (1983)).

Weighing the factors leads to the conclusion that postponement of this Court's issuance of a writ against the Property is warranted and appropriate. The Property is already the subject of

litigation in the Foreclosure Action, to which Fryd and the owner of the Property are parties, and is subject to questions involving the enforceability of liens against it.  There is no inconvenience of the federal forum except, as set forth above, the Company is an actual party to the Foreclosure action and the issue of the enforceability of the final judgment entered here against the owner could properly be adjudicated by the state court as part of the issues litigated before it. Moreover, the postjudgment process for enforcement of a judgment under TRIA § 201 applies state law. *Stansell II*, 771 F.3d at 730. That state law, not federal law, will be applied is another factor militating for abstention here. Another factor militating for abstention is that the Foreclosure Action was commenced earlier than the suit before this Court and includes the exercise of personal jurisdiction over the LLC that owns the property. Finally, as argued above, the state court is poised to adequately address and protect all of the parties' interests.  By seeking intervention, Plaintiffs seek to be joined to the Foreclosure Action where the question of the validity and priority of liens against the Property will be determined in accordance with the pretrial and trial safeguards afforded by the Florida Rules of Civil Procedure.

      E.    *Even If the Court Were to Grant a Writ, It Should be A Writ of Attachment, not a Writ of Execution*

This Court should not issue any writ because Plaintiffs cannot demonstrate that they have a valid federal ATA judgment against FARC, the Cartel of the Suns, or El Aissami and cannot demonstrate that Mr. López is an agency or instrumentality of the FARC, the Cartel of the Suns, or El Aissami. But even if this court were to disagree, Plaintiffs at most should be given a writ of attachment, not the writ of execution they seek. The Eleventh Circuit held that while a nonjudgment debtor under TRIA is constitutionally entitled to notice and an opportunity to be heard before execution. *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 729 (11th Cir. 2014). While the Eleventh Circuit has held that there is no entitlement to a hearing before

a writ of execution, as a practical matter, if this Court decides to grant the writ, it should grant a writ of attachment, not a writ of execution. A writ of attachment would provide Plaintiffs with a claim on the properties while affording Mr. López and the mortgage companies that also assert a claim on the properties at issue a formal opportunity to intervene and seek an evidentiary hearing.

TRIA attachments against parties who are not original defendants and not judgment debtors should be performed under Florida's Proceedings Supplementary statute, Florida Statute § 56.29. This statute provides for notice, opportunity to present defenses, and for a trial, before the property of a non-defendant and non-judgment debtor is attached and sold.  Fla. Stat. § 56.29(2). As the Honorable Jose A. Gonzalez, Jr. observed in *Bally Case & Cooler, Inc. v. H. Kaiser Assocs., Inc*., 514 F. Supp. 352, 354 (S.D. Fla. 1981), Florida Statute § 56.29 is the correct procedure to be followed in execution of judgment where the property sought to be levied upon is not owned by the judgment debtor.  Florida Statute § 56.29(2), states in pertinent part:

> (2)    The judgment creditor shall, in the motion described in subsection (1) or in a supplemental affidavit, describe any property of the judgment debtor not exempt from execution in the hands of any person or any property, debt, or other obligation due to the judgment debtor which may be applied toward the satisfaction of the judgment. Upon filing of the motion and affidavits that property of the judgment debtor, or any debt, or other obligation due to the judgment debtor in the custody or control of any other person may be applied to satisfy the judgment, then the court shall issue a Notice to Appear.  …
>
> The Notice to Appear must describe with reasonable particularity the property, debt, or other obligation that may be available to satisfy the judgment, must provide such person with the opportunity to present defenses, and must indicate that discovery as provided under the rules of civil procedure is available and that there is a right to a jury trial as provided in s. 56.18. The Notice to Appear must be served as provided for in chapter 48.

In *Bally Case & Cooler, Inc.,* the court entered judgment for the plaintiff and against the defendant in the amount of $50,649.04 plus interests and costs. Then a Writ of Execution was issued and served on Big Green Frog Enterprises, Inc., an entity that was not a party to the original

action. Under Bally's instructions, the United States Marshal seized a Piper Aircraft that was both titled to and in the possession of Big Green Frog Enterprises. *Bally Case & Cooler, Inc.,* 514 F. Supp. at 353. The Court granted Big Green Frog Enterprises' Motion to Quash the Writ of Execution because the Plaintiff failed to follow the procedure that ensured that Big Green Frog Enterprises was provided with due process. The Plaintiff sought reconsideration of the Court's order, which was denied.

The Plaintiff in *Bally Case & Cooler Inc*. argued that Florida Statute §56.16 provides the remedy available to a third-party claiming ownership of seized property. *Id.* The District Court rejected the argument and reasoned:

> The correct procedure to be followed in the instant case is set forth in Fla. Stat. § 56.292 which contains two jurisdictional prerequisites for supplementary postjudgment proceedings. First, the judgment creditor must present a returned and unsatisfied writ of execution. Second, the judgment creditor must present an affidavit averring that the writ of execution is valid and unsatisfied, as well as listing third parties who are to be impled. *Mission Bay Campland, Inc. v. Sumner Financial Corp.*, 71 F.R.D. 432, 434 (M.D.Fla.1976); *Tomayko v. Thomas*, 143 So.2d 227, 229-30 (Fla. 3d DCA 1962).

> It is patently clear that Fla. Stat. § 56.29 is the correct procedure to be followed in execution of judgment where the property sought to be levied on is (a) in the possession or control of a third party; and (b) is titled in the name of a third party. Florida Statute § 56.16 does not apply to property in the possession of and titled in third parties. Section 56.16 simply permits a judgment creditor to execute on property in the possession of the judgment debtor while protecting third parties who may have an interest therein.

*Id.* at 354-55. Like the Plaintiff in *Bally Case & Cooler Inc*, Plaintiffs here failed to follow the procedure that would ensure that the owners of the two properties, who are non-judgment debtors, were afforded due process before any sale of their property was ordered.

Notice and an opportunity to be heard before any court ordered deprivation takes place is essential to preserving the integrity of the procedural process clause. *Fuentes v. Shevin*, 407 U.S. 67, 97 (1972) ("the essential reason for the requirement of a prior hearing is to prevent unfair and

mistaken deprivations of property, however, it is axiomatic that the hearing must provide a real test").

Moreover, if the Court orders a writ of execution at this stage, Mr. López's recourse would be to attempt to stay the sale, which, pursuant to Florida procedure, would require the payment of a bond. Under the circumstances here, because Mr. López is not the original judgment debtor, the statute requiring Mr. López to pay a bond would be unconstitutional as applied. The only statute under Florida law that allows a court to stay a sale and provide for court review of the writ is Florida Statute §56.15 which, when applied in these circumstances, is unconstitutional. Florida Statute §56.15 states:

> Executions; stay of illegal writs.—If any execution issues illegally, the judgment debtor may obtain a stay by making and delivering an affidavit to the officer having the execution, stating the illegality and whether any part of the execution is due, with a bond with surety payable to the judgment creditor in double the amount of the execution or the part of which a stay is sought conditioned to pay the execution or part claimed to be illegal and any damages for delay if the affidavit is not well founded. On receipt of such affidavit and bond the officer shall stay proceedings on the execution and return the bond and affidavit to the court from which the execution issued. The court shall pass on the question of illegality as soon as possible. If the execution is adjudged illegal in any part, the court shall stay it as to the part but if it is adjudged legal in whole or in part, the court shall enter judgment against the principal and surety on such bond for the amount of so much of the execution as is adjudged to be legal and execution shall issue thereon.

Fla. Stat. §56.15.

Only after a bond is posted is the Court permitted to "pass on the question of illegality as soon as possible." *See id.* The statute as written, does not even allow the court to permit discovery, accept motions, or convene a trial. This is a not only a violation of the due process clause, but also of the Seventh Amendment right to a jury trial. *See United States v. Stein*, 881 F.3d 853, 860 (11th Cir. 2018) (Pryor, J. concurring opinion)(discussing the right to a jury trial as one of the most fundamental rights provided by the United States Constitution).

A law which requires a person to post a bond, who was neither an original defendant nor a judgment-debtor, to get a hearing is unconstitutional. *See Johnson v. Glenn's Furniture Co*., 372 F. Supp. 56, 58–59 (N.D. Ga. 1972) ("In those cases where the posting of bond is argued to be an impediment to due process it is in those instances where the bond was a prerequisite to the hearing or 'day in court' itself."); *see Sniadach v. Family Finance Corp.*, 395 U.S. 337 (1969); *Fuentes v. Shevin*, 407 U.S. 67, 84-85 (1972); *Parks v. "Mr. Ford,"* 556 F.2d 132, 143 (3d Cir. 1977) (finding unconstitutional a Pennsylvania statute that did not provide for a due process hearing before a sale under the repairman statute unless the property owner posted a bond or commenced an action in replevin.); *cf. Jenness v. Little*, 306 F. Supp. 925, 929 (N.D. Ga. 1969) ("The Court holds that to prohibit candidates from getting their names on the ballot solely because they cannot post a certain amount of money is illegal and unconstitutional.).

Due Process under the Fourteenth Amendment, and the right to a jury trial under the Seventh Amendment, must not be conditioned upon the payment of money, especially by a person/entity who was never sued as an original defendant. Even assuming that application the Florida Statutes requiring a bond is constitutionally sound in this context, which it is not, Mr. López effectively will be denied any opportunity for a determination of whether the writ was illegal. This is so because the Mr. López is subject to the OFAC regulations after being unilaterally designated under the Foreign Narcotics Kingpin Designation Act ("Kingpin Act") and its applicable regulations. See 31 C.F.R. § 598, et seq. This designation prohibits Mr. López from using any funds or assets in the United States. In short, posting a bond would violate OFAC regulations. Even assuming OFAC would grant a license that would be required in favor of any surety company for the bond transaction to even take place, *see* 31 C.F.R. §598.503 ("The Director of the Office of Foreign Assets Control reserves the right to exclude any person, property, or transaction from the operation of any license or from the privileges conferred

24

by any license"), there is no mechanism for ensuring OFAC will issue a license and no requirement for OFAC to move with any due haste on the application.

To avoid these issues, if the Court still believes that TRIA affords the Plaintiffs the ability to seek Mr. López's assets to satisfy their ATA judgment and inclined to grant a writ against the properties at issue, the Court should at most grant a writ of attachment, which would adequately preserve any claims Plaintiffs may have on the properties.

## III.     CONCLUSION

This Court should not issue writs on the properties at issue because Plaintiffs cannot establish that they have a valid federal ATA judgment against El Aissami, the FARC, or the Cartel of the Suns, and further cannot establish that Mr. López is an agency or instrumentality of these three parties. Even if the Court were to disagree, the Court should abstain from jurisdiction given the pending state court matter.

## <u>CERTIFICATION OF SERVICE</u>

I HEREBY CERTIFY that on March 17, 2023, I electronically filed the foregoing Response to Motion for Writ with the Clerk of the Court by using the CM/ECF system.

/s Adam S. Fels
Adam S. Fels
Fridman Fels & Soto, PLLC
150 Alhambra Cir.
Suite 715
Coral Gables, FL 33134
Telephone: (305) 569-7701
afels@ffslawfirm.com

Attorney for *6301 Collins Ave 1008 LLC, 9000 SW 63rd Court LLC*
