IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
CASE NO. 21-23190-CIV-MORENO

CARLOS EDUARDO MARRON, MARIA
MARRON, C.R., a minor, and S.A., a minor,

    Plaintiffs / Judgment Creditors,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; TAREK WILLIAM
SAAB, and TARECK EL AISSAMI

    Defendants / Judgment Debtors.

_____/

**PLAINTIFFS' MOTION FOR WRIT OF EXECUTION**

Plaintiffs, Carlos Marrón and his family respectfully move for writs of execution for certain Florida properties of Raul Belisario Gorrin ("Gorrin" and the "Gorrin Properties," respectively) which are held in the names of shell companies owned by Gorrin. Such writs is appropriate given that the Gorrin Properties are currently blocked by the Office of Foreign Assets Control ("OFAC") because they are owned by Mr. Gorrin—an agent and instrumentality of Judgment Debtors the Cartel of the Suns (the "Cartel") and Nicolas Maduro Moros ("Maduro").[1] Mr. Gorrin provided material support to at least three judgment debtors in this matter, the Cartel, Maduro, and Tarek El Aissami ("El Aissami")—all of which this Court has already found liable for their roles in the

---

[1] Press Release, U.S. Dept. of Treasury, OFAC, *Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders* (Jan. 8, 2019) (announcing designation of Gorrin), https://home.treasury.gov/news/press-releases/sm583

kidnapping and torture of Carlos Eduardo Marrón. Where, as here, a person provides material support to a terrorist party, Congress has specified in the Terrorism Risk Insurance Act ("TRIA") that terrorism victims such as Plaintiffs may satisfy their judgment from that person's property blocked by OFAC.

## **INTRODUCTION**

The Cartel, Maduro, and their co-conspirators including El Aissami kidnapped and tortured Mr. Marrón, extorting his family out of their life savings for the "offense" of publishing the true free market exchange rate between Venezuela's currency and U.S. Dollars. *See* ECF No. 26 at 12-13. Gorrin is at the heart of the Venezuelan corruption that Mr. Marrón denounced.

As Douglas Farah—a leading expert on the illegal conduct of the Maduro Regime and the Cartel of the Suns, including their currency control scams, narcotics trafficking, and money laundering—explains, there is myriad evidence that Gorrin is an agency or instrumentality of the judgment debtors. To begin, OFAC has designated Gorrin for his central role in Venezuela money laundering activity.[2] This activity provided material support to Maduro, the Cartel and the Individual Defendants because it enabled them (1) launder the Cartel of the Suns' ill-gotten criminal cocaine proceeds, (2) provide loot that Maduro doled out to maintain his grip on authoritarian power in Venezuela, which in turn allowed him to commit crimes including terrorism with impunity, and (3) personally enriched Maduro and Individual Defendants El Aissami and

---

[2] On January 8, 2019, OFAC added Gorrin to its SDN List, and determined that the property and interests in property subject to U.S. jurisdiction of Gorrin are blocked under Executive Order (E.O.) 13850. *See* Notice, Dep't of Treasury, OFAC, 84 Fed. Reg. 2946 (Feb. 8, 2019), https://www.govinfo.gov/content/pkg/FR-2019-02-08/pdf/2019-01643.pdf; *see also* OFAC Specially Designated Nationals and Blocked Persons List ("SDN List") at p. 590 (June 6, 2022), https://www.treasury.gov/ofac/downloads/sdnlist.pdf (listing GORRIN BELISARIO, Raul (a.k.a. GORRIN BELISARIO, Raul Antonio; a.k.a. GORRIN BELISARIO, Raul Antonio De La Santisima Trinidad; a.k.a. GORRIN, Raul; a.k.a. GORRIN, Raul A; a.k.a. GORRIN, Raul Antonio; a.k.a. GORRIN-BELISARIO, Raul Antonio De La Santisima).

Moreno Perez. *See* Declaration of Douglas G. Farah (June 5, 2024) ("Farah"), ECF No. 318-1.

Indeed, federal courts around the country have already held that Gorrin—based on his extensive money laundering of narcotics proceeds—is an agency or instrumentality of the FARC. *See also Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, Case No., 1:20-mc-00249-PAC (S.D.N.Y. 2022), ECF No. 93. That money laundering benefited not just FARC (itself a Judgment Debtor in this case), but also benefited FARC's co-conspirators, *i.e.*, Maduro, the Cartel, El Aissami and the other Judgment Debtors in this case.

## RELEVANT PROCEDURAL BACKGROUND

On January 23, 2023, the Court awarded Plaintiffs a final default judgment against the Defendants, jointly and severally, in the amount of $153,843,976. [ECF No. 46]. The judgment remains unsatisfied. In granting default judgment, this Court recognized that Defendants kidnapped Plaintiff Carlos Marrón and detained him in Venezuela for a year, and the Defendants extorted money from his wife. ECF No. 36 (granting default judgment).

As of today, the entire judgment remains unsatisfied, with collections to date having only offset the accruing interest on the judgment, but not having reduced the principal amount of the original judgment.

## ARGUMENT

### I. PLAINTIFFS ARE ENTITLED TO WRITS OF EXECUTION UNDER TRIA.

As this Court recognized, Section 201(a) of TRIA permits a victim of international terrorism to execute on the blocked assets of a defendant terrorist's agency or instrumentality. ECF No. 108 at 16 (*quoting Stansell V*, 45 F.4th 1340, 1346 (11th Cir. 2022)). The Eleventh Circuit identified four pre-requisites to executing on the blocked assets of a judgment debtor's agency or instrumentality. First, Plaintiffs must have "obtained a judgment against a terrorist party for a claim based on an act of terrorism." *Stansell* V, 45 F.4th at1347. Second, the amount sought

3

to be garnished may not exceed Plaintiffs' outstanding compensatory damages. *Id*. Third, the assets must be blocked. *Id*. Fourth, the third party must be an agency or instrumentality of the terrorist party. *Id*. Here, Plaintiffs easily satisfy all elements.

### A. First Element of TRIA § 201: Plaintiffs' Judgment Is Against a Terrorist Organization for an Act of Terrorism.

This Court has already held that "the kidnapping of Marrón and the acts of extortion against his wife are acts of terrorism under [8 U.S.C. § 1182(a)(3)(B)(ii)(11)]." *See* Order Granting Motion for Writ of Execution, ECF No. 108, at 17.

In addition, Defendant Maduro and the Individual Defendants are "terrorists" for TRIA purposes. "TRIA does not define the term "terrorist" and as such, the Court must give the term its plain meaning. Black's Law Dictionary defines terrorist as one who 'uses violence such as bombing, shooting, or kidnapping in an attempt to intimidate . . . especially as a means of achieving a political end.'" *Marrón v. Maduro*, 1:21-cv-23190 (S.D. Fla.), ECF No. 108, at 19 (*citing* Black's Law Dictionary (11th Ed. 2019)). Under this definition, Maduro and the Individual Defendants—who this Court determined were responsible for the kidnapping and torture of Mr. Marrón, and who were motivated by political concerns, that is, a reprisal for Mr. Marrón's criticism of Maduro and his regime—are terrorists.

Further, under TRIA § 201(d)(4), a "terrorist organization" is defined by reference to the definition in 8 U.S.C. § 212(a)(3)(B)(vi), which includes "a group of two or more individuals, whether organized or not which engages in, or has a subgroup which engages in" certain specified activities, *id.* § 212(a)(3)(B)(vi)(III), that include committing, inciting or soliciting funds for terrorist activity, *id.* § 212(a)(3)(B)(iv), which "terrorist activity" in turn includes, *inter alia*, any act of torture under 18 U.S.C. § 2340, *id.* § 212(a)(3)(E)(iii)(I). The Cartel is a "terrorist organization" under the foregoing definition because it is "a group of two or more persons," that is responsible for the torture of Mr. Marrón. *See Albán v. Maduro*, 1:21-cv-20706, ECF No. 110

4

at 5 (holding that under TRIA § 201, the Cartel is a terrorist organization in engaged in terrorist activity, based upon the Cartel's torture of plaintiff in that case, Mr. Albán, among other statutory violations).

### B. Second Element of TRIA § 201: The Unsatisfied Amount of Plaintiffs' Judgment Does Not Exceed the Value of the Blocked Assets.

The entire principal amount of Plaintiffs' judgment, *i.e.*, $153,843,976, is currently unsatisfied. The estimated value of the property subject to execution appears to under $12 million.

| Blocked Property | Estimated value[3] |
|---|---|
| 4100 Salzedo Street, Unit 913, Coral Gables, FL | $688,700 |
| 4100 Salzedo Street, Unit 813, Coral Gables, FL | $646,700 |
| 4100 Salzedo Street, Unit 807, Coral Gables, FL | $611,500 |
| 4100 Salzedo Street, Unit 608, Coral Gables, FL | $560,200 |
| 4100 Salzedo Street, Unit 1010, Coral Gables, FL | $674,800 |
| 144 Isla Dorada Blvd., Coral Gables, FL | $8,099,500 |
| | $11,281,000 |

Accordingly, the value of the blocked assets does not exceed the unsatisfied amount of the judgment.

### C. Third Element of TRIA § 201: The Asset at Issue Is the Blocked Property of Gorrin.

The OFAC has designated Gorrin as well as other individuals and entities for providing support to the corrupt and illegitimate Maduro regime. It has also designated and blocked several high-level Cartel of the Suns members, including Nicolas Maduro Moros; Diosdado Cabello Rondon; Nestor Luis Reverol Torres; Hugo Armando Carvajal Barrios; and Tareck Zaidan El

---

[3] Zillow.com (last visited June 19, 2025).

Aissami Maddah. OFAC blocks property owned by (1) a designated individual, (2) a designated entity, or (3) an entity in which a blocked person or persons have 50% or greater interest.

On January 8, 2019, OFAC designated and blocked individuals and entities "involved in a significant corruption scheme designed to take advantage of Venezuela's currency exchange practices, generating more than $2.4 billion in corrupt proceeds," pursuant to Executive Order 13850. Farah at ¶ 21. These designated entities include Gorrin and his Florida-based companies Corpomedios LLC; RIM Group Investments, Corp.; RIM Group Investments I, Corp.; RIM Group Investments II, Corp.; and RIM Group Investments III, Corp. *Id.*[4] Gorrin and his companies remain designated and blocked by OFAC.[5]

| Blocked Property | Owner[6] |
|---|---|
| 4100 Salzedo Street, Unit 913, Coral Gables, FL | RIM Group Investments II Corp. |
| 4100 Salzedo Street, Unit 813, Coral Gables, FL | RIM Group Investments II Corp. |
| 4100 Salzedo Street, Unit 807, Coral Gables, FL | RIM Group Investments I Corp. |
| 4100 Salzedo Street, Unit 608, Coral Gables, FL | RIM Group Investments I Corp. |
| 4100 Salzedo Street, Unit 1010, Coral Gables, FL | RIM Group Investments Corp. |
| 144 Isla Dorada Blvd., Coral Gables, FL | RIM Group Investments III, Corp. |

---

[4] *See also* Exhibit 1 (results of OFAC Sanctions List Search, https://sanctionssearch.ofac.treas.gov/, listing RIM Group Investments I Corp., RIM Group Investments II Corp., and RIM Group Investments III Corp. as blocked companies "Linked To: GORRIN BELISARIO, Raul").

[5] *See* footnote 2, *supra.*

[6] *See* Exhibit 9 (results of search of Property Appraiser of Miami-Dade County, available at https://www.miamidade.gov/Apps/PA/PropertySearch/#/ (last visited June 19, 2025) (identifying owners).

### D. Fourth Element of TRIA § 201: Mr. Gorrin Is an Instrumentality of the Cartel, Maduro and the Individual Defendants.

Although TRIA does not define "instrumentality," the Eleventh Circuit has endorsed a broad definition: an "instrumentality" includes any party that provided material support to a terrorist party at any point in time, whether financial, technological, or the provision of goods or services. *See Stansell V*, 45 F.4th at 1350 (quoting *Stansell II*, 771 F.3d at 724 n.6); *Marrón*, 2023 WL 6356969, at *13 ("A third party who provides material support to a terrorist at any point in time constitutes an agency or instrumentality, even if they purportedly stopped aiding the terrorist."). In *Stansell II*, where the plaintiffs sued the narco-terrorist organization FARC under the federal ATA, 18 U.S.C. § 2333, the Eleventh Circuit approved the district court's defining an "agency or instrumentality" as any party that:

> "is or was ever involved" in any aspect of the [the defendant's] trafficking operations or that assisted with the [the defendant's] "financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support" of, the [defendant's] international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the [the defendant]; and/or (3) "playing a significant role in" the [the defendant's] narcotics trafficking.

771 F.3d at 724 n.6.

A third party need not be an agency or instrumentality of a terrorist party at the time that execution or garnishment is sought. *Id*. Neither "direct ties" nor knowledge is required to establish agency/instrumentality status. *See id.*, at 1351–55. Under the foregoing Eleventh Circuit definition, Gorrin is an instrumentality of the Maduro, the Cartel, and the other Judgment Debtors due to his involvement in an illegal currency exchange scheme, which directly benefited the Cartel of the Suns and the Maduro regime. From 2003 until 2019, Venezuela enacted currency controls in an effort to mitigate the effects of an oil strike. *See Caballero*, Case No. 1:18-cv-25337, ECF No. 81-1. According to John Robert McBrien, former OFAC Associate Director for Global Targeting, the Venezuelan currency controls led to a money laundering scheme within the Maduro

7

regime. *Id*. Mr. McBrien affirmed in a sworn declaration that Gorrin and Matthias Krull, a Swiss banker who was convicted of Conspiracy to Commit Money Laundering in 2018, played major roles in the currency scheme. Gorrin bribed officials in the Maduro regime to grant Gorrin access to the Venezuelan government's favorable currency exchange rate. *Id*. Gorrin profited immensely from the scheme, at the expense of the Venezuelan people, and concealed his proceeds in United States and European bank accounts, real properties, and other assets. According to Mr. McBrien, Krull assisted Gorrin in concealing these proceeds . *See Caballero*, 1:18-cv-25337, ECF No. 81-1.

Mr. McBrien affirmed that, in addition to bribing Venezuelan officials for his own gain, Gorrin participated in the currency scheme by laundering money on behalf of Maduro's inner circle, many of whom are Cartel of the Suns members. *See Caballero*, 1:18-cv-25337, ECF No. 81-1. The scheme therefore directly benefited Cartel of the Suns members Nicholas Maduro; Cilia Adela Flores de Maduro; and Maduro's stepsons, Walter Jacob Gavidia Flores, Yosser Daniel Gavidia Flores, and Yoswal Alexander Gavidia Flores. *Id*. The resulting illicit profits, Mr. McBrien affirmed, enabled FARC and the Cartel of the Suns to engage in international narcotics trafficking. *Id*.

Additionally, Gorrin has been criminally charged with Conspiracy to Violate the Foreign Corrupt Practices Act; Conspiracy to Commit Money Laundering; and Laundering of Monetary Instruments in connection with this currency scheme. *United States v. Gorrin*, Case No. 9:18-cr-80160-WPD (S.D. Fla.), ECF No. 44. His two co-defendants, Claudia Patricia Diaz Guillen and Adrian Jose Velasquez Figueroa, were convicted on December 15, 2022, of Conspiracy to Commit Money Laundering and Laundering of Monetary Instruments for their participation in the same scheme. *See Gorrin*, 9:18-cr-80160-WPD, ECF No. 310. According to testimony at his codefendants' trial, Gorrin paid hundreds of millions of dollars in bribes to secure the rights to

engage in over $1 billion in unlawful foreign currency exchange transactions. Farah at ¶ 26. Gorrin remains a fugitive from justice.

In sum, Gorrin's facilitation of the currency exchange scheme and money laundering on behalf of Maduro's inner circle directly benefited the illicit activities of FARC and Cartel of the Suns. Gorrin is accordingly an agency/instrumentality of Cartel of the Suns. Farah at ¶ 19.

### a. Other Courts have correctly determined that Gorrin is an agency and instrumentality of FARC.

Other courts in this District have determined that Gorrin is an agency/instrumentality of FARC for purposes of granting writs of garnishment. *See Caballero*, 1:18-cv-25337, ECF No. 151; *Stansell*, 1:19-cv-20896, ECF No. 22; *Pescatore*, 1:19-cv-20811, ECF No. 11; *Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, Case No., 1:20-mc-00249-PAC (S.D.N.Y. 2022), ECF No. 93. Those findings were correct. Although Gorrin has contested his status as an agency/instrumentality of FARC, these challenges do not prevent this Court from granting a writ in this matter. *See Stansell*, 1:19-cv-20896, ECF No. 549; *Caballero*, 1:18-cv-25337, ECF No. 187. As the Eleventh Circuit noted in *Stansell V*, third parties such as Gorrin are entitled to contest their agency/instrumentality statuses only *after* the Court issues an *ex parte* writ of garnishment. *See* 45 F.4th at 1356–57. The challenges in other cases therefore do not affect the Court's ability to issue the requested writ here.

### b. OFAC's Designation of Gorrin for His Role in Currency Control Scams Confirms His Status as an Instrumentality for Maduro and the Other Judgment Debtors.

Because OFAC's determinations involve "the intersection of national security, foreign policy, and administrative law," the judiciary affords extraordinary deference to OFAC's determinations. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007). As the Eleventh Circuit explained in rejecting a party's challenge to an OFAC designation, the "decision of the OFAC is entitled to great deference, and should be reversed only if arbitrary and

9

capricious." *De Cuellar v. Brady*, 881 F.2d 1561, 1565 (11th Cir. 1989).  Consistent with these decisions, courts in this district—when presiding over terrorism victims' efforts to satisfy their judgments from the blocked property of instrumentalities of terrorists—agree to afford OFAC's designations "great deference."  *Stansell v. Revolutionary Armed Forces of Colom.*, 2019 WL 5291044, at *7 (S.D. Fla. Aug. 21, 2019) (Torres, J.), *R&R adopted*, 2019 WL 5290922 (S.D. Fla. Sept. 26, 2019) (Scola, J.).

In addition, as this Court has noted a court's deference to the OFAC's determinations has never been limited by the *Chevron* doctrine and is not modified by the overturning of that decision. ECF No. 108, at 28 ("*Chevron* deference . . . applies to an agency's construction of a statute it administers, and not the agency's factual findings… Accordingly, the Court finds that the potential narrowing of *Chevron* would not necessarily translate into a lack of deference for an OFAC decision.") *citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984); *accord, e.g., Arevalo v. US. Atty-Gen.*, 872 F.3d 1l84, 1187-88 (11th Cir. 2017) (explaining that Chevron provides a framework for judicial review when a court reviews an agency's construction of the statute which it administers.).  This Court's conclusions were both prescient and correct.

Last year, the Supreme Court did, in fact, overrule *Chevron*.  *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024).  In so doing, however, the Supreme Court was clear that while in accordance with the Administrative Procedures Act (the "APA"), "courts decided legal questions by applying their own judgment"—explained that the APA "*does mandate* that judicial review of agency policymaking and factfinding be deferential." *Id.* at * 2261 (citing § 706(2)(E)) (emphasis in original).  Specifically, "agency factfinding in formal proceedings [may be] set aside if 'unsupported by substantial evidence.'" *Id.* (quoting 5 U.S.C. § 706(2)(E)).

This deferential standard is the one that applies to OFAC determinations leading to the designation of any person—like Gorrin—as a specially designated national ("SDN"), *i.e.*, an OFAC sanctioned entity. *See  Chichakli v. Trump*, 242 F. Supp. 3d 45, 51 (D.D.C.), *aff'd,* 714 F. App'x 1 (D.C. Cir. 2017) (describing how an OFAC factual determination that certain entities were blocked due their affiliation to SDN would be reviewed under the "unsupported by substantial evidence" test); *see generally Stansell v. Revolutionary Armed Forces of Columbia (FARC)*, No. 8:09-CV-2308-T-26MAP, 2011 WL 13176221, at *1 (M.D. Fla. Dec. 5, 2011) (holding that OFAC's findings "deserve deference" and describing OFAC's sophisticated fact-finding process that often involves "consultations by OFAC with multiple law enforcement, intelligence agencies, and the military."). Accordingly, the Court should continue to afford heightened deference to OFAC's determinations on the questions of which entities are properly designated as SDNs subject to US sanctions, and why.

On January 8, 2019, OFAC designated Gorrin as a Special Designated National ("SDN"), subject to U.S. sanctions under the Venezuela sanctions program, and issued an accompanying Press Release titled "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders." Farah at ¶ 21  The Press Release accompanying Gorrin's OFAC designation explains: "Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) sanctioned Venezuelan individuals and companies involved in a significant corruption scheme designed to take advantage of the Government of Venezuela's currency exchange practices, generating more than $2.4 billion in corrupt proceeds." *Id.*, at ¶ 22 (*quoting* Press Release, U.S. Dep't of Treasury, Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders (Jan. 8, 2019), available at https://home.treasury.gov/news/press-releases/sm583

(explaining that "Today's designations target individuals who took advantage of a corrupt system within the Venezuelan [Office the National Treasury ("ONT")], stealing billions of dollars from the Venezuelan people since 2008, under the watch of two Venezuelan National Treasurers, Alejandro Jose Andrade Cedeno (Andrade) and [Claudia Patricia Diaz Guillen].")). "Andrade was sentenced by the United States District Court for the Southern District of Florida on November 27, 2018, to 10 years in prison for accepting over $1 billion in bribes for his role in the below scheme." Farah at ¶ 23.

Gorrin was one of two Venezuelan businesspersons known to have reaped massive profits when Andrade cut them in on the lucrative currency control scam: "While Andrade was National Treasurer, he awarded the ONT exchange business to a limited number of individuals, including [Raúl Gorrín Belisario ("Gorrin")] and Leonardo Gonzalez Dellan (Gonzalez)." *Id*., at ¶ 25.

To get this opportunity to reap vast dirty profits, Gorrin paid massive bribes to Andrade. *Id.*, at ¶ 26  "In return for their selection as the only currency exchange houses approved by the ONT, Gorrin and Gonzalez, another Venezuelan businessman, paid hundreds of millions of dollars in bribes to Andrade.  Andrade facilitated the continuation of the bribery scheme by introducing Gorrin to Andrade's successor, Diaz, when he left the ONT." *Id*.

Not only did Gorrin earn money for himself, he also laundered Andrade's share of the ill-gotten proceeds.  *Id.*, at ¶ 27.  "Gorrin and Gonzalez controlled the corrupt wealth that was generated on Andrade's behalf, holding the money in offshore bank accounts and reinvesting in properties, aircraft, and other luxury assets at the direction of Andrade.  Andrade's portion of the illicit profits were never sent directly to Andrade; instead these individuals would purchase assets for Andrade, at his direction, or on his behalf." *Id*.

As noted above, Andrade was prosecuted in federal court in Florida and pled guilty to money laundering and agreed to a forfeiture of $1 billion. *Id.,* at ¶ 28 (*citing United States v. Andrade*, 9:17-cr-80242-RLR (S.D. Fla. Jan. 4, 2018), ECF No. 9, at 1-11 (Plea Agreement)). Andrade agreed to a factual proffer that confirmed that "Defendant [Andrade] agreed to accept bribes from co-conspirators [such as Gorrin] in exchange for selecting them to carry out the U.S. dollar to bolivar exchange process with the ONT, which allowed those co-conspirators to obtain substantial profits on the exchange transactions. The co-conspirators agreed to bribe the Defendant in order to secure improper advantages from the Defendant and secure additional profits in the business deals." Farah at ¶ 29 (*quoting Andrade*, 9:17-cr-80242-RLR, ECF No. 9, at 12-15).

OFAC designated Gorrin under the Venezuela sanctions program because he played a central role in Venezuelan regime-sponsored currency control schemes, siphoning off hundreds of millions, if not billions, of dollars from the Venezuelan state treasury in so doing. Farah at ¶ 20. Through those currency control scams, Gorrin supported provided material support to the Judgment Debtors in at least three ways: (1) the currency control scams that Gorrin supported were integral to the Cartel of the Sun's laundering of the proceeds of narcotics trafficking; (2) the currency control scams that Gorrin supported provided loot that the Maduro regime doled out to maintain its grip on authoritarian power in Venezuela, which in turn allowed the regime to commit crimes including terrorism with impunity; and (3) Venezuela currency control scams personally enriched Individual Defendants Maduro, Moreno Perez, and El Aissami. *Id.*

      **i. The DOJ indicted Gorrin for his central role in Venezuelan currency scams.**

On October 23, 2024, the United States indicted Gorrin for conspiracy to commit money laundering. *See United States v. Gorrin*, 24-cr-20468 (S.D. Fla.). In the indictment, the United

States alleges that Gorrin conspired with others, including senior executives at PDVSA to launder the proceeds of currency scams.

The indictment sets forth that Gorrin and his co-conspirators bribed PDVSA officials "in exchange for the approval of foreign loan exchange contracts with Venezuela's state-owned oil entity, PDVSA." *Id.*, Dkt. 1, ¶ 1. "Through these loan contacts, **RAUL GORRIN BELISARIO** and his co-conspirators sought to exploit the Republic of Venezuela's fixed foreign currency exchange rate, which valued the Venezuelan bolívar artificially high compared to rate available on the open market." *Id.* ¶ 2. For example, "under the guise of one such loan contract, PDVSA paid . . . the equivalent of $600 for a loan of Venezuela bolivars worth only about $50 million on the open market, resulting in profits worth approximately $550 million." *Id.* ¶ 3. The indictment explains that the co-conspirators used the corrupt proceeds to pay bribes and the Gorrin laundered his share. *Id.* ¶¶ 4-6.

Prior to the 2024 indictment, the U.S. government had already indicted Gorin in 2018. *See United States v. Gorrin*, 9:18-cv-80160 (S.D. Fla.). In that indictment, Gorrin was charged with conspiracy to violate the Foreign Corrupt Practices Act ("FCPA"), based on allegations that he "paid hundreds of millions of dollars in bribes to secure rights to engage in over $1 billion in foreign currency exchange transactions that resulted in profits for Raul Gorrin Belisario of hundreds of millions of dollars." *Id.*, Dkt. 44 (Superseding Indictment) ¶ 10.

Gorrin is currently a fugitive from justice in the United States. Farah at ¶ 32. Immigrations and Customs Enforcement ("ICE") lists him as among its most wanted criminals. *Id.*, (*citing* ICE, Most Wanted https://www.ice.gov/most-wanted/gorrin-belisario-raul-antonio-de-la-santisima-t (last visited June 4, 2024)).

### ii. Venezuelan currency control scams personally enriched Individual Defendants Maduro, Moreno Perez, and El Aissami.

The currency manipulation in which Gorrin participated could only be possible through and with the direct support of the most senior government officials, who set the exchange rates that were manipulated. Farah at ¶ 33. Ultimately, such government officials serve at the pleasure of Maduro (and before him, Hugo Chavez), and as such, the currency control schemes discussed herein occur only because those schemes are sanctioned by, and ultimately benefit, Maduro in his personal capacity. *Id.*

To begin, Maduro personally profited from Venezuelan currency control schemes involving PDVSA. *Id.*, at ¶ 34. In a classic *quid pro quo*, Maduro lent his approval to the Venezuela currency scams and more specifically to Gorrin's role in taking profits from the corruption, and Gorrin paid millions of dollars to Maduro's relatives, for further payment to Maduro. *Id.* Of the proceeds (in excess of $500 million) of the Venezuela currency scam for which Gorrin was indicted, Gorrin received approximately half of the funds, and from Gorrin's own share, he transferred approximately $159 million to Maduro's stepsons, known as "Los Chamos." *Id.*, at ¶ 35. Although Los Chamos were nominally the recipients of the funds, the money (or at least the vast majority of it) would have been transferred to their mother, the First Lady of Venezuela, for Maduro's ultimate disposition. *Id.*

Bringing the *quid pro quo* full circle, Los Chamos would intervene with their mother if Gorrin needed any assistance from Maduro. *Id.*, at ¶ 36. The factual proffer of an indicted banker (Matthias Krull) who was involved in laundering money related to the Venezuelan currency scams discussed above explains that Gorrin "introduced KRULL to Mario Enrique Bonilla Vallero . . . as people who [Gorrin] represents." *United States v. Krull*, 18-cr-20682 (S.D. Fla), Dkt. 30 (Factual Proffer), at ¶ 27 (referring to Gorrin as "Conspirator 7"). Gorrin "in turn, asked KRULL

15

if KRULL knew who 'Mario' represents. When KRULL answered 'no,' [Gorrin] explained that 'Mario' represents 'Los Chamos' (the Stepsons of [Maduro]). [Gorrin] explained to KRULL how 'Los Chamos' help [Gorrin] solve issues with [Maduro], by intervening with their mother, the wife of [Maduro]." *Id*. ¶ 28 (referring to Maduro as "Venezuela Official 2" and references Gorrin as "Conspirator 7").

Maduro also enjoyed a number of indirect benefits from his relationship with Gorrin. Farahat ¶ 37. For example, Maduro appointed Carlos Erik Malpica Flores—the favorite nephew of Venezuela's First Lady, Cilia Flores, and one of her most trusted advisors—to be National Treasurer in September 2013, thereby allowing Malpica Flores to reap a lucrative share of the ongoing Venezuelan currency control frauds. *Id.* (*citing* Ricardo Guanipa D'Erizans, *Family Business: Corruption in the Maduro Regime*, Dialogo Americas (July 25, 2019), available at https://dialogo-americas.com/articles/family-business-corruption-in-the-maduro-regime/). As well, Gorrin lavished gifts on Maduro's wife. *Id.* (*citing* Dept of Treasury, *Treasury Targets Venezuelan President Maduro's Inner Circleand Proceeds of Corruption in the United States* (Sept. 25, 2018) https://home.treasury.gov/news/press-releases/sm495 ("Gorrin also purchased gifts for Cilia Adela Flores de Maduro, the First Lady of Venezuela, who was designated by OFAC on September 25, 2018 pursuant to E.O. 13692.")).

Defendant Moreno Perez also personally profited from Venezuelan currency control schemes. For example, he received a "a luxurious residence in the Alto Hatillo area in Caracas . . . from an individual charged in the United States with a multibillion-dollar fraud scheme." Farah at ¶ 38 (*citing United States v. Moreno Perez*, 20-cr-2407 (S.D. Fla.), at D.E. 1, Affidavit of Shauna L. Willard, Special Agent, Homeland Security Investigations, ¶ 20, available online at https://www.justice.gov/opa/page/file/1261816/download). Defendant Moreno Perez similarly

16

received $3 million in bribes from Raul Gorrin, *id.* at ¶ 10 (describing bribes paid by "co-conspirator 1" a "former criminal defense attorney in Venezuela that currently controls a media company in Venezuela," *i.e.*, Gorrin), who was at the center of the currency control scams, alongside of Gonzalez Dellan. Farah at ¶ 39.

Defendant El Aissami—who has fallen out of favor with the Maduro regime in recent years—also has been accused of engaging in currency manipulation schemes. *Id.*, at ¶ 40 (*citing* Jose Luis Granados Ceja, *Venezuela Details Former Oil Minister El Aissami Over PDVSA Corruption Case*, VenezuelaAnalysis (April 9, 2024), available at [Venezuela Detains Former Oil Minister El Aissami Over PDVSA Corruption Case - Venezuelanalysis](#) (describing allegations from Defendant Saab that "El Aissami was working in collaboration with people in the United States and that their aim was to further damage the Venezuelan economy through currency manipulation. . . . With this structure they evaded all [Central Bank] financial regulations, bringing with it the instability of the national currency; fueling the increase in the black market exchange rate and causing damage to the Venezuelan state.")).

Moreover, when the regime accused El Aissami, one of its most senior leaders, of this misconduct it is because he had not shared the wealth generated with other officials in a way that had been previously established. Farah at ¶ 41. For the leadership of Maduro's regime, the crime was not the currency manipulation but their assessment that they were not getting their "fair share" of the payoffs. *Id.*

>    iii. **The currency control scams that Gorrin supported provided loot that Maduro doled out to maintain his grip on authoritarian power in Venezuela, which in turn allowed him to commit crimes including terrorism with impunity.**

Gorrin's currency control schemes played a significant role in propping up the economically troubled Maduro regime. *Id.*, at ¶ 42. Currency conversion schemes have been one

17

of Maduro's most successful techniques for siphoning funds from the Venezuelan treasury into insiders' pockets as the legal economy, particularly the oil sector, withers. *Id.* The total amount that criminals reaped from these currency scams have been estimated to be in the tens of billions. *Id.*, (*citing* Venezuela Investigative Unit, *How Criminal Opportunists Exploit Venezuela's Currency Controls*, Insight Crime (June 16, 2015), available at https://insightcrime.org/news/analysis/how-criminal-opportunists-exploit-venezuela-currency-controls/).

Through earnings from currency conversion scams (as well as narcotics trafficking and other crimes), Maduro purchases the loyalty of his senior leaders and loyalists, thereby, cementing his authoritarian control over Venezuela. Farah at ¶ 43. Gorrin's bribes enriched numerous members of Maduro's inner circle, including Alejandro Andrade, Claudia Diaz Guillen, Adrian Velasquez, Hugo Carvajal, and Victor Aular. *Id.* "A key to Maduro's resilience has been the loyalty he has retained among most Venezuelan security forces. For years, military leaders and other officials have enriched themselves through corruption, drug trafficking, and other illicit industries." *Id.*, (*citing* Congressional Research Service, Venezuela, Background and U.S. Relations (April 28, 2021), at 5, available online at https://fas.org/sgp/crs/row/R44841.pdf).

In other words, dirty money is the lifeblood of the Maduro regime and its ongoing grip on power despite international sanctions. Farah at ¶ 45. As the Congressional Research Service explains that the Cartel leaders "hang on because, in spite of Venezuela's economic implosion, they are still reaping millions." *Id.* Maduro's grip on power in Venezuela, in turn, completes the circle, allowing Maduro and his cronies to commit crimes—such as raiding Venezuela's treasury—with impunity and without interference from legitimate law enforcement. *Id.*, at ¶ 46.

Terrorism against individuals like the Plaintiffs in this case (such as Mr. Marrón and his family) fits into the same pattern. Farah at ¶ 47. Through acts of terrorism and human rights abuses, the Maduro regime, the Cartel of the Suns, and the Individual Defendants suppress opposition to their narcotics trafficking, public corruption, currency schemes, money laundering, and Maduro's authoritarian control of Venezuela. *Id.* And by retaining such income and power, Maduro, the Cartel and individual defendants remain positioned to continue to commit acts of terrorism and human rights abuses. *Id.*

For the foregoing reasons, Raul Gorrin was and remains an instrumentality of Maduro, the Cartel, and the other Judgment Debtors.

\* \* \*

As set forth above, each element of TRIA is satisfied. Accordingly, writs of execution should issue for each of the foregoing property.

## CONCLUSION

For the foregoing reasons, writs of garnishment should issue for each the Gorrin Properties. Proposed writs are attached as Exhibits 2 to 8.

Respectfully submitted on June 20, 2025.

> */s/ Jaime D. Guttman*
> Jaime D. Guttman (Fla. Bar No. 44076)
> *jaime@scale.law*
> Scale Law Partners, LLC
> 777 Brickell Avenue, Suite 500
> Miami, FL 33131
> (786) 273-9033 (Main)

/s/ Alex C. Lakatos
Alex C. Lakatos (*pro hac vice*)
alakatos@mayerbrown.com
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000 (Main)

*Counsel for Plaintiffs / Judgment Creditors*

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing document on June 20, 2025, through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

/s/ Jaime D. Guttman