**IN THE UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**
**CASE NO. 21-23190-CIV-MORENO**

CARLOS EDUARDO MARRON, MARIA
MARRON, C.R., a minor, and S.A., a minor,

        Plaintiffs / Judgment Creditors,

v.

NICOLAS MADURO MOROS,
FUERZAS ARMADA REVOLUCIONARIAS
DE COLUMBIA ("FARC"); THE CARTEL OF
THE SUNS A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; TAREK WILLIAM
SAAB, and TARECK EL AISSAMI

        Defendants / Judgment Debtors.

_____/

## PLAINTIFFS' MOTION FOR WRITS OF GARNISHMENT AND EXECUTION

Plaintiffs, Carlos Marrón and his family, respectfully move for (1) a writ of execution for a Florida property of Gustavo Adolfo Perdomo Rosales ("Perdomo" and the "Perdomo Property," respectively) which are held in the name of a shell companies owned by Perdomo and (2) a writ of garnishment for an account held in the name of a shell company owned by Perdomo at Seacoast Bank (the "Perdomo Account"), which acquired Professional Bank, where the assets were originally blocked.

The writs are appropriate given that the Perdomo Property and the Perdomo Account are currently blocked by the Office of Foreign Assets Control ("OFAC") because they are owned by Perdomo—an agent and instrumentality of Judgment Debtors.[1]  Mr. Perdomo provided material

_____

[1] Press Release, U.S. Dept. of Treasury, OFAC, *Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders* (Jan. 8, 2019)

support to at least three judgment debtors in this matter, the Cartel of the Suns (the "Cartel"), Nicolas Maduro Moros ("Maduro"), and Tarek El Aissami ("El Aissami")—all of which this Court has already found liable for their roles in the kidnapping and torture of Carlos Eduardo Marrón. Where, as here, a person provides material support to a terrorist party, Congress has specified in the Terrorism Risk Insurance Act ("TRIA") that terrorism victims such as Plaintiffs may satisfy their judgment from that person's property blocked by OFAC.

## INTRODUCTION

The Cartel, Maduro, and their co-conspirators including El Aissami kidnapped and tortured Mr. Marrón, extorting his family out of their life savings for the "offense" of publishing the true free market exchange rate between Venezuela's currency and U.S. Dollars. *See* ECF No. 26 at 12-13.  Perdomo—along with his business partner Raúl Gorrín Belisario ("Gorrin")—is at the heart of the Venezuelan corruption that Mr. Marrón denounced.

As Douglas Farah—a leading expert on the illegal conduct of the Maduro Regime and the Cartel of the Suns, including their currency control scams, narcotics trafficking, and money laundering—explains, there is myriad evidence that Perdomo is an agency or instrumentality of the judgment debtors.  To begin, OFAC has designated Perdomo for his role in Venezuelan money laundering activity. This activity provided material support to Maduro, the Cartel and the Individual Defendants because it enabled them (1) launder the Cartel of the Suns' ill-gotten criminal cocaine proceeds, (2) provide loot that Maduro doled out to maintain his grip on authoritarian power in Venezuela, which in turn allowed him to commit crimes including terrorism with impunity, and (3) personally enriched Maduro and Individual Defendants El Aissami and Moreno Perez.  *See* enclosed Declaration of Douglas G. Farah.

---

(announcing designation of Perdomo and Magus Holding LLC, the shell company that holds the Perdomo Property and the Perdomo Account on Perdomo's behalf), https://home.treasury.gov/news/press-releases/sm583.

Indeed, federal courts around the country have already held that Perdomo—based on his extensive money laundering of narcotics proceeds—is an agency or instrumentality of the FARC. *See also Caballero v. Fuerzas Armadas Revolucionarias De Colombia*, Case No., 1:20-mc-00249-PAC (S.D.N.Y. 2022), ECF No. 91, ¶ 3; ECF No. 93. That money laundering benefited not just FARC (itself a Judgment Debtor in this case), but also benefited FARC's co-conspirators, *i.e.*, Maduro, the Cartel, El Aissami and the other Judgment Debtors in this case.

## RELEVANT PROCEDURAL BACKGROUND

On January 23, 2023, the Court awarded Plaintiffs a final default judgment against the Defendants, jointly and severally, in the amount of $153,843,976. [ECF No. 46]. The judgment remains unsatisfied. In granting default judgment, this Court recognized that Defendants kidnapped Plaintiff Carlos Marrón and detained him in Venezuela for a year, and the Defendants extorted money from his wife. ECF No. 36 (granting default judgment).

As of today, the entire judgment remains unsatisfied, with collections to date having only offset the accruing interest on the judgment, but not having reduced the principal amount of the original judgment.

## ARGUMENT

### I.  PLAINTIFFS ARE ENTITLED TO WRITS OF EXECUTION AND GARNISHMENT UNDER TRIA.

As this Court recognized, Section 201(a) of TRIA permits a victim of international terrorism to execute on the blocked assets of a defendant terrorist's agency or instrumentality. ECF No. 108 at 16 (*quoting Stansell V*, 45 F.4th 1340, 1346 (11th Cir. 2022)). The Eleventh Circuit identified four pre-requisites to executing on the blocked assets of a judgment debtor's agency or instrumentality. First, Plaintiffs must have "obtained a judgment against a terrorist party for a claim based on an act of terrorism." *Stansell* V, 45 F.4th at 1347. Second, the amount sought to be garnished may not exceed Plaintiffs' outstanding compensatory damages. *Id*. Third, the

3

assets must be blocked. *Id.* Fourth, the third party must be an agency or instrumentality of the terrorist party. *Id.* Here, Plaintiffs easily satisfy all elements.

### A. First Element of TRIA § 201: Plaintiffs' Judgment Is Against a Terrorist Organization for an Act of Terrorism.

This Court has already held that "the kidnapping of Marrón and the acts of extortion against his wife are acts of terrorism under [8 U.S.C. § 1182(a)(3)(B)(ii)(11)]." *See* Order Granting Motion for Writ of Execution, ECF No. 108, at 17.

In addition, Defendant Maduro and the Individual Defendants are "terrorists" for TRIA purposes. "TRIA does not define the term "terrorist" and as such, the Court must give the term its plain meaning. Black's Law Dictionary defines terrorist as one who 'uses violence such as bombing, shooting, or kidnapping in an attempt to intimidate . . . especially as a means of achieving a political end.'" *Marrón v. Maduro*, 1:21-cv-23190 (S.D. Fla.), ECF No. 108, at 19 (*citing* Black's Law Dictionary (11th Ed. 2019)). Under this definition, Maduro and the Individual Defendants—who this Court determined were responsible for the kidnapping and torture of Mr. Marrón, and who were motivated by political concerns, that is, a reprisal for Mr. Marrón's criticism of Maduro and his regime—are terrorists.

Further, under TRIA § 201(d)(4), a "terrorist organization" is defined by reference to the definition in 8 U.S.C. § 212(a)(3)(B)(vi), which includes "a group of two or more individuals, whether organized or not which engages in, or has a subgroup which engages in" certain specified activities, *id.* § 212(a)(3)(B)(vi)(III), that include committing, inciting or soliciting funds for terrorist activity, *id.* § 212(a)(3)(B)(iv), which "terrorist activity" in turn includes, *inter alia*, any act of torture under 18 U.S.C. § 2340, *id.* § 212(a)(3)(E)(iii)(I). The Cartel is a "terrorist organization" under the foregoing definition because it is "a group of two or more persons," that is responsible for the torture of Mr. Marrón. *See Albán v. Maduro*, 1:21-cv-20706, ECF No. 110 at 5 (holding that under TRIA § 201, the Cartel is a terrorist organization engaged in terrorist

activity, based upon the Cartel's torture of plaintiff in that case, Mr. Albán, among other statutory violations).

**B. Second Element of TRIA § 201:  The Unsatisfied Amount of Plaintiffs' Judgment Does Not Exceed the Value of the Blocked Assets.**

The entire principal amount of Plaintiffs' judgment, *i.e.*, $153,843,976, is currently unsatisfied.   The assets in the Perdomo Account are approximately $3.062 million.  The estimated value of Perdomo Property appears to be under $1 million.

| Blocked Property | Estimated value[2] |
|---|---|
| 4100 Salzedo Street, Unit 804, Coral Gables, FL | $670,100 |

Accordingly, the value of the blocked assets does not exceed the unsatisfied amount of the judgment.

**C. Third Element of TRIA § 201: The Assets at Issue Are the Blocked Property of Perdomo.**

The OFAC has designated Perdomo as well as other individuals and entities for providing support to the corrupt and illegitimate Maduro regime.  It has also designated and blocked several high-level Cartel of the Suns members, including Nicolas Maduro Moros; Diosdado Cabello Rondon; Nestor Luis Reverol Torres; Hugo Armando Carvajal Barrios; and Tareck Zaidan El Aissami Maddah.  OFAC blocks property owned by (1) a designated individual, (2) a designated entity, or (3) an entity in which a blocked person or persons have 50% or greater interest.

On January 8, 2019, OFAC designated and blocked individuals and entities "involved in a significant corruption scheme designed to take advantage of Venezuela's currency exchange practices, generating more than $2.4 billion in corrupt proceeds," pursuant to Executive Order 13850.   Farah at ¶ 26.   These designated entities include Perdomo and his Florida-based

---

[2] Zillow.com (last visited June 25, 2025).

5

companies, including Magus Holding LLC and Magus II Holding LLC. *Id.*[3]  Perdomo and his companies remain designated and blocked by OFAC.[4]  And Perdomo, through Magus Holding LLC, owns 4100 Salzedo Street, Unit 804, Coral Gables, Florida,[5] and through Magus II Holding LLC owns account at Professional Bank.[6]  Professional Bank has since been acquired by Seacoast Bank.[7]

### D. Fourth Element of TRIA § 201: Perdomo Is an Instrumentality of the Cartel, Maduro and the Individual Defendants.

Although TRIA does not define "instrumentality," the Eleventh Circuit has endorsed a broad definition: an "instrumentality" includes any party that provided material support to a terrorist party at any point in time, whether financial, technological, or the provision of goods or services. *See Stansell V*, 45 F.4th at 1350 (quoting *Stansell II*, 771 F.3d at 724 n.6); *Marrón*, 2023 WL 6356969, at *13 ("A third party who provides material support to a terrorist at any point in time constitutes an agency or instrumentality, even if they purportedly stopped aiding the

---

[3]  *See also* Exhibit 1 (results of OFAC Sanctions List Search, https://sanctionssearch.ofac.treas.gov/, listing Magus Holding LLC as "Linked To: PERDOMO ROSALES, Gustavo Adolfo."

[4] *See* footnote 1, *supra.*

[5]  *See* Exhibit 2 (results of search website of Miami-Dade Property Appraiser, https://www.miamidade.gov/Apps/PA/PropertySearch/#/) (showing that Magus Holding LLC owns 4100 Salzedo Street, Unit 804, Coral Gables, Florida).

[6] *See Caballero v. FARC*, ECF No. 276 (Interested Parties, Magnus Holding II Corp. and RIM Group Investment Corp.'s Memorandum of Points and Authorities In Support of the Motion to Dissolve, Vacate, and Quash Writ of Garnishment) (explaining that Professional Bank has account "in the name of Magus II containing $3.062 million"). Caballero subsequently voluntarily dismissed his writ as to the Professional Bank account pursuant to a settlement. *Id.,* ECF No. 472, at 2.

[7] Press Release, Seacoast Completes Acquisition of Professional Holding Corp. ("Seacoast Banking Corporation of Florida (NASDAQ: SBCF) . . . the holding company for Seacoast National Bank, announced today the completion of its acquisition of Professional Holding Corp. ("Professional") (NASDAQ: PFHD), parent company of Professional Bank, effective January 31, 2023") https://www.seacoastbank.com/newsroom/seacoast-completes-acquisition-of-professional-holding-corp.

terrorist."). In *Stansell II*, where the plaintiffs sued the narco-terrorist organization FARC under the federal ATA, 18 U.S.C. § 2333, the Eleventh Circuit approved the district court's defining an "agency or instrumentality" as any party that:

> "is or was ever involved" in any aspect of the [the defendant's] trafficking operations or that assisted with the [the defendant's] "financial or money laundering network" because it "was either (1) materially assisting in, or providing financial or technological support for or to, or providing goods or services in support" of, the [defendant's] international narcotics trafficking activities; and/or (2) "owned, controlled, or directed by, or acting for or on behalf of" the [the defendant]; and/or (3) "playing a significant role in" the [the defendant's] narcotics trafficking.

771 F.3d at 724 n.6.

A third party need not be an agency or instrumentality of a terrorist party at the time that execution or garnishment is sought. *Id.* Neither "direct ties" nor knowledge is required to establish agency/instrumentality status. *See id.*, at 1351–55. Under the foregoing Eleventh Circuit definition, Perdomo is an instrumentality of the Maduro, the Cartel, and the other Judgment Debtors due to his involvement in an illegal currency exchange scheme, which directly benefited the Cartel of the Suns and the Maduro regime.

### a. OFAC's Designation of Perdomo for His Role in Currency Control Scams Confirms His Status as an Instrumentality for Maduro and the Other Judgment Debtors.

Because OFAC's determinations involve "the intersection of national security, foreign policy, and administrative law," the judiciary affords extraordinary deference to OFAC's determinations. *Islamic Am. Relief Agency v. Gonzales*, 477 F.3d 728, 734 (D.C. Cir. 2007). As the Eleventh Circuit explained in rejecting a party's challenge to an OFAC designation, the "decision of the OFAC is entitled to great deference, and should be reversed only if arbitrary and capricious." *De Cuellar v. Brady*, 881 F.2d 1561, 1565 (11th Cir. 1989). Consistent with these decisions, courts in this district—when presiding over terrorism victims' efforts to satisfy their judgments from the blocked property of instrumentalities of terrorists—agree to afford OFAC's

designations "great deference." *Stansell v. Revolutionary Armed Forces of Colom.*, 2019 WL 5291044, at *7 (S.D. Fla. Aug. 21, 2019) (Torres, J.), *R&R adopted*, 2019 WL 5290922 (S.D. Fla. Sept. 26, 2019) (Scola, J.).

In addition, as this Court has noted, a court's deference to the OFAC's determinations has never been limited by the *Chevron* doctrine and is not modified by the overturning of that decision. ECF No. 108, at 28 ("*Chevron* deference . . . applies to an agency's construction of a statute it administers, and not the agency's factual findings… Accordingly, the Court finds that the potential narrowing of *Chevron* would not necessarily translate into a lack of deference for an OFAC decision.") *citing Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837 (1984); *accord, e.g., Arevalo v. US. Atty-Gen.*, 872 F.3d 1l84, 1187-88 (11th Cir. 2017) (explaining that Chevron provides a framework for judicial review when a court reviews an agency's construction of the statute which it administers.). This Court's conclusions were both prescient and correct.

Last year, the Supreme Court did, in fact, overrule *Chevron*. *See Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024). In so doing, however, the Supreme Court was clear that, while in accordance with the Administrative Procedures Act (the "APA"), "courts decided legal questions by applying their own judgment", the APA "*does mandate* that judicial review of agency policymaking and factfinding be deferential." *Id.* at * 2261 (citing § 706(2)(E)) (emphasis in original). Specifically, "agency factfinding in formal proceedings [may be] set aside if 'unsupported by substantial evidence.'" *Id.* (quoting 5 U.S.C. § 706(2)(E)).

This deferential standard is the one that applies to OFAC determinations leading to the designation of any person—like Perdomo—as a specially designated national ("SDN"), *i.e.*, an OFAC sanctioned entity. *See Chichakli v. Trump*, 242 F. Supp. 3d 45, 51 (D.D.C.), *aff'd,* 714 F. App'x 1 (D.C. Cir. 2017) (describing how an OFAC factual determination that certain entities were

blocked due their affiliation to SDN would be reviewed under the "unsupported by substantial evidence" test); *see generally Stansell v. Revolutionary Armed Forces of Columbia (FARC)*, No. 8:09-CV-2308-T-26MAP, 2011 WL 13176221, at *1 (M.D. Fla. Dec. 5, 2011) (holding that OFAC's findings "deserve deference" and describing OFAC's sophisticated fact-finding process that often involves "consultations by OFAC with multiple law enforcement, intelligence agencies, and the military."). Accordingly, the Court should continue to afford heightened deference to OFAC's determinations on the questions of which entities are properly designated as SDNs subject to U.S. sanctions, and why.

On January 8, 2019, OFAC designated Perdomo as an SDN, subject to U.S. sanctions under the Venezuela sanctions program, and issued an accompanying Press Release titled "Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders." Farah at ¶ 24. The Press Release accompanying Perdomo's OFAC designation explains: "Today, the U.S. Department of the Treasury's Office of Foreign Assets Control (OFAC) sanctioned Venezuelan individuals and companies involved in a significant corruption scheme designed to take advantage of the Government of Venezuela's currency exchange practices, generating more than $2.4 billion in corrupt proceeds." *Id.*, at ¶ 22 (*quoting* Press Release, U.S. Dep't of Treasury, Treasury Targets Venezuela Currency Exchange Network Scheme Generating Billions of Dollars for Corrupt Regime Insiders (Jan. 8, 2019), available at https://home.treasury.gov/news/press-releases/sm583 (explaining that "Today's designations target individuals who took advantage of a corrupt system within the Venezuelan [Office the National Treasury ("ONT")], stealing billions of dollars from the Venezuelan people since 2008, under the watch of two Venezuelan National Treasurers, Alejandro Jose Andrade Cedeno (Andrade) and [Claudia Patricia Diaz Guillen].")). "Andrade was sentenced by the United States

District Court for the Southern District of Florida on November 27, 2018, to 10 years in prison for accepting over $1 billion in bribes for his role in the below scheme." Farah at ¶ 27.

Gorrin was one of two Venezuelan businesspersons known to have reaped massive profits when Andrade cut them in on the lucrative currency control scam: "While Andrade was National Treasurer, he awarded the ONT exchange business to a limited number of individuals, including [Gorrin] and Leonardo Gonzalez Dellan (Gonzalez)." *Id.*, at ¶ 25.

To get this opportunity to reap vast dirty profits, Gorrin and Perdomo paid massive bribes to Andrade. *Id.*, at ¶ 30. "In return for their selection as the only currency exchange houses approved by the ONT, Gorrin and Gonzalez, another Venezuelan businessman, paid hundreds of millions of dollars in bribes to Andrade. Andrade facilitated the continuation of the bribery scheme by introducing Gorrin to Andrade's successor, Diaz, when he left the ONT." *Id.*

More specifically, "Gorrin, Gonzalez, and Gorrin's brother-in-law and business partner, Gustavo Adolfo Perdomo Rosales (Perdomo), purchased assets and paid expenses for Andrade related to numerous aircraft and yachts, properties in the United States and abroad, multiple championship horses, and numerous high-end watches. The purchase of all of these goods and wiring of payments was hidden behind a sophisticated network of U.S. and foreign companies that hid the individuals' beneficial ownership." *Id.* at ¶ 31.

Andrade was prosecuted in federal court in Florida and pled guilty to money laundering and agreed to a forfeiture of $1 billion. *Id.*, at ¶ 32 (*citing United States v. Andrade*, 9:17-cr-80242-RLR (S.D. Fla. Jan. 4, 2018), ECF No. 9, at 1-11 (Plea Agreement)). Andrade agreed to a factual proffer that confirmed that "Defendant [Andrade] agreed to accept bribes from co-conspirators [such as Gorrin and Perdomo] in exchange for selecting them to carry out the U.S. dollar to bolivar exchange process with the ONT, which allowed those co-conspirators to obtain

substantial profits on the exchange transactions.  The co-conspirators agreed to bribe the Defendant in order to secure improper advantages from the Defendant and secure additional profits in the business deals."  Farah at ¶ 32 (*quoting Andrade*, 9:17-cr-80242-RLR, ECF No. 9, at 12-15).

OFAC designated Perdomo under the Venezuela sanctions program because he played a central role in Venezuelan regime-sponsored currency control schemes, siphoning off hundreds of millions, if not billions, of dollars from the Venezuelan state treasury in so doing.  Farah at ¶ 20.  Through those currency control scams, Perdomo  provided material support to the Judgment Debtors in at least three ways: (1) the currency control scams that Perdomo supported were integral to the Cartel of the Sun's laundering of the proceeds of narcotics trafficking; (2) the currency control scams that Perdomo supported provided loot that the Maduro regime doled out to maintain its grip on authoritarian power in Venezuela, which in turn allowed the regime to commit crimes including terrorism with impunity; and (3) Venezuela currency control scams personally enriched Individual Defendants Maduro, Moreno Perez, and El Aissami.  *Id.* ¶ 18.

### i. Perdomo and Gorrin were co-conspirators in Venezuelan currency scams.

On October 23, 2024, the United States indicted Gorrin for conspiracy to commit money laundering, with numerous co-conspirators, including Perdomo.  *See United States v. Gorrin*, 24-cr-20468 (S.D. Fla.), at ECF No. 1 ("Gorrin Indictment").  In the Gorrin Indictment, Perdomo is identified as "Conspirator 5 . . . a Venezuelan national and business partner and close relative of **RAUL GORRIN BELISARIO**."  Farah ¶ 33 (citing Gorrin Indictment at 2, ¶ 10).  The Gorrin Indictment explains that Gorrin and Perdomo: shared asset managers and bankers, owned, organized and/or controlled shell companies together; utilized the same directors for those shell companies; and utilized the same Swiss financial institutions to assist their money laundering.  Farah ¶ 34 (citing Gorrin Indictment at 4-5).

The United States alleges that Gorrin conspired with Perdomo and others, including senior executives at PDVSA (the Venezuelan state oil company, which this Court has determined is an agency or instrumentality of the Judgment Debtors), to launder the proceeds of currency scams. Farah ¶ 35. The indictment sets forth that Gorrin bribed PDVSA officials "in exchange for the approval of foreign loan exchange contracts with Venezuela's state-owned oil entity, PDVSA." Farah ¶ 36 (citing Gorrin Indictmebt at 7). "Through these loan contacts, **RAUL GORRIN BELISARIO** and his co-conspirators sought to exploit the Republic of Venezuela's fixed foreign currency exchange rate, which valued the Venezuelan bolívar artificially high compared to rate available on the open market." *Id.* For example, "under the guise of one such loan contract, PDVSA paid . . . the equivalent of $600 for a loan of Venezuela bolivars worth only about $50 million on the open market, resulting in profits worth approximately $550 million." *Id.* The indictment explains that the co-conspirators used the corrupt proceeds to pay bribes and the co-conspirators then laundered the profits they distributed among themselves. *Id.*

### ii. Venezuelan currency control scams personally enriched Individual Defendants Maduro, Moreno Perez, and El Aissami.

The currency manipulation in which Perdomo participated could only be possible through and with the direct support of the most senior government officials, who set the exchange rates that were manipulated. Farah at ¶ 37. Ultimately, such government officials serve at the pleasure of Maduro (and before him, Hugo Chavez), and as such, the currency control schemes discussed herein occur only because those schemes are sanctioned by, and ultimately benefit, Maduro in his personal capacity. *Id.*

To begin, Maduro personally profited from Venezuelan currency control schemes involving PDVSA. *Id., at ¶ 38.* Of the proceeds (in excess of $500 million) of the Venezuela currency scam for which Gorrin was indicted, Gorrin and Perdomo "sought the assistance of their personal banker,

Krull, in moving approximately $200 million for the benefit of" Maduro's stepsons, known as "Los Chamos." *Id.,* at ¶ 40 (citing Gorrin Indictment at 12). Although Los Chamos were nominally the recipients of the funds, the money (or at least the vast majority of it) would have been transferred to their mother, the First Lady of Venezuela, for Maduro's ultimately disposition. *Id.*

Defendant Moreno Perez also personally profited from Venezuela currency control schemes. For example, he received a "a luxurious residence in the Alto Hatillo area in Caracas . . . from an individual charged in the United States with a multibillion dollar fraud scheme." *Id.,* at ¶ 41 (quoting *United States v. Moreno Perez*, 20-cr-2407 (S.D. Fla.), at D.E. 1, Affidavit of Shauna L. Willard, Special Agent, Homeland Security Investigations ("Willard Affidavit"), ¶ 20). Defendant Moreno Perez similarly received $3 million in bribes from Gorrin, who worked hand-in-glove with Perdomo to perpetrate the currency control scams. Farah at ¶ 42 (citing Willard Affidavit, ¶ 10).

Defendant El Aissami—who has fallen out of favor with the Maduro regime in recent years—also has been accused of engaging in currency manipulation schemes. Farah at ¶ 43. Moreover, when the regime accused El Aissami, one of its most senior leaders, of this misconduct it is because he had not shared the wealth generated with other officials in a way that had been previously established. Farah at ¶ 44. For the leadership of Maduro's regime, the crime was not the currency manipulation but their assessment that they were not getting their "fair share" of the payoffs that had previously been agreed to collectively. *Id.*

     **iii.** **The currency control scams that Perdomo supported provided loot that Maduro doled out to maintain his grip on authoritarian power in Venezuela, which in turn allowed him to commit crimes including terrorism with impunity.**

The currency control schemes that Perdomo supported played a significant role in propping up the economically troubled Maduro regime.  Farah at ¶ 45.  Currency conversion schemes have been one of Maduro's most successful techniques for siphoning funds from the Venezuelan treasury into insiders' pockets as the legal economy, particularly the oil sector, withers.  *Id.*  The total amount that criminals reaped from these currency scams have been estimated to be in the tens of billions.  *Id.* [still in para. 41] (*citing* Venezuela Investigative Unit, *How Criminal Opportunists Exploit Venezuela's Currency Controls*, Insight Crime (June 16, 2015), available at https://insightcrime.org/news/analysis/how-criminal-opportunists-exploit-venezuela-currency-controls/).

Through earnings from currency conversion scams (as well as narcotics trafficking and other crimes), Maduro purchases the loyalty of  his senior leaders   and   loyalists, thereby, cementing his authoritarian control over Venezuela.  Farah at ¶ 46.  Gorrin and Perdomo's bribes enriched numerous members of Maduro's inner circle, including Alejandro Andrade, Claudia Diaz Guillen, Adrian Velasquez, Hugo Carvajal, and Victor Aular.  *Id.*  "A key to Maduro's resilience has  been the loyalty he has retained among most Venezuelan security forces.  For years, military leaders and other officials have enriched themselves through corruption, drug trafficking, and other illicit industries."  *Id.* at ¶ 47, (*citing* Congressional Research Service, Venezuela, Background and U.S. Relations (April 28, 2021), at 5, available online at https://fas.org/sgp/crs/row/R44841.pdf).

In other words, corruption derived from siphoning off billions of dollars in state funds is the lifeblood of the Maduro regime and its ongoing grip on power despite international sanctions.

Farah at ¶ 48.  As the Congressional Research Service explains that the Cartel leaders "hang on because, in spite of Venezuela's economic implosion, they are still reaping millions."  *Id.* Maduro's grip on power in Venezuela, in turn, completes the circle, allowing Maduro and his cronies to commit crimes—such as raiding Venezuela's treasury—with impunity and without interference from legitimate law enforcement.  *Id.*, at ¶ 49.

Terrorism against individuals like the Plaintiffs in this case (such as Mr. Marrón and his family) fits into the same pattern.  Farah at ¶ 50.  Through acts of terrorism and human rights abuses, the Maduro regime, the Cartel of the Suns, and the Individual Defendants suppress opposition to their narcotics trafficking, public corruption, currency schemes, money laundering, and Maduro's authoritarian control of Venezuela.  *Id.*  And by retaining such income and power, Maduro, the Cartel and individual defendants remain positioned to continue to commit acts of terrorism and human rights abuses.  *Id.*

For the foregoing reasons, Raul Gorrin was and remains an instrumentality of Maduro, the Cartel, and the other Judgment Debtors.

* * *

As set forth above, each element of TRIA is satisfied.  Accordingly, writs of execution should issue for each of the foregoing property.

## CONCLUSION

For the foregoing reasons, a writ of execution should issue for the Perdomo Property and a writ of garnishment should issue for the Perdomo Account.  Proposed writs are attached as Exhibits 3 and 4 hereto.

15

Respectfully submitted on June 30, 2025.

/s/ Jaime D. Guttman
Jaime D. Guttman (Fla. Bar No. 44076)
jaime@scale.law
Scale Law Partners, LLC
777 Brickell Avenue, Suite 500
Miami, FL 33131
(786) 273-9033 (Main)

/s/ Alex C. Lakatos
Alex C. Lakatos (pro hac vice)
alakatos@mayerbrown.com
Mayer Brown LLP
1999 K Street NW
Washington, DC 20006
(202) 263-3000 (Main)

Counsel for Plaintiffs / Judgment Creditors

## CERTIFICATE OF SERVICE

I certify that I filed the foregoing document on June 30, 2025, through CM/ECF, which automatically and electronically delivered notice of filing to counsel of record for all parties that have appeared.

/s/ Jaime D. Guttman