**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO.: 1:21-cv-23190-FAM**

CARLOS EDUARDO MARRON,                                     JURY TRIAL DEMAND
MARIA MARRON, C.R., a minor, and
S.A., a minor,

        Plaintiffs,

vs.

NICOLAS MADURO MOROS,
FUERZAS ARMADA
REVOLUCIONARIAS DE COLUMBIA
("FARC"); THE CARTEL OF THE SUNS
A.K.A. CARTEL DE LOS SOLES;
VLADIMIR PADRINO LOPEZ; MAIKEL
JOSE MORENO PEREZ; NESTOR LUIS
REVEROL TORRES; TAREK WILLIAM
SAAB, and TARECK EL AISSAMI,

        Defendants.

_____/

**INTERESTED PARTIES' OMNIBUS MOTION TO DISSOLVE, VACATE, AND
QUASH WRITS OF GARNISHMENT AND WRITS OF EXECUTION AND RESPONSE
IN OPPOSITION TO MOTIONS FOR WRITS OF GARNISHMENT AND EXECUTION**

      Raul Gorrin Belisario ("Gorrin"), Gustavo Perdomo de Rosales ("Perdomo"), RIM Group

Investments Corp., RIM Group Investments I Corp., RIM Group Investments II Corp., RIM Group

Investments III, Corp., Magus Holding LLC, Magus Holding II Corp., and RIM Group

Investments I Corp. (the "Interested Parties"), hereby move this Court pursuant to Fla. Stat. §§

77.07, 77.041, and applicable law to dissolve, quash, or otherwise vacate the writs of garnishment

and execution improvidently issued by the Clerk of Court upon the motions of Plaintiffs Carlos

Eduardo Marron, Maria Marron, C.R., and S.A. (the "Plaintiffs"). *See* ECF Nos. 319, 323-328,

336-337 (the "Writs"). The Interested Parties additionally respond in opposition to Plaintiffs'

Motions for Writ of Garnishment and Motions for Writs of Execution. *See* ECF Nos. 318, 322,

334 (the "Motions for Writs"), which seek to execute against the Interested Parties' properties

pursuant to Section 201 of the Terrorism Risk Insurance Act of 2002, Pub. L. No. 107–297, § 201(a), 116 Stat. 2322, 2337 ("TRIA").

## PROCEDURAL BACKGROUND

Plaintiffs' motions for writs of execution and garnishment are premised on a demonstrably false assertion: that Gorrin and Perdomo have been deemed "agencies or instrumentalities" of terrorists by courts "around the country" including "[o]ther courts in this District."  *See* ECF No. 318 at 3, 9; ECF No. 322 at 3, 9; ECF No. 334 at 3. That is categorically untrue. In the only case where this issue was actually litigated—*Caballero v. FARC*, Case No. 1:18-cv-25337-KMM (S.D. Fla.)—the court granted summary judgment in favor of the Interested Parties, holding there was no admissible evidence that they laundered money for Nicolás Maduro, his family members, or for the benefit of the FARC. *See  Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2023 WL 5437222, at *6 (S.D. Fla. Aug. 21, 2023) ("no facts suggest that Gorrin and Perdomo money launder for Maduro and his family members, or for the benefit of the FARC."). The final judgment, which dismissed all claims with prejudice, is entitled to preclusive effect under fundamental principles of res judicata.

Instead of acknowledging that outcome, Plaintiffs misrepresent *Caballero* as a case that supports their position that Gorrin and Perdomo are an "agency or instrumentality" ("A/I") of a terrorist party. *See* ECF No. 318 at 3, 9; ECF No. 322 at 3, 9; ECF No. 334 at 3. They go so far as to cite the declaration of John McBrien, an "expert" so lacking in credibility that Caballero withdrew him from the case entirely. McBrien's opinions were never admitted under *Daubert*, and his testimony played no role in the *Caballero* decision—indeed, the case was resolved in the Interested Parties' favor because all of Caballero's proffered experts failed to raise a triable issue of fact.

The procedural history of *Caballero* underscores the Plaintiffs' distortions. Caballero first obtained an *ex parte*, under-seal A/I finding. He thereafter moved for writs of execution and garnishment—again under seal—concealing these proceedings from the Interested Parties. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2023 WL 187685, at *8 (S.D. Fla. Jan. 15, 2023)

("Plaintiff's counsel relied on a mistakenly sealed order to conceal the agency and instrumentality proceedings from counsel for the Interested Parties"). At a U.S. Marshals' sale – without notice to the Interested Parties – Caballero sold a property located on Fisher Island and a property located on Collins Avenue to himself using credit bids on his default judgment. *Id.* at *3 ("without any hearing on the matter, the Properties were sold by Plaintiff at a USMS sale on November 8, 2022"). After an emergency hearing, Judge Moore adopted the R&R of Judge Becerra,[1] finding that the Interested Parties had a constitutional right to challenge the A/I allegation, restraining Caballero from disposing of the properties, and entering a scheduling order on the agency or instrumentality determination. *See id.* at *10.

Following discovery, Judge Moore granted summary judgment in favor of the Interested Parties. *See Caballero*, 2023 WL 5437222, at *12; *see also Caballero v. Gonzalez*, No. 23-14051, 2025 WL 1768819, at *2 (11th Cir. June 26, 2025) ("They moved to vacate the agency or instrumentality finding, and later moved for summary judgment . . . . On August 21, 2023, the district court agreed and entered summary judgment for Gorrin and Perdomo, explaining that Caballero's 'daisy chain style of argument' was too attenuated"). Judge Moore ordered all writs vacated *nunc pro tunc* and directed Caballero to reconvey the properties. *Caballero v. FARC*, No. 1:18-CV-25337-KMM (S.D. Fla. Aug. 28, 2023), ECF No. 439. After Caballero moved for an emergency stay, Judge Moore entered an amended final judgment that left intact the dismissal with prejudice but deferred reconveyance of the properties pending appeal. *Caballero v. FARC*, No. 1:18-CV-25337-KMM (S.D. Fla. Sept. 1, 2023), ECF No. 440.

Meanwhile, due to mounting association fees that went unpaid for years, the Fisher Island and Collins Avenue properties faced foreclosure so Judge Moore approved private sales to preserve equity and prevent the ongoing dissipation. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM (S.D. Fla. Apr. 23, 2024 and Aug. 20, 2024), ECF Nos. 411, 421.[2]

---

[1] *Caballero v. Fuerzas Armadas Revolucionarios de Colombia*, No. 1:18-CV-25337-KMM, 2022 WL 18664563, (S.D. Fla. Dec. 10, 2022).
[2] Caballero then filed a petition for writ of mandamus, which the Eleventh Circuit denied. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, ECF No. 432-5.

Unfortunately, when it came time to close on the Fisher Island property, the private buyer was unable to obtain title insurance due to the pendency of Caballero's appeal and, as a result, the property faced a looming state court foreclosure sale scheduled for April 15, 2025, based on unpaid assessments owed to the Fisher Island condominium association. *Caballero v. FARC*, No. 1:18-CV-25337-KMM (S.D. Fla. Sept. 1, 2023), ECF No. 448 at 3.

To avoid the proverbial "fire sale" at a price many millions of dollars below the previously negotiated private purchase offer, the buyer agreed to pay off the condominium association's fees and cancel the foreclosure sale—but only on the condition that the Interested Parties reach a settlement with Caballero that would result in dismissal of all appeals with prejudice so that the buyer could obtain title insurance. *Id.* The Interested Parties accordingly had no choice but to enter into a Joint Notice of Global and Final Resolution and Joint Motion for Court Approval, which acknowledged that the "Buyer has not closed on the purchase of the Fisher Island Property due to Caballero's appeal," and further stated that the "Buyer has represented [to the Interested Parties] that upon the filing of th[e] Joint Notice, the Buyer will: (i) timely make the payments necessary to cancel the Foreclosure Sale of the Fisher Island Property; and (ii) close on the purchase of the Fisher Island Property on or before April 30, 2025." *Id.*

After a brief extension of the closing deadline, the sale of the Fisher Island property was consummated. Pursuant to the agreement, Caballero received $6 million from the sale proceeds. *Caballero v. FARC*, No. 1:18-CV-25337-KMM, (S.D. Fla. May 23, 2025), ECF No. 469. The remainder of the proceeds was to be transferred to D.E. Wilson, Jr., the holder of the applicable OFAC license. *See id.* Mr. Wilson is authorized by OFAC to "represent[] the Properties in litigation and other forms of dispute resolution, owned by Raul Belisario Gorrin and Gustavo Perdomo . . . including but not limited to, acting as legal representative for the Properties," and he authorized the undersigned counsel to defend the Caballero litigation. *See* Declaration of Ed Wilson ("Wilson Decl."), attached as Exhibit 3, at ¶ 9.[3]

---

[3] Mr. Wilson is a former Acting General Counsel, Deputy General Counsel, and Deputy Assistant Secretary for Management of the U.S. Department of the Treasury, he served as Associate Counsel

Consistent with the terms of the global resolution, Judge Moore entered an order on June 12, 2024, dismissing Caballero's claims with prejudice. *Caballero v. FARC*, No. 1:18-CV-25337-KMM, (S.D. Fla. June 12, 2025), ECF No. 474.

On June 9, 2025—after witnessing that Caballero had extracted $6 million from the Interested Parties by capitalizing on a foreclosure crisis on the unlawfully acquired Fisher Island property—the Plaintiffs rushed into the fray. Seizing on the same pool of OFAC-licensed assets, they filed their Motion for Writ of Garnishment directed at D.E. Wilson, Jr., Lankford & Reed PLLC, and the Clerk of Court., falsely asserting that "other courts" had found Gorrin to be an A/I and specifically citing the *Caballero* case. *See* ECF No. 318 at 3, 9. That same day, they obtained a writ of garnishment—without any A/I determination, *ex parte* or otherwise—and purportedly attempted to serve Mr. Wilson's firm with the writ of garnishment. They followed with a Motion for Writ of Execution on June 20, 2025 targeting Gorrin's Florida real estate (ECF No. 322), and on June 30, 2025, moved for additional writs against Perdomo and his properties (ECF No. 334). None of these motions were supported by a judicial A/I finding.

For all of the reasons set forth herein, the Writs must be vacated and Plaintiffs' Motions for Writs denied in full.

## SUMMARY OF THE ARGUMENT

The Writs at issue were all obtained without any judicial approval or a finding that the Interested Parties are an A/I of any terrorist party. The properties targeted by the Writs are all subject to an OFAC license rendering them immune from execution under TRIA. There was and still is no legal basis for the writs to have issued. The writs should be dissolved, quashed, or otherwise vacated and Plaintiffs' pending Motions for Writs should be denied, for all of the reasons set forth herein, including at least the following five reasons:

*First*, the Eleventh Circuit has squarely held that before a writ of garnishment or writ of execution may issue under TRIA, the court must make an express finding that the property owner

---

to the President, and he at one time served as Acting Director of OFAC under Treasury Secretary James A. Baker III. *See* Wilson Decl. at ¶ 4.

is an A/I of a terrorist party. *See Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 729 (11th Cir. 2014) ("***Before*** a writ of garnishment or execution pursuant to TRIA § 201 issues, a district court ***must*** determine that the property owner is a SDNT designated under TWEA or the IEEPA and is an agency or instrumentality of the judgment debtor terrorist party.") (emphasis added); *see also id.* at 723 (Plaintiffs "must establish that the purported agency or instrumentality is actually an agency or instrumentality."). Plaintiffs improperly bypassed that threshold requirement—obtaining writs through ministerial action by the Clerk of Court,[4] without any court order or judicial findings and in contravention of binding precedent. Because the writs were issued by the Clerk of Court without any agency or instrumentality determination, they are a legal nullity.

Second, in an effort to obtain an end run around the "agency or instrumentality" requirement, Plaintiffs falsely assert to this Court that "federal courts around the country" and "[o]ther courts in this District" have held that Gorrin and Perdomo are A/Is. *See* ECF No. 318 at 3, 9; ECF No. 322 at 3, 9; ECF No. 334 at 3. That is demonstrably untrue. Plaintiffs cite four cases in support of this material misrepresentation: (1) *Caballero v. FARC*, 1:18-cv-25337, ECF No. 151; (2) *Stansell v. FARC*, 1:19-cv-20896, ECF No. 22; (3) *Pescatore v. FARC*, 1:19-cv-20811, ECF No. 11; and (4) *Caballero v. FARC*, Case No., 1:20-mc-00249-PAC (S.D.N.Y. 2022), ECF No. 93. The *Stansell* and *Pescatore* orders do not mention Gorrin or Perdomo at all, nor are they implicated in those cases whatsoever. Plaintiffs' claim is not merely misleading—it is false.

Plaintiffs also cite the 2022 *ex parte* A/I finding in the *Caballero* case but omit that Judge Moore later granted summary judgment in favor of Gorrin and Perdomo. Despite prevailing and defeating the false allegations of A/I status, Plaintiffs misrepresent the *Caballero* case as

---

[4] The Clerk of Court likely did not appreciate that, "[a]lthough the procedure for a writ of execution is automatic under Florida law," nevertheless, "[t]he considerations are different where, as here, Plaintiffs seek to recover against real property owned by an [alleged] agent of the Defendants, who presumably was not on notice as to the judgment." *Marron v. Moros*, 21-23190-CIV, 2023 WL 6356969, at *4 (S.D. Fla. Sept. 29, 2023). The Clerk of Court later explained that at least one of the writs was a "Writ Issued in Error," showing that the issuance was ministerial and not deliberative. ECF No. 333.

supporting the very proposition it rejected. Plaintiffs' reliance on false citations underscores the absence of any valid legal basis for garnishment or execution and compels immediate vacatur of the improvidently issued writs.[5]

*Third*, all of the property at issue is subject to a license issued by the Secretary of the Treasury, on behalf of the Department of the Treasury's Office of Foreign Asset Control ("OFAC") to D.E. Wilson, Jr. and his firm Lankford & Reed PLLC. Wilson Decl. ¶ 9. The "blocked assets" against which judgment holders can execute under TRIA are narrowly defined as "any assets seized or frozen by the United States." TRIA, § 201(d)(2). "TRIA is clear that only blocked assets are subject to execution and assets that are subject to a United States license do not qualify as blocked assets." *Marron v. Moros*, 21-23190-CIV, 2023 WL 3619308, at *4 (S.D. Fla. May 24, 2023). Courts uniformly hold that OFAC-licensed property as a matter of law is not "seized or frozen" by the U.S. and, therefore, is not "blocked" or subject to execution pursuant to TRIA. *See, e.g., Est. of Levin v. Wells Fargo Bank, N.A.*, No. CV 21-420 (JEB), 2023 WL 3750577, at *5 (D.D.C. June 1, 2023) (citing Second, Fifth, and Seventh Circuits). The license issued to Mr. Wilson grants him authority to manage the blocked properties and expressly authorizes him to "in the ordinary course of business decide to sell the Properties." Wilson Decl. ¶ 10. He is actively endeavoring to sell some of the licensed real estate to preserve the value of OFAC's bargaining position with Gorrin and Perdomo and avoid the continued accrual of taxes, condominium association fees, and maintenance costs (*id.*) —exactly the kind of dissipation Judge Moore found detrimental in Caballero. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, 2024 WL 5681471, at *2 (S.D. Fla. Aug. 20, 2024).

In addition, shortly before Plaintiffs sought the writ of garnishment directed to Mr. Wilson and his law firm, Mr. Wilson sold the licensed property on Fisher Island, resulting in the receipt

---

[5] Plaintiffs also mischaracterize the Caballero action in the Southern District of New York, which merely registered Caballero's default judgment against the FARC and adopted Judge Moore's now-overturned *ex parte* A/I finding; after Gorrin and Perdomo intervened, the case was stayed, and all claims against them were dismissed with prejudice. *See* 1:20-mc-00249-PAC (S.D.N.Y.), ECF Nos. 1, 87, 89, 95, 106, 161.

of $7,529,072.09. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, ECF No. 469. Mr. Wilson is also set to receive from the Clerk of Court an additional $4,201,543.87 from the sale of a licensed property on Collins Avenue. *See id.* at ECF No. 477. Pursuant to the OFAC license, he is authorized to use those proceeds to pay outstanding "expenses, costs, legal, administrative and other fees that [we]re necessary and incident to the sale" before placing the "remainder" in a "blocked account." Wilson Decl., ¶ 10. Meanwhile, Plaintiffs obtained a writ of garnishment directed to Mr. Wilson and his law firm, Lankford & Reed, PLLC. Wilson Decl. ¶ 10.

The writ of garnishment undermines the license's operation by obstructing access to the OFAC-licensed sale proceeds from which expenses, costs, and fees needed to sell the properties and are to be paid. Accordingly, the writ should be vacated. Once fees and expenses are paid and the "remainder" of the sale proceeds are "placed into a blocked account," Wilson Decl. ¶ 10, Plaintiffs may then file a "renewed TRIA claim" and "move for a writ of garnishment as to the remaining funds," consistent with this Court's ruling in *Marron v. Moros*, 2023 WL 3619308, at *6-7.[6] But, at this juncture, the writ of garnishment must be vacated. Likewise, the writs of execution must be vacated: the properties remain under the control of a specific license that authorizes their management and sale, and Mr. Wilson is actively working to sell them—precisely to avoid further dissipation and in compliance with the license's terms.

*Fourth*, the Court has pending before it not only the improvidently issued Writs (ECF Nos. 319, 323-328, 336-337) that are due to be vacated, but also the Motions for Writs (ECF Nos. 318, 322, & 344). Those motions must be denied because Plaintiffs must first prove A/I status before this case reaches a post-judgment posture that permits the filing of motions for writs of execution or garnishment. *See Caballero v. Fuerzas Armadas Revolucionarios de Colombia*, 1:18-CV-25337-KMM, 2023 WL 4363886, at *5 (S.D. Fla. June 28, 2023) ("[A]t the agency and instrumentality stage of the litigation, where the Interested Parties are merely defending against

---

[6] The Interested Parties maintain that even after the remainder is deposited into a blocked account, the funds will remain subject to the specific license and will not be blocked for purposes of TRIA execution.

their designation as agencies or instrumentalities of FARC, this is not a postjudgment execution proceeding as to the Interested Parties."). That requires either bringing a separate declaratory judgment action against the Interested Parties or initiating proceedings supplementary, issuing notices to appear, and impleading the Interested Parties. *See Jackson-Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1137-38 (11th Cir. 2013). Plaintiffs should therefore at least be required to commence proceedings supplementary, add the Interested Parties to this lawsuit, and obtain a judgment determining them to be an "agency or instrumentality" consistent with due process, prior to filing motions for writs of execution or garnishment.

*Fifth*, even if the Court were to allow the agency or instrumentality determination to proceed *via* these motions for writs of execution and garnishment, (and it ought not), Plaintiffs have failed to proffer admissible evidence sufficient to set forth a *prima facie* case that either Gorrin or Perdomo is an "agency or instrumentality" of any terrorist party. The motions merely rehash the same innuendo rejected by Judge Moore after years of litigation in the *Caballero* case. The sole "evidence" Plaintiffs proffer is not admissible documentary evidence or fact witness testimony but instead an inadmissible "expert opinion" contained in the declarations of the journalist Douglas C. Farah. *See* ECF Nos. 318-1, 334-1 at ¶¶ 13-15, 17 (the "Farah Declarations") (repeatedly referring to "opinions" and noting that the declaration is "to provide the expert opinion that" Gorrin and Perdomo are an "an agency or instrumentality of Maduro, the Cartel, and the Individual Defendants"). The Farah Declarations rest entirely on uncorroborated conjecture, multiple degrees of separation, inference chains, and inadmissible hearsay, and altogether lack any credible or reliable evidentiary foundation. Because the Farah Declarations—even if deemed admissible—fail to prove that the Interested Parties are an A/I of any terrorist party, the Motions for Writs should be denied outright. But if the Court believes the Farah Declarations are sufficient to warrant commencing an A/I proceeding, it must first exercise *Daubert*'s threshold gatekeeping function, including by affording the Interested Parties the opportunity to conduct expert discovery as to Mr. Farah and file an appropriate *Daubert* motion. This approach would spare both the Court

and the Interested Parties from needless expenditure of resources on a proceeding that should never begin at all if predicated upon an unreliable and inadmissible expert opinion.

Finally, if the Court is to allow any "agency or instrumentality" proceedings to move forward, it should deny the Plaintiffs' Motions for Writs, and instead issue a scheduling order setting the matter for a a jury trial on the "agency or instrumentality" determination. *See Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 1:18-CV-25337-KMM, 2023 WL 187685, at *10 (S.D. Fla. Jan. 15, 2023) ("the Interested Parties are entitled to—and due process requires— an opportunity to be heard in this matter . . . . By separate order, the Court will issue a scheduling order regarding the Motion to Vacate."); *Caballero v. Fuerzas Armadas Revolucionarias de Colombia*, No. 1:18-CV-25337-KMM, ECF No. 216  (S.D. Fla. Jan. 27, 2023) (scheduling trial on "trial on the issue of agency and instrumentality determination"). The Interested Parties deny the allegations that they are an "agency or instrumentality" of any terrorist as detailed in the Declaration of Gorrin (Exhibit 1) ("Gorrin Decl.") and the Declaration of Perdomo (Exhibit 2) ("Perdomo Decl.").

As in any case in which the defending parties appear and deny the allegations against them, they are the entitled to a full and fair opportunity to defend themselves—especially against allegations as serious as those related to terrorism. Accordingly, even if the Court is inclined to allow the Plaintiffs' "agency or instrumentality" claim to proceed at some stage, the Interested Parties respectfully request that the Court ensure they are afforded due process by issuing a scheduling order setting a jury trial on the "agency or instrumentality" determination.

<u>**ARGUMENT**</u>

I.   **The Writs Should Be Vacated Because They Are Legal Nullities.**

   A.  **The Writs Should Be Vacated Because They Issued Prior to an A/I Determination.**

The Eleventh Circuit has squarely held that before a writ of garnishment or writ of execution may issue under TRIA, the Court must make an express finding that the property owner is an A/I of a terrorist party. *See Stansell*, 771 F.3d at 729 ("*Before* a writ of garnishment or execution pursuant to TRIA § 201 issues, a district court *must* determine that the property owner .

. . is an agency or instrumentality of the judgment debtor terrorist party" (emphasis added) ); *id.* at 723 (Plaintiffs "must establish that the purported agency or instrumentality is actually an agency or instrumentality."). "Because Claimants [a]re entitled to the basic constitutional protection of due process, they [a]re entitled to be heard on their challenge to the agency or instrumentality issue." *Id.* at 727. "Without notice and a fair hearing where both sides are permitted to present evidence, the third party never has an opportunity to dispute its classification as an agency or instrumentality." *Id.*

There can be no execution or garnishment until Plaintiffs prove agency or instrumentality status. *See Caballero*, 2023 WL 4363886, at *5. ("[A]t the agency and instrumentality stage of the litigation, where the Interested Parties are merely defending against their designation as agencies or instrumentalities of FARC, this is not a postjudgment execution proceeding as to the Interested Parties.").

This Court has made it very clear that it does not "do things ex parte as much as possible," stating without ambiguity, "I don't do things ex parte. I don't do things sealed. I just don't . . . . I will not issue the writ until I get some response." ECF No. 68 at 5:14-15, 19:2-21:2. Because the writs issued prior to any A/I determination or any response, violating controlling law and this Court's procedures which were very clearly conveyed to Plaintiffs, the writs should be immediately vacated and declared a legal nullity.

### B.   The Writs Should Be Vacated Because They Target OFAC-Licensed Property.

Because the properties at issue are subject to the OFAC license issued to Mr. Wilson and his law firm, Wilson Decl. ¶¶ 8-10, and because "TRIA is clear that only blocked assets are subject to execution and assets that are subject to a United States license do not qualify as blocked assets," *Marron*, 2023 WL 3619308, at *4, the writs should be immediately vacated and declared null and void.

#### 1.   The OFAC License Issued to Mr. Wilson and Lankford & Reed PLLC Removes The Properties from TRIA's Definition of Blocked Assets.

TRIA narrowly defines the "blocked assets" against which judgment holders can execute as "any assets seized or frozen by the United States." TRIA § 201(d)(2). In the seminal case of *Weinstein v. Iran*, 299 F. Supp. 2d 63 (S.D.N.Y. 2004), Judge Wexler labeled TRIA's "seized or frozen by the United States" language a "limitation that th[e] Court cannot ignore" and defined "seized" property as that taken into possession by the government, and "frozen" property as that for which no transaction of any kind is prohibited. *Id.* at *75; *accord Martinez v. Republic of Cuba*, No. 10-22095-CIV, 2011 WL 13115432, at *7 (S.D. Fla. June 27, 2011). Courts uniformly hold that OFAC-licensed property is not seized or frozen by the United States and thus is not a "blocked asset[]" subject to execution within the meaning of TRIA. *See, e.g., Levin*, 2023 WL 3750577, at *5 (collecting cases).

This Court applied this same analysis in *Martinez v. Republic of Cuba*, No. 10-22095-CIV-FAM, 2011 WL 13115471, at *1 (S.D. Fla. Aug. 26, 2011). In *Martinez*, this Court found that TRIA did not "authorize[] garnishment" because the property was OFAC licensed and, therefore, the "writs of garnishment [were] null and void," (*id.*), adopting Judge Torres' legal determination that "OFAC [had] licensed Garnishees to provide travel services to Cuba and make payments associated therewith," and thus "[t]he assets . . . [were] not subject to an across-the-board prohibition on transfer" and "ha[d] not been seized or frozen by the United States for purposes of the TRIA and therefore [we]re not 'blocked.'" *Martinez*, 2011 WL 13115432, at *7.

The specific license at issue authorizes management and maintenance of the properties that the writs purport to target—and it also authorizes the sale of the properties and permits the use of the sale proceeds to pay third parties for taxes, legal fees, administrative expenses, and other necessary costs associated with the sale, and to thereafter place the remainder in a blocked account. The license removes the properties at issue from the definition of "frozen" because there is no across-the-board prohibition against transfers or transactions of any kind. The properties are also not "seized" because the government has not taken possession of any of the properties.

**2. The Writs of Execution Target Properties that are Not "Frozen" or "Seized."**

The writs of execution that Plaintiffs improperly obtained (ECF Nos. 323-28, 337) target real property that is licensed by OFAC to be sold. Wilson Decl. ¶ 10. The real property is not "frozen" because there is no across-the-board prohibition against transfers or transactions of any kind – on the contrary, the OFAC licensee is actively trying to sell the real estate pursuant to the license. Wilson Decl. ¶¶ 9-10. Nor are the properties "seized" because the government has not taken ownership of them and indeed, it cannot because OFAC may only take title to blocked assets under 50 U.S.C. § 1707(a), a section of IEEPA not used by the President in the governing executive order, No. 13850. Wilson Decl., ¶ 7. Because the licensed properties are not "seized or frozen by the United States," the real estate is not "blocked" within the meaning of TRIA § 201(d)(2) and, therefore, not subject to execution pursuant to TRIA.

### 3.   The Writ of Garnishment Targets Proceeds that are Not "Frozen" or "Seized."

The writ of garnishment directed to Mr. Wilson and his firm Lankford & Reed PLLC (ECF No. 319) also targets proceeds that are not "frozen" or "seized." Shortly before Plaintiffs sought the writ of garnishment directed to Mr. Wilson and his law firm, Mr. Wilson sold a licensed property on Fisher Island, resulting in the receipt of $7,529,072.09. *See Caballero v. FARC*, No. 1:18-CV-25337-KMM, ECF No. 469. Mr. Wilson is also set to receive from the Clerk of Court an additional $4,201,543.87 from the sale of a licensed property on Collins Avenue. *See id.* at ECF No. 477. Pursuant to the OFAC license, Wilson is authorized to use those proceeds to pay outstanding "legal, administrative or other fees that [we]re necessary and incident to the sale" before placing the "remainder" in a "blocked account." Wilson Decl., ¶ 10. The writ of garnishment directed to Mr. Wilson and Lankford & Reed, PLLC purports to obstruct this activity that the license affirmatively authorizes. Because Mr. Wilson has not yet paid from the sale proceeds all of the fees and expenses that were necessary for the sales to occur, the sale proceeds are not subject to a prohibition against transfers or transactions of any kind. The sale proceeds are

therefore not "frozen" and thus not "blocked" pursuant to TRIA or subject to execution pursuant to TRIA.[7]

The writ of garnishment's attempt to override the license's operation by obstructing access to the OFAC-licensed sale proceeds from which fees and expenses are to be paid is unlawful. Accordingly, the writ of garnishment (ECF No. 319) should be vacated. *See Martinez*, 2011 WL 13115471, at *1. Once fees and expenses are paid and the "remainder" of the sale proceeds are "placed into a blocked account," (Wilson Decl. ¶ 10), Plaintiffs may file a "renewed TRIA claim" and "move for a writ of garnishment as to the remaining funds," consistent with this Court's ruling in *Moros*, 2023 WL 3619308, at *6-7.

### 4. The Writs of Garnishment and Writs of Execution are Null and Void.

The Venezuela Sanctions Regulations provide that any "transfer" of a controlled asset without an OFAC license is prohibited, with transfers being defined as including any:

> purported act . . . the purpose, intent, or effect of which is to create, surrender, release, convey, transfer, or alter, directly or indirectly, any right, remedy, power, privilege, or interest with respect to any property.  Without limitation on the foregoing, it shall include . . . . the creation or transfer of any lien; the issuance, docketing, or filing of, or *levy of or under, any judgment*, decree, attachment, injunction, *execution*, or other judicial or administrative process or order, *or the service of any garnishment; . . .*

31 C.F.R. § 591.310 (emphasis added).

Plaintiffs' writs are "null and void" because they violate three independent Venezuela Sanctions Regulations. *See* 31 C.F.R. § 591.202(a) ("Any transfer . . . that is in violation of any provision of this part or of any regulation,  . . . is null and void"); 31 C.F.R. § 591.202(b) ("Unless licensed pursuant to this part, any attachment, judgment, decree, *lien, execution, garnishmen*t, *or other judicial process is null and void*" (emphasis added)); 31 C.F.R. § 591.407 ("the enforcement of any lien, judgment, arbitral award, decree, or other order through *execution, garnishment, or other judicial process* purporting to transfer or otherwise alter or affect property or interests in

---

[7] The proceeds are also not "seized" as the government has not taken possession of the proceeds.

property blocked pursuant to § 591.201, . . . is prohibited unless authorized pursuant to a specific license issued by OFAC pursuant to this part.").

Plaintiffs do not have an OFAC license and they cannot execute or garnish the OFAC-licensed assets pursuant to TRIA (or any other statute) so the writs "are null and void." *Martinez*, 2011 WL 13115432, at *8; *accord Martinez*, 2011 WL 13115471, at *1.

## II.    The Motions for Writs Should Be Denied.

### A.   Plaintiffs' Motions for Writs Must Be Denied Because No Judgment or A/I Liability Determination Against the Interested Parties Exists.

Plaintiffs' Motions for Writs must be denied because Plaintiffs first need to prove A/I status before this is case is in a post-judgment posture that allows for the filing of motions for writs of execution or garnishment in the first place. *See Caballero*, 2023 WL 4363886, at *5 ("[A]t the agency and instrumentality stage of the litigation, where the Interested Parties are merely defending against their designation as agencies or instrumentalities of FARC, this is not a postjudgment execution proceeding as to the Interested Parties."). That requires either bringing a separate declaratory judgment action against the Interested Parties or initiating proceedings supplementary, issuing notices to appear, impleading the Interested Parties, and obtaining a liability determination. *See Jackson-Platts v. Gen. Elec. Cap. Corp.*, 727 F.3d 1127, 1137-38 (11th Cir. 2013). "[W]hile a court may enter a new, final judgment against a third party, . . . it may do so only if the third party is brought into the supplementary proceeding as an actual party and is given a fair opportunity to present its defenses." *Id.* That means if the Court is to issue "a finding of liability against the unjoined" parties," then "the rights of third parties may not be adjudicated in supplementary proceedings unless said parties have been fully impleaded and given an opportunity to defend." *Sea Condo. Apartments, Inc. v. Juno by the Sea N. Condo. Ass'n (The Tower), Inc.*, 419 So. 2d 399, 400 (Fla. 4th DCA 1982); *accord Morton v. Cord Realty, Inc.*, 677 So. 2d 1322, 1324 (Fla. 3d DCA 1996) ("[D]ue process requires that the rights of third persons claiming adversely both to the plaintiff and defendant in execution should not be finally

adjudicated unless such persons have been first fully impleaded and brought into the proceedings as actual parties and given opportunity to present their claim"). If the Plaintiffs want to implead the Interested Parties, they should do so following the appropriate process for instituting proceedings supplementary seeking final judgment on their claim of A/I status – a claim which stands to impose new liability on the Interested Parties in an amount equal to the Defendants/Judgment-Debtors liability to Plaintiffs, based on a judgment that the Interested Parties are not a party to and had no opportunity to defend against.

### 1. The Interested Parties Have Not Been Served and Deny that There is Any Personal Jurisdiction Over Them.

Service is necessary to obtain personal jurisdiction in these proceedings that seek to impose liability on the Interested Parties based on new theories as to their independent conduct and how it somehow benefitted alleged terrorist parties. *See Deluca v. King*, 197 So. 3d 74, 76-77 (Fla. 2d DCA 2016). "An impleaded third party must still be properly served in order to exercise jurisdiction." *Id.* at 77. The plaintiff bears the burden of establishing proper service. *Opella v. Rullan*, 2011 WL 2600707, at *4 (S.D. Fla. June 29, 2011), *report and recommendation adopted*, 2011 WL 13220496 (S.D. Fla. Aug. 9, 2011). None of the Interested Parties have been served with process despite being accused of being A/Is of alleged terrorists. Lack of service of process would render any final determination as to the A/I determination void.[8]

In addition, the Interested Parties deny that there is personal jurisdiction over them in this District with respect to the Plaintiffs' claim of A/I status. Plaintiffs bear the burden of proving personal jurisdiction. *See Thompson v. Carnival Corp.*, 174 F. Supp. 3d 1327, 1333 (S.D. Fla. Nov. 16, 2021); *Brown v. Carnival Corp.*, 202 F. Supp. 3d 1332, 1342 (S.D. Fla. 2016). Florida law recognizes general and specific personal jurisdiction. *See, e.g., Thompson*, 174 F. Supp. 3d at 1333; *Ferenchak v. Zormati*, 572 F. Supp. 3d 1284, 1290 (S.D. Fla. Nov. 16, 2021). It is self-evident that there is no general jurisdiction over Gorrin and Perdomo, residents of Venezuela who

---

[8] Lack of service also provides any independent basis for vacatur of the writs of garnishment and execution.

are designated by OFAC and therefore cannot even travel to this District. Specific jurisdiction over a defendant is available "only 'if the claim asserted against the defendant arises from the defendant's contacts with Florida, and those contacts fall within one of the enumerated categories set forth in [Fla. Stat.] section 48.193(1)(a).'" *Wertheim Jewish Education Trust, LLC v. Deutsche Bank AG*, 2017 WL 6313939, *7 (S.D. Fla. Dec. 6, 2017). Exercising specific jurisdiction under Florida law requires proof of "a connection or 'connexity' between the enumerated activity in Florida and the cause of action." *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1292 (11th Cir. 2022).

Specific jurisdiction is lacking because Plaintiffs have not identified any statutorily enumerated acts by Gorrin or Perdomo within Florida (Fla. Stat. § 48.193(a)(1)-(9)) and have not identified any connection between any such Florida contacts and its claims regarding Venezuela. *See D-I Davit Int'l-Hische GMBH v. Carpio*, 346 So. 3d 197, 201 (Fla. 3d DCA 2022) (the "purported connexity to Florida must relate to the actual tort alleged.").

The Department of Justice has tacitly conceded in its indictment against Gorrin – (there is no indictment against Perdomo) – that the Florida real estate at issue is not traceable to the purportedly improper Venezuelan currency exchange by characterizing the real estate as "substitute" assets pursuant to 21 U.S.C. § 853(p), which means that the properties are the untainted "other property of the defendant." *See United States v. Gorrin Belisario*, S.D. Fla. Case No. 18-cr-80160-WPD, ECF No. 44 at 18; *Honeycutt v. United States*, 581 U.S. 443, 452 (2017) (construing substitute asset forfeiture as property untainted by offense). Specifically, the Department of Justice has intentionally declined to identify these assets as traceable assets in the criminal case involving an indictment against Gorrin related to the currency exchange. Not surprisingly, the Department of Justice did not renew *lis pendens* against these properties; nor could it because they lack connection to the Venezuelan currency exchange.

In another case seeking to impose a constructive trust against Gorrin's real estate that is now also the subject to the Plaintiffs' improperly issued writs, Judge Bloom dismissed the case with prejudice, finding that the "allegations are insufficient to demonstrate a causal link between the [Currency Exchange] Funds and Properties" and "all supporting documents, including the

OFAC findings [and indictment], are devoid of allegations connecting the Funds." *Casa Express Corp. as Tr. of Casa Express Tr. v. Bolivarian Republic of Venezuela*, No. 21-CV-23103, 2024 WL 1756363, at *11 (S.D. Fla. Apr. 24, 2024). Judge Bloom ultimately declined to "accept a conclusory allegation that because the Entities own the Properties, the misappropriated Venezuelan Funds have necessarily been used to buy each of the Properties in question." *Id.*

Judge Bloom also determined that there was no personal jurisdiction over Gorrin because no evidence showed that "Gorrin operated a business venture in Florida sufficient to establish personal jurisdiction" nor did any evidence establish "establish connexity between the bribe-related acts to the Properties." Similarly, in this case, Gorrin and Perdomo expressly deny that any of the properties at issue were are connected to any of the conduct alleged by Plaintiffs, Gorrin Decl. at ¶ 21, Perdomo Decl. at ¶ 22, and the Plaintiffs fail to show connexity to Florida. Because Plaintiffs cannot establish personal jurisdiction over Gorrin and Perdomo, the Motion for Writs against them must be denied.[9]

**B. Plaintiffs Motions for Writs Must Be Denied Because the OFAC-Licensed Properties Are Not Subject to TRIA Execution.**

For the same reasons that the writs must be vacated because the properties they target are OFAC licensed as set forth in Section I.B., *supra*, the Motions for Writs must be denied. Plaintiffs concede the Motions for Writs that one of the "pre-requisites to executing on the blocked assets of a judgment debtor's agency or instrumentality" is that the "assets must be blocked" pursuant to TRIA. ECF No. 318 at 4-5; ECF No. 322 at 3-4; ECF No. 334 at 3-4. Because all of the targeted properties are subject to a specific OFAC license, they fall outside TRIA's definition of "blocked assets," they are not subject to execution or garnishment, and the Motions for Writs must therefore be denied. *See* Section I.B., *supra*.

---

[9] Lack of personal jurisdiction would also support vacatur of the Writs in addition to denial of the Motion for Writs because writs issued in a case in which there is no personal jurisdiction are void.

### C. Plaintiffs Have Failed to Proffer Admissible Evidence of A/I Status.

#### 1. Definition of "Agency or Instrumentality" Requires Materiality—Not Attenuation, Speculation, or Incidental Benefit.

Although "TRIA does not define "agency or instrumentality," the Eleventh Circuit has adopted the legal understanding of the terms, finding that, under TRIA, "agency" refers to "[a] fiduciary relationship created by express or implied contract or by law, in which one party (the agent) may act on behalf of another party (the principal) and bind that party by words or actions." *Stansell v. Revolutionary Armed Forces of Colombia*, 45 F.4th 1340, 1352 (11th Cir. 2022). Under TRIA, "instrumentality" refers to "[a] thing used to achieve an end or purpose." *Id.* The Eleventh Circuit held that "to be an agency of a terrorist party under § 201(a) of the TRIA one must know the identity of the terrorist party with whom the agent-principal relationship exists," but to be an instrumentality of a terrorist party under the TRIA such knowledge is not required. *Id.* at 1353-54.

"Common sense indicates, however, that the more *attenuated the link* the more difficult it will be to prove [A/I] status" indirectly. *Caballero*, 2023 WL 5437222, at *3 (quoting *Stansell*, 771 F.3d at 742). "While a party may demonstrate A/I status through an indirect relationship, not any indirect relationship will suffice." *Id.* To prove A/I status, the plaintiff must show that the alleged assistance of a terrorist party is not "attenuated," e.g., separated by degrees of separation, and that the assistance also "*materially* benefits" the terrorist party. "[T] enuous connection" and "entirely speculative" guesswork "unsupported by fact" that money must eventually have ended up in the hands of a terrorist because "that is how money is typically is handled" is insufficient to prevail on a claim that a third party is in fact an "agent or instrumentality" of a terrorist. *Id.* at ** 4 n.12, 4-5.

The alleged A/Is conduct at issue must be proven to "materially benefit[]" a terrorist. *Id.* at 6. For example, even if "paying bribes and purchasing dollars from the Venezuelan government may have incidentally benefitted" a terrorist organization, the plaintiff must show that the A/I "provided any material assistance." *Id.* "[M]ulti-link argument vaguely connecting Gorrin's actions to the [the terrorist party] fails to establish that Gorrin materially *assisted* the" terrorist party. To

prevail, the Plaintiff must show that the alleged "A/I" "is actually an agency or instrumentality." *Id.* at *8. Evidence that "portions of profits" from various commercial endeavors, at times go to terrorist parties does not show that the specific commercial endeavors made by the alleged A/I "actually" went to a terrorist party. *Id.* Courts should not accept theories that either lack factual support or would have "sprawling consequences" rendering "anyone who did business with the Venezuelan government" and A/I of a terrorist organization. *Id* at *9.

A plaintiff cannot establish A/I status by citing to "numerous pages in expert reports" without "bolstering [those] statements with factual support." *Id.* at *11. "[E]xpert reports . . .full of conclusory statements with little to no factual basis" do not demonstrate A/I status. *Id.* A plaintiff cannot rely "on speculative multi-link chains, as well as inferences, to connect the" alleged A/I to a terrorist party.  *Id.* at *12.

> **2   Plaintiffs' Claim that Gorrin and Perdomo are A/Is of the Cartel of the Suns (the "Cartel"), Nicolas Maduro Moros ("Maduro"), and Tarek El Aissami ("El Aissami") But Repeatedly Relay Sprawling and Scattered Assertions and Anecdotes That Do Not Connect Gorrin or Perdomo to the "Cartel," Maduro, or El Aissami  *At All*—Let Alone Materially .**

Plaintiffs claim that Gorrin and Perdomo are A/Is of the Cartel, Maduro, and El Aissami. ECF No. 318 at 1; ECF No. 322 at 1; ECF No. 334 at 2. Even after studying the Motions for Writs, one would be hard pressed to concisely explain what factual theory renders Gorrin or Perdomo A/Is of either the so-called "Cartel," Maduro, or El Aissami. Were the Motions for Writs a complaint, they would charitably be characterized as "a shotgun pleading that fail[s] to put the Defendants on notice of the respective claims against them." *Lacayo v. Wells Fargo Bank, N.A.*, No. 16-23187-CIV, 2019 WL 8756577, at *2 (S.D. Fla. Sept. 23, 2019).

The Motions for Writs are in fact the quintessential sort of "shotgun" pleading that fails to even comport with the liberal set forth in Federal Rule of Civil Procedure 8(a)(2). *See Barmapov v. Amuial*, 986 F.3d 1321, 1325 (11th Cir. 2021) (affirming dismissal of complaint with prejudice where it was a "shotgun pleading . . . rife with immaterial factual allegations, including five pages and 24 paragraphs of irrelevant details about the alleged criminal backgrounds of some of the

defendants"). Under well settled Eleventh Circuit law, such pleadings are "fatally defective" and should be dismissed. *See B.L.E. v. Georgia*, 335 F. App'x 962, 963 (11th Cir. 2009). The sprawling and frenetic pace of Plaintiffs' A/I narrative cannot be distilled into any concrete, articulable claim.

*First*, Plaintiffs claim that Gorrin and Perdomo engaged in a currency exchange scheme that constituted a "money laundering scheme" that benefitted the terrorist parties. ECF No. 318 at 7-8; ECF No. 322 at 8-9; ECF No. 334 at 7-10. That is the same alleged currency scheme that Judge Moore addressed when granting summary judgment in the *Caballero* case. *Caballero*, WL 5437222, at *9-10 (considering and rejecting theory that Gorrin was "(1) serving as a "testaferro" for Maduro; (2) bribing Maduro through gifts to his wife; (3) laundering money for Maduro"). Plaintiffs fail to connect any allegations regarding the Venezuelan currency exchange into material support of either the Cartel, El Aissami, or Maduro.

Plaintiffs rely on the declaration of the unadmitted expert in the *Caballero* case that the Interested Parties prevailed in, John Robert McBrien,[10] but Plaintiffs simply cite to his entire 289-page declaration without any pin cites. *See* ECF No. 318 at 8-9; ECF No. 322 at 7-8; *Caballero*, 2023 WL 5437222, at *11 (plaintiff cannot establish A/I status by citing to "numerous pages in expert reports" without "bolstering [those] statements with factual support.").

Plaintiffs rely on an indictment related to the currency exchange, which does mention either the Cartel, Maduro or El Aissami anywhere therein. *See* ECF No. 318 at 9; ECF No. 322 at 13-14. No effort is made by Plaintiffs to connect the indictment to material support of the Cartel, El Aissami, or Maduro. Moreover, an indictment is an allegation – not admissible evidence. *See Caballero*, 2023 WL 5437222, at *10 (indictment afforded "no weight").

---

[10] In addition to being an unadmitted expert in the *Caballero* case that the Interested Parties prevailed in, McBrien has also been rejected by other district courts for making insufficient A/I claims. *Caballero v. FARC*, 2020 WL 11571726, *3 (N.D. Cal. Oct. 8, 2020) ("Attached to McBrien's declaration are many general articles about drug trafficking, but there is no specific, concrete evidence linking [Respondent] or the Flores Drug Trafficking Organization to FARC.").

Plaintiffs rely on alleged gifts given to relatives of Maduro. ECF No. 318 at 15-16; ECF No. 322 at 15-16; *see Caballero*, 2023 WL 5437222, at *10 (Plaintiffs fail to explain how "gifts Gorrin gave to Cilia Flores" materially assisted a terrorist party and is insufficient to even "demonstrate that Gorrin is an A/I of Cilia Maduro").

 Plaintiffs falsely claim that other courts have found Gorrin and Perdomo to be A/Is when Plaintiffs know that to be false. ECF No. 318 at 8-9; ECF No. 322 at 9; ECF No. 334 at 3.

Plaintiffs claim an OFAC designation connects Gorrin and Perdomo to the Cartel, Maduro and El Aissami when the OFAC designation makes no mention of either the Cartel, Maduro or El Aissami, let alone material support for terrorism. *See* ECF Nos. 318 at 10-14; ECF No. 322 at 9-13; ECF No. 334 at 7-9, 11.

Plaintiffs claim that Gorrin and  Perdomo bribed people other than the Cartel, Maduro or El Aissami, without explaining how those bribes materially benefitted the Cartel, Maduro or El Aissami, including a PDVSA "loan scheme" that Judge Moore also found failed to establish A/I status and a bribe to Moreno Perez who Plaintiffs are not claiming either Gorrin or Perdomo are an A/I of. ECF No. 318 at 13-14; ECF No. 322 at 13-14; ECF No. 334 at 11-13; *Caballero*, 2023 WL 5437222, at *4-6.

Plaintiffs claim that El Aissami is also engaging in currency manipulation schemes and fell out with Maduro without explaining how either Gorrin or Perdomo are materially assisting El Aissami as A/Is, merely because El Aissami is engaged in the currency exchange system. ECF No. 318 at 16; ECF No. 322 at 17; ECF No. 334 at 13.

Plaintiffs submit the Farah Declarations alleging in conclusory fashion, without factual support, that Gorrin's participation "played a significant role in propping up the economically troubled Maduro regime." ECF No. 318-1 at ¶¶ 41-23 [sic]. Coincidentally, Mr. Farah also opines the exact same thing with respect to Perdomo, again without any factual support—"The currency control schemes that Perdomo supported played a significant role in propping up the economically troubled Maduro regime." ECF No. 334-1 at ¶¶ 44-49.

Having endeavored to recount most of the Plaintiffs' assertions, it becomes almost self-evident that the Plaintiffs have submitted a shotgun pleading akin to the "style of argument" in Caballero which is "convoluted and confusing: conclusory statements . . . which cite to conclusory statements . . . which cite to large portions of expert reports" that rely on "speculative multi-link chains, as well as inferences, to connect the Interested Parties" to the alleged terrorist parties. Given this same "daisy chain style of argument" that is "as attenuated as the substance of his argument itself," and "[g]iven the attenuated link Plaintiff attempts to draw between the Interested Parties and" Maduro, El Aissami, and the Cartel, "as well as the lack of evidence demonstrating any material assistance that the Interested Parties provided to them," the Court should deny the Plaintiffs' Motions for Writs as a matter of law. *Caballero*, 2023 WL 5437222, at *12.

### 3. A *Daubert* Hearing Is Required Before an A/I Proceeding Can Begin.

As noted in Section 2, *supra*, the Farah Declarations are the sole evidence that the Plaintiffs submitted under penalty of perjury in support of their Motions for Writs, but the Farah Declarations are actually expert opinions that have not been admitted under *Daubert*. *See* ECF Nos. 318-1, 334-1 at ¶¶ 13-15, 17 (the declarations "provide the expert opinion that" Gorrin and Perdomo are an "an agency or instrumentality of Maduro, the Cartel, and the Individual Defendants"). The so-called expert opinions proffered in the *Caballero* case also purported to attest to A/I status and they backed a "daisy chain style of argument" regarding a so-called "loan scheme," "dollar shortage scheme," "bond scheme," and other miscellaneous aspersions regarding gifts to Maduro's wife and laundering money for Maduro, all of which was shown under the crucible of the adversary process to be "as attenuated as the substance of [the] argument itself," resulting in summary judgment in favor of the Interested Parties. *Caballero*, 2023 WL 5437222, at *12. If the Court finds the substance of the Farah Declarations to be sufficient to allow for the commencement proceedings regarding A/I status *if admissible*, the most efficient path forward is to first determine if the Farah Declarations *are admissible* and to therefore allow an adversary process, including expert discovery and deposition of Farah, followed by the litigation of a *Daubert* motion. Only if

the Farah Declarations survive Daubert's exacting requirements should the Court allow any proceeding as to the Interested Parties alleged A/I status to commence.

Federal Rule of Evidence 702 governs the admission of expert witnesses. Under that Rule, four conditions must be satisfied before an expert may testimony will be deemed admissible: (1) the expert's scientific, technical, or otherwise special knowledge will help the jury to understand the evidence or determine a disputed fact; (2) the testimony is based on sufficient facts or data; (3) the testimony is the product of reliable principles and methods; (4) the expert has reliably applied those principles and methods to the facts of the case. Fed. R. Evid. 702.

The Supreme Court's decision in *Daubert v. Merrell Down Pharmaceuticals, Inc.* provides a three-part inquiry that district courts undertake in applying Rule 702. 509 U.S. 579 (1993). This requires a "rigorous inquiry to determine whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291–92 (11th Cir. 2005) (simplified). The burden is on the proponent of the expert testimony to show, by a preponderance of the evidence, the testimony satisfies each prong. *See Hendrix ex rel. G.P. v. Evenflo Co., Inc.*, 609 F.3d 1183, 1194 (11th Cir. 2010).

Federal Rule of Evidence 703 also applies here. Rule 703 governs the permissible bases for an expert's opinion testimony and provides:

> An expert may base an opinion on facts or data in the case that the expert has been made aware of or personally observed. If experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted. But if the facts or data would otherwise be inadmissible, the proponent of the opinion may disclose them to the jury only if their probative value in helping the jury evaluate the opinion substantially outweighs their prejudicial effect.

Fed. R. Evid. 703.

With respect to Rule 703, it permits expert testimony "based on firsthand observation of the witness, on facts or data presented at the trial, or on facts and data presented before the trial[.]" *Tyler v. Bethlehem Steel Corp.*, 958 F.2d 1176, 1188 (2d Cir. 1992) (alteration added). It does not permit an expert to "simply repeat or adopt the findings of another expert without attempting to assess the validity of the opinions relied upon." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d 1348, 1357 (N.D. Ga. 2000) (citations omitted). Courts thus need to "ensure that an expert witness is sufficiently familiar with the reasoning or methodology" underlying the expert's testimony. *Id.* (citation omitted).

Plaintiffs' proffered expert, Mr. Farah, may not, "under the guise of giving expert testimony . . . [,] become the mouthpiece of the witnesses on whose statements or opinions the expert purports to base his opinion." *Factory Mut. Ins. Co. v. Alon USA L.P.*, 705 F.3d 518, 524 (5th Cir. 2013) (alterations added; citation and quotation marks omitted). He may not simply parrot another person's words, and must be "sufficiently familiar with the reasoning or methodology behind the information to permit cross-examination." *In re Polypropylene Carpet Antitrust Litig.*, 93 F. Supp. 2d at 1357 (citation omitted). Acting as a mere "mouthpiece" for someone else's out of court statements is impermissible. *Factory Mut.*, 705 F.3d at 524 (citation and quotation marks omitted). Such testimony is not admissible under Rule 703. *See Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1364 (S.D. Fla. 2009) ("While it is true that an expert's testimony may be formulated by the use of the facts, data and conclusions of other experts . . . , such expert must make some findings and not merely regurgitate another expert's opinion." (alteration added; citations and quotation marks omitted)).

With respect to Rule 702, the three-part inquiry articulated in *Hendrix ex rel. G.P.* applies. 609 F.3d at 1194 (requiring that experts (1) be qualified to testify competently regarding the matters they intends to address; (2) their methodology be sufficiently reliable; and (3) their testimony assist the trier of fact (citation omitted)). Expert testimony is admissible only if the testimony is given by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education[.]" Fed. R. Evid. 702 (alterations added). The plain language of Rule 702

makes clear, "[w]hile scientific training or education may provide possible means to qualify, experience in a field may offer another path to expert status." *United States v. Frazier*, 387 F.3d 1244, 1259–61 (11th Cir. 2004) (alteration added). Assuming an expert is qualified to testify, the expert may testify only about matters within the scope of the person's expertise. See City of *Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (explaining "the expert [must be] qualified to testify competently regarding the matters he intends to address" (alteration added; citations and footnote call number omitted)); *Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1262 (S.D. Fla. 2012) ("Determining whether a witness is qualified to testify as an expert requires the trial court to examine the credentials of the proposed expert in light of the subject matter of the proposed testimony." (quotation marks and citation omitted)).

That does "does not mean that experience, standing alone, is a sufficient foundation rendering reliable any conceivable opinion the expert may express." *Frazier*, 387 F.3d at 1261. Under Rule 702, expert testimony is admissible only if "the testimony is based on sufficient facts or data; . . . the testimony is the product of reliable principles and methods; and . . . the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702(b)–(d) (alterations added). Accordingly, a witness "relying solely or primarily on experience . . . must explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts. The trial court's gatekeeping function requires more than simply taking the expert's word for it." *Frazier*, 387 F.3d at 1261. The Court should exclude expert testimony where "there is simply too great an analytical gap between the data and the opinion proffered[,]" or where the testimony's "factual basis is not adequately explained" in the first instance. *Cook v. Sheriff of Monroe Cnty.*, 402 F.3d 1092, 1111 (11th Cir. 2005) (alteration added; citations omitted).

Farah bases his opinion entirely on inadmissible news articles, press releases, and general inadmissible hearsay and inference stacking. His analysis thus "suffers from the impermissible 'black box' syndrome, where 'data is fed at one end and an answer emerges at the other, and the jury cannot see how the pieces fit together or how the data drives the conclusion.'" *Lee-Bolton v.*

*Koppers Inc.*, 319 F.R.D. 346, 377 (N.D. Fla. 2017). Unreliable inputs yield unreliable outputs. *See Coffey v. Dowley Mfg., Inc.*, 89 F. App'x 927, 931 (6th Cir. 2003) (excluding as unreliable expert testimony where the witness "made guesstimations' with regard to important elements of [his] calculations" (alteration added)); *SLSJ, LLC v. Kleban*, 277 F. Supp. 3d 258, 281 n.21 (D. Conn. 2017) ("[N]o matter how sophisticated and capable an information processor is, the quality of that information it generates cannot be superior to the quality of the information it received." (alteration added; quotation marks omitted)). *Kay v. First Cont'l Trading*, 976 F. Supp. 772, 775–76 (N.D. Ill. 1997) (excluding an expert's otherwise "permissible" statistical model because the expert used "speculative" input values). *Daubert* requires "conclusions supported by good grounds for each step in the analysis — mean[ing] that any step that renders the analysis unreliable under the Daubert factors renders the expert's testimony inadmissible." *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1245 (11th Cir. 2005) (alteration added; emphasis in original; quotation marks and citations omitted).

Farah may not pass off as reliable methodology a judgment call informed only by his purported "experience — an abstraction not visible to the eyes of the Court, the jury, and opposing counsel, or testable in the crucible of cross examination[.]" *Open Text S.A. v. Box, Inc.*, No. 13-cv-04910-JD, 2015 WL 349197, at *6 (N.D. Cal. Jan. 23, 2015) (alteration added; citation and quotation marks omitted). Rule 702 does not permit such conjecture. *See GPNE Corp. v. Apple, Inc.*, No. 12-cv-02885-LHK, 2014 WL 1494247, at *4 (N.D. Cal. Apr. 16, 2014) ("[T]he Court must be able to see the mechanisms in order to determine if they are reliable and helpful.") (alteration added; quotation marks and citation omitted)); *Metavante Corp. v. Emigrant Sav. Bank*, 619 F.3d 748, 761 (7th Cir. 2010) ("Rule 702 does require, however, that the expert explain the 'methodologies and principles' that support his opinion[.]") (alteration added; citations omitted))

Farah must meet these exacting requirements for his expert opinion to be admissible. Thus, if the Motions for Writs are not denied outright, the Court should allow for expert discovery of Farah and a *Daubert* motion should be briefed and decided before any A/I proceedings commence.

**D.  The Alleged Terrorist Parties are Government Officials of a Non-Designated State.**

TRIA provides for satisfaction of judgments entered against three types of "terrorist part[ies]:" (1) "a terrorist," (2) "a terrorist organization (as defined in section 212(a)(3)(B)(vi) of the Immigration and Nationality Act (8 U.S.C. 1182(a)(3)(B)(vi)))," or (3) ***a foreign state designated as a state sponsor of terrorism*** under section 6(j) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)) or section 620A of the Foreign Assistance Act of 1961 (22 U.S.C. 2371)." TRIA § 201(d)(4) (emphasis added). The "terrorist" and "terrorist organization" categories apply to non-state actors. *See Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 731 (11th Cir. 2014) ("TRIA's definition clearly contemplates nonstate judgment debtors being subjected to TRIA execution.") (citing TRIA § 201(d)(4) as "defining 'terrorist party' to include both state actors and non-state terrorist organizations.").

In cases in which an alleged terrorist victim seeks to execute against a state actor under the category of "a foreign state designated as a state sponsor of terrorism," courts have uniformly required that the foreign state have been formally designated. *In re Terrorist Attacks on Sept. 11, 2001*, 657 F. Supp. 3d 311, 331 (S.D.N.Y. 2023) ("Moreover, TRIA § 201(a) could not be wielded against Afghanistan or its instrumentalities independently because Afghanistan has not been designated as a state sponsor of terrorism. . . . Yet, Afghanistan does not qualify as … a 'terrorist party' under TRIA § 201(d)(4) … because Afghanistan is not and has never been designated as a state sponsor of terrorism."); *Weininger v. Castro*, 462 F. Supp. 2d 457, 479 (S.D.N.Y. 2006) ("In 1982, Cuba was designated by the State Department as a state sponsor of terrorism under Section 6(j) of the Export Administration Act of 1979 . . . It therefore falls within TRIA's definition of 'terrorist party.' *See* § 201(d)(4). Therefore, Plaintiffs have each obtained a judgment against a terrorist party, a prerequisite to execution under TRIA."); *Kirschenbaum v. 650 Fifth Ave. & Related Props.*, 830 F.3d 107, 132 (2d Cir. 2016), *abrogated on other grounds by Rubin v. Islamic Republic of Iran*, 583 U.S. 202 (2018) ("At the time of this writing, three countries fall within the TRIA's definition of 'terrorist party' by virtue of having been designated as state sponsors of

terrorism: Iran, Sudan, and Syria. . . . South Yemen was removed from the list in 1990, Iraq in 2004, Libya in 2006, North Korea in 2008, and Cuba in 2015.").

In this case, the Plaintiffs named the following defendants: (1) the President of Venezuela (Maduro) (ECF No. 1 at ¶¶ 26, 47); (2) the former Vice President of Venezuela and current Minister of Industries and National Production and Minister of Petroleum (El Aissami) (*id*. at ¶ 33); (3) the Attorney General/Prosecutor General of Venezuela (Saab) (*id*. at ¶ 32); (4) the Minister of Defense of Venezuela (Padrino Lopez) (*id*. at ¶ 29); (5) the current Chief Justice of the Venezuelan Supreme Court (Moreno Perez) (*id*. at ¶ 30); and (6) and the Minister of People's Power for Electric Power and former director of the Venezuelan equivalent of the DEA (Reverol Torres) (*id*. at ¶ 31). According to the Plaintiffs, these individuals are members of the "Maduro Regime"—"the unlawful apparatus through which Maduro and his deputies control Venezuela." *Id*. at 4; *id*. at ¶ 57 ("The Maduro Regime includes myriad individuals, including many in governmental positions, who are beholden to Maduro and who execute unlawful instruction from Maduro and his deputies.").

Additionally, the Plaintiffs named the "Cartel of the Suns" as a defendant, which, according to the Plaintiffs, was grown by the "Venezuelan government under Hugo Chavez" to afford "Venezuelan officials engaged in drug trafficking immunity in exchange for their loyalty to Chavez" (*id*. at ¶ 63) and consists of "[m]ember[s] of the Venezuelan military (*id*. at ¶ 62). Indeed, the Plaintiffs claim that the name "the Cartel of the Suns" is a "reference to the sun insignia on the Venezuelan military uniforms of many of the cartel's leaders." *Id*. at ¶ 62. According to the Plaintiffs, members of the Maduro Regime, including Maduro, Reverol Torres and Padrino Lopez, "are senior figures within the Cartel" of the Suns. *Id*. at ¶ 64; *Id*. at ¶ 72(b) (the Cartel of the Suns "includes some of the most senior officials in the Maduro regime.").

The Plaintiffs' Complaint alleges that "[t]he Maduro Regime maintains its unlawful control over the Venezuelan state through its terrorist suppression of Venezuela's civilian population, including through the routine kidnapping, torture, and murder of those who express criticisms that the Maduro Regime wishes to silence or who share information the Maduro Regime wishes to

conceal." *Id*. at ¶ 3; *id*. at ¶ 95 ("The Maduro Regime engages in violent and unlawful terroristic abuses against the Venezuela population to suppress political opposition, maintain its authoritarian grip on Venezuela, and facilitate the Maduro Criminal Enterprise's lucrative narcotics trafficking and public corruption income."). The Plaintiffs' Complaint alleges that the Maduro Regime does not tolerate "Venezuelans telling the truth about what is going on in their country," finding this sort of "free speech" objectionable and "marking" such "whistleblowers" for "retribution, kidnapping, torture, and murder." *Id*. at ¶ 7-8. According to the Plaintiffs, Mr. Marron's website in which he "published the true, free market exchange rate between Venezuela's currency and U.S. dollars," was "an embarrassment to the Maduro Regime," which was "hyper-sensitive about the true exchange rate." *Id*. at ¶ 9; *id*. at ¶ 128 ("The Maduro Regime was extremely hostile toward websites that published true dollar to bolivar exchange rates."); *id*. at ¶ 129. Thus, according to the Plaintiffs, "when the DolarPro website owned by Mr. Marron began to publish the dollar to bolivar exchange rate, Mr. Marron incurred the wrath of the Maduro Regime." *Id*. at ¶ 130; *id*. at ¶ 131 ("In addition, the DolarPro website published other accurate information concerning the situation in Venezuela, including topics such as politics, economics, international relations, and public health," which "did not adhere to the Maduro Regime's party line" and "further infuriated the Maduro Regime.").

The Plaintiffs claim that, as a result: (1) Mr. Marron's father was kidnapped by Venezuela's General Directorate of Military Counterintelligence ("DGCIM") (*id*. at ¶ 134); (2) Mr. Marron was subsequently taken into custody by armed DGCIM agents and held at the DGCIM's headquarters offices in Caracas, Venezuela (*id*. at ¶ 137);[11] (3) the Maduro Regime brought charges against Mr. Marron for alleged violation of "Venezuela's Article 24 of Decree 2167 of the December 29, 2015 (known as the Law of the Foreign Exchange Regime and Its Unlawful Acts)" (*id*. at ¶ 141); and

---

[11] According to the Plaintiffs, "the DGCIM reports directly to Maduro as *de facto* commander-in-chief of Venezuela's army, and administratively to Vladimir Padrino Lopez, as the *de facto* Minister of Defense," and "[t]he DGCIM has broad powers to 'conduct, coordinate and execute activities aimed at the discovery, prevention and shutdown of enemy activity,' including protecting President Maduro." *Id*. at ¶ 100.

(4) after his release from custody, "[t]he Maduro Regime continued to hold Mr. Marron's passport and told him he could not leave Venezuela or use any of his assets to survive in Venezuela." *Id*. at ¶ 18.

The Plaintiffs' allegations make clear that they claim to be victims of terrorism perpetrated by government officials and entities acting on behalf of a foreign state. Accordingly, to execute against the alleged agencies or instrumentalities of those state actors, Plaintiffs must satisfy TRIA's requirement of obtaining a judgment against a "terrorist party," which in this context is "a foreign state designated as a state sponsor of terrorism." TRIA § 201(d)(4). Rather than meeting the threshold requirement that the foreign state actually be designated as a state sponsor of terrorism, Plaintiffs attempt to circumvent it by naming individual government officials who are part of the foreign state's apparatus (the "Maduro Regime") and asking this Court to label them "terrorists" under the non-state actor provisions of TRIA. But the power to determine whether a foreign state, through its officials, sponsors terrorism lies exclusively with the Executive Branch. And to the extent the Executive Branch makes such a determination, it alone has the power to formally designate that government. It has not done so with respect to Venezuela. Thus, is it improper for the Plaintiffs to ask this Court to make a determination that is exclusively (and properly) reserved to the Executive Branch in the person of the Secretary of State.

Most importantly, TRIA functions within the broader framework of U.S. economic sanctions programs, which serve an essential component of the country's foreign policy and national security strategy. Accordingly, the interpretation of TRIA's provisions, including the provision at issue here pertaining to foreign states, has significant implications for the Executive Branch's ability to enforce sanctions in alignment with national interests and to influence U.S. foreign relations.

**III.    If the Court is Inclined to Allow Proceedings on the A/I Issue to Commence, the Interested Parties Request that the Court Issue a Scheduling Order Setting Trial.**

The Eleventh Circuit has held that "because an agency or instrumentality determination carries drastic results – the attachment and execution of property – it undeniably implicates due process concerns . . . [and] are entitled to notice and an *opportunity to be heard* in order to rebut the allegations and preserve their possessory interest in blocked assets. *Stansell*, 771 F.3d at 726 (emphasis added). "Without notice and *a fair hearing where both sides are permitted to present evidence*, the third party never has an opportunity to dispute its classification as an agency or instrumentality." *Id.* at 727 (emphasis added). Such a hearing has been denied only where an interested party "not once had  . . . explicitly presented argument or evidence" to refute the alleged A/I status. *Stansell v. Lopez* Bello, 802 F. App'x 445, 448 (11th Cir. 2020). Here, the Interested Parties explicitly deny the allegations against them. *See* Gorrin Decl., ¶¶ 1-21 and Perdomo Decl., ¶¶ 1-22.

The Eleventh Circuit has held that "under both federal law and Florida law summary judgment should be denied where conflicting inferences can be drawn from the evidence," and required a trial on the agent or instrumentality determination. *Stansell*, 45 F.4th at 1356. In that case, after an evidentiary hearing, the target of execution proceedings introduced his declaration. The declarant stated based on "personal knowledge" that he never "directly or indirectly ... [was] associated with[,] provided material assistance to[,] engaged in financial transactions with[,] or supported in any way, financially, logistically, or otherwise, the FARC," and that precluded summary judgment. *Id.* at 1358-60. The Interested Parties submit the Declarations of Gorrin (Exhibit 1) and Perdomo (Exhibit 2), which do the exact same thing – they completely deny any connection at all to terrorism or any terrorist party. That is sufficient to preclude summary judgment and to require a trial – whether bench or jury – on the A/I issue.

If the Court is to permit any "agency or instrumentality" proceedings at all, it should deny the Plaintiffs' motions for writs of execution and garnishment and issue a scheduling order setting a jury trial on the "agency or instrumentality" determination. *See Caballero v. Fuerzas Armadas*

*Revolucionarios de Colombia*, No. 1:18-CV-25337-KMM, 2023 WL 187685, at *10 (S.D. Fla. Jan. 15, 2023) ("the Interested Parties are entitled to—and due process requires—an opportunity to be heard in this matter . . . . By separate order, the Court will issue a scheduling order regarding the Motion to Vacate."); *Caballero v. Fuerzas Armadas Revolucionarios de Colombia*, No. 1:18-CV-25337-KMM,  ECF No. 216  (S.D. Fla. Jan. 27, 2023) (scheduling trial on "trial on the issue of agency and instrumentality determination").

Accordingly, if the Court is inclined to permit Plaintiffs to proceed with an A/I determination despite the procedural and evidentiary deficiencies outlined above, it should issue a scheduling order setting the matter for trial. This would ensure a fair and orderly adjudication, consistent with due process that everyone who appears before the courts of the United States is lucky enough to receive  – including foreign nationals designated by OFAC. *See Stansell*, 771 F.3d at 725 ("[w]here a district court exercises its jurisdiction over property within the United States, . . . the owners of that property have due process rights regardless of their location or nationality.").

## CONCLUSION

WHEREFORE, the Interested Parties respectfully request that the Court quash, modify, or otherwise vacate the Writs of Garnishment and Writs of Execution (ECF Nos. 319, 323-328, 336-337) and deny the Plaintiffs' Motion for Writs of Garnishment (ECF No. 318), Plaintiffs' Motion for Writ of Execution (ECF No. 322), and Plaintiffs' Motion for Writ of Garnishment (ECF No. 334).

## REQUEST FOR HEARING

Pursuant to Local Rule 7.1(b), the Interested Parties hereby request oral argument given the complexity of the issues, the amount in controversy, and the significance of the allegations. The Interested Parties estimate that oral argument will require approximately 1-2 hours.

## <u>JURY DEMAND</u>

Plaintiffs hereby demand a trial by jury on all issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure, Fla. Stat. § 56.18, Fla Stat. § 77.08, the U.S. Constitution, and any other applicable law.

By: /s *Lisandra Guerrero*
HOWARD SREBNICK
Florida Bar No. 919063
E-mail: HSrebnick@RoyBlack.com
LISANDRA GUERRERO
Florida Bar No. 0098521
E-mail: LGuerrero@RoyBlack.com
**BLACK SREBNICK**
201 South Biscayne Boulevard, Suite 1300
Miami, Florida 33131 / Ph. (305) 371-6421

*/s/ Robert T. Dunlap*
ROBERT T. DUNLAP
Florida Bar No. 119509
Email: rdunlap@fnf.law
**Freedman Normand Friedland LLP**
1 SE 3rd Avenue, Suite 1240
Miami, FL 33131

*Counsel for the Interested Parties*